UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RICHARD ALLEN BELL
DC Number: C03384
    Plaintiff,

v.                    Case No.: 3:22-cv-4701-MCR-HTC

OFFICER JACOBSEN, et al.,
    Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Richard Bell, Comes Now pro se in response to Defendants Drew Jacobsen and Justin Neel (Collectively "Defendants")'s Motion for Summary Judgment. The disputed facts set forth through the Affidavits, depositions, and documents produced herein establish unequivocally that there are indeed Numerous genuine issues as to material facts at issue that require a trial to be decided by a trier of facts. Therefore, Defendants Are not entitled to judgment as a matter of law.

## BACKGROUND

This is a pro se civil rights action for damages brought by a State prison inmate against two former Correctional Officers pursuant to §1983 of title 42 of the United States Code. Plaintiff's Complaint is predicated upon claims that (i) Defendant Drew Jacobsen, whom was a Correctional Officer employed by Florida Department of Corrections ("FDOC") And Acting under the color of State law, did Knowingly and intentionally recklessly disregard the Knowledge he possessed of the substantial risk of physical harm posed to Plaintiff by his cellmate the further compounded this violation by further inciting then arming, Plaintiff's cellmate to assault Plaintiff; (ii) Defendant Lieutenant Justin Neel, whom was a Supervisory level Correctional Officer employed by Florida Department of Corrections and Acting under the color of State

1

law, did knowingly and intentionally recklessly disregard the knowledge he possessed of a substantial risk of physical harm posed to Plaintiff by his cellmate due in part by the reckless actions of his subordinate officer, Defendant Jacobsen, that he also knew about; And (iii) both Defendants Drew Jacobsen and Justin Neel knew, or should have reasonably known, that their actions or failure to act violated Plaintiff's Constitutional right by placing Plaintiff at a substantial risk of serious harm which inturn caused Plaintiff to be grossly, nearly fatally, injured.

The Factual Allegations contained in Plaintiff's Second Amended Complaint Are as follows:

Defendants Jacobsen and Neel were deliberately indifferent by their individual Acts of knowingly and intentionally recklessly disregarding the knowledge they possessed of a substantial risk of physical harm posed to Plaintiff by his cellmate After Plaintiff conveyed to both these officials this information prior to the September 11, 2020 inmate assault incident Plaintiff was victim to detailed in the instant Complaint. Defendant Jacobsen's deliberate indifference was established first by him recklessly disregarding the information Plaintiff conveyed to him directly pertaining to the Plaintiff's cellmate's mental health issues that made him paranoid and hostile toward Plaintiff And that this hostile paranoia had already cause numerous conflicts that had nearly turned violent, the information that Plaintiff's cellmate had already threatened to kill the Plaintiff because he believed Plaintiff was plotting on him, Plaintiff even exemplified to Defendant Jacobsen his cellmate, inmate Mike's, propensity to act upon these delusions by conveying information about Mike's criminal case for Assaulting a law enforcement officer with a deadly weapon because he believed the officer was plotting on him. Plaintiff then requested of Defendant Jacobsen for a cell transfer for he or his cellmate or some form of intervention. Defendant Jacobsen disregarded all this information and refused to act upon Any of the information about the risk of harm posed to Plaintiff by his cellmate and instead proceeded to further incite a physical altercation between the two cellmates by stating to Plaintiff that they were going to "either get along or go ahead and kill each other." And then communicate his intent to recruit other officers Plaintiff might address the issue with, not to intervene either. Defendant Jacobsen then further incited a physical altercation between the cellmates by taking measures to exasperate inmate Mike's paranoia by telling him that while he was away from the cell Plaintiff had stated to him that either Officers were going to move inmate Mike or Plaintiff was going to fuck him up.

Thereafter inmate Mike returned to the cell and confronted Plaintiff about Defendant Jacobsen's remark that Plaintiff had threatened to harm him. Inmate Mike wanted to fight plaintiff at that time however, Plaintiff was able to de-escalate the confrontation by refusing to fight. Defendant Jacobsen then a few days later armed Plaintiff's cellmate with a instrument to use as a weapon against Plaintiff in a attack by illicitly allowing inmate Mike to keep a tray in his cell after mealtime.

Defendant Justin Neel's deliberate indifference and Bystander's Liability was established by him possessing and also recklessly disregarding the knowledge he possessed, the same knowledge Defendant Jacobsen possessed, of a substantial risk of physical harm posed to Plaintiff by his cellmate and furthermore about the reckless actions of his direct subordinate officer, Defendant Jacobsen, to incite a physical altercation between the two cellmates which Plaintiff conveyed to him directly in a one on one conversation yet he refused to act in any way to address the risk to Plaintiff or intervene by moving the Plaintiff or his cellmate to resolve the matter. Thereafter, Plaintiff suffered a brutal assault by his cellmate in his sleep with the tray Defendant Jacobsen had allowed him to keep then post the inmate assault complicit non-party officials removed the weapon used from the scene that Defendant Jacobsen had provided and omitted it from the incident, and disciplinary, reports to conceal Defendant Jacobsen's culpability and complicity in the attack on Plaintiff.

## STATEMENT OF FACTS

The following Exhibits are filed contemporaneously with this motion

### Doc. A. Request form submitted by Plaintiff

Plaintiff submitted a request form to classification at his current institution attempting to procure a copy of the falsified disciplinary report omitting the weapon (tray) used in the September 11, 2020 assault on Plaintiff. Plaintiff has produced this document in support of paragraph 8 of Plaintiff's affidavit, attached as document "W", explaining why he is unable to produce a copy of the disciplinary report.

### Doc. B. Request form submitted by Plaintiff

(See document "A" description)

Doc. C. Informal Grievance submitted by *Plaintiff*
 (See document "A" description)

Doc. D. Request Form submitted by *Plaintiff*
 (See document "A" description)

Doc. E. Formal Grievance submitted by *Plaintiff*
 (See document "A" description)

Doc. F. Plaintiff's Request For Production of Documents
 Plaintiff has attached this document in support of paragraph 8 of Plaintiff's Affidavit's claim that he requested the disciplinary report against Bashan Mike for the September 11, 2020 assault on Plaintiff

Doc. G. Interdepartment Email Incident Report
 This Incident report from Emergency Action Center establishes that staff observed inmate Mike assaulting Plaintiff with a weapon unknown to the official sending the email because "Staff did not recover the weapon".

Doc. H. Interdepartment Email Incident Report
 (See document "G" description)

Doc. I. Interdepartment Email Incident Report
 (See document "G" description)

Doc. J. Optometry Medical Report
 This shows that plaintiff suffered a trauma induced cataract as a result of the September 11, 2020 assault. A injury caused by the debris of a weapon and not conducive with Defendant's theory of events of the attack on Plaintiff being perpetrated by Mike with his fists.

Doc. K. Optometry Medical Report

(See document "J" description)

Doc. L.  Optometry Medical Report
   (See document "J" description)

Doc. M. Optometry Medical Report
   (See document "J" description)

Doc. N.  Affidavit of Isaac Day - Nov. 15, 2021
   In this sworn Affidavit Isaac Day gives his witness Statement of being present at Santa Rosa Correctional Institution in B-dormitory on September 11, 2020 and witnessing Non-Party officials tamper with evidence. And State Plaintiff had been beat with a tray - a bloody tray they were holding after removing it from the Scene of the attack.

Doc. O. Affidavit of Isaac Day - Jan. 17, 2022
   (See document "N" description)

Doc. P. Second Amended Complaint's Statement of Facts
   In this Statement of Facts Plaintiff give his initial description of the events that he predicates his claims Against the Defendants upon.

Doc. Q. Informal Grievance Submitted by Plaintiff
   In this grievance Plaintiff grieves information produced by Defendants during Discovery that informed Plaintiff that he was classified with the FDOC database as have two prior escape charges. Which the grievance respondent indicated in their denial is incorrect. This Same database, and Department official, are the Same that was relied upon by the Defendants to refute Isaac Day's testimony by alleging he was not present at Santa Rosa on September 11, 2020. Showing that the information presented to refute Isaac Day's by Defendants is not by itself enough to discredit Day's Affidavit.

Doc. R.  Defendant Jacobsen's Interrogatories Responses
   Defendants' response to interrogatory #4 establish through their admission of what

5

a reasonable response would be to knowledge of a situation such as the one described in Paragraphs 19-30 of the instant complaint to their own Knowledge they did not respond reasonably.

Doc. S. Defendant Neel's Interrogatories Responses
    (See document "B" description)

Doc. T.  Chapter 33-103.005 (5), F.A.C. Grievance Procedures
    This policy disproves Defendants theory of officials Non response to Plaintiff's grievance filed prior to the September 11, 2020 attack, discredits the seriousness of the risk of harm to Plaintiff.

Doc. U.  Formal Grievance Submitted by Plaintiff
    This grievance which was filed 1/28/2021, 10 months before coming back in contact with Isaac Day, disproves Defendants' assertion that Plaintiff had no prior knowledge he was assaulted with a tray. Day was merely the one to provide Plaintiff definite personal knowledge of what he knew was the weapon used in the attack on Plaintiff.

Doc. V. Secretary's Office Grievance Submitted by Plaintiff
    (See document "U" description)

Doc. W.  Affidavit of Richard Bell

Doc. X.  Deposition of Plaintiff Richard Bell
    Plaintiff has only provided the limited deposition transcripts he procured by them being attached to Defendants' summary judgment motion.

Date 11/17/2023

                                    Respectfully Submitted,
                                    /s/ Richard Bell
                                    Richard A. Bell   DC# C03384
                                    Charlotte Correctional Institution
                                    33123 Oil Well Road
                                    Punta Gorda, FL  33955

6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RICHARD ALLEN BELL
DC Number: C03384
        Plaintiff,

v.                                          Case No.: 3:22-CV-4701-MCR-HTC

OFFICER JACOBSEN, et al.,
        Defendants.

PLAINTIFF'S STATEMENT OF DISPUTED FACTUAL ISSUES

        Defendants' have moved for summary judgment on the Plaintiff's claim concerning failure to protect Plaintiff from an attack by another inmate. Pursuant to Local Rule of this Court, the plaintiff submits the following list of genuine issues of material fact that require the denial of defendants motion.

1. Wether Plaintiff spoke to both Defendants about the Ordeal with his cellmate, Bashan Mike, and requested a cell change for either he or his cellmate prior to the September 11, 2020 inmate assault incident. See, Doc. P, Paragraph 25 and 30; declaration para. 9 and 14; Doc. X, pg. 105, L. 10 - pg. 106, L. 13, pg. 130, L. 1-22; Affidavit of Richard Bell, para. 10 and 11

2. Wether Plaintiff provided both Defendants sufficient information so that they both subjectively knew of the substantial risk to Plaintiff after he'd spoken to both Defendants individually. See, Doc. P, para. 25 and 30; declaration para. 9 and 14; Doc. X, pg. 105, L. 10-pg. 106, L. 13, pg. 130, L. 1-22; Docs. "R" and "S", Q & A # 4 and 5; Affidavit of Richard Bell, para. 10 and 11.

3. Wether Defendants responded reasonably, under the circumstances, to the knowledge of substantial risk to Plaintiff and were their actions/inaction reckless to the point of violating Plaintiff's 8th U.S.C. Amendment right and constitute deliberate indifference. See, Doc. P, para. 25-26, 30, 31; declaration 9-11 and 14; Docs. "R" and "S", Q & A # 4 and 5; Affidavit of Richard Bell, para. 11

7

4. Wether there was a causal connection between Defendants actions/inaction and the inmate assault on Plaintiff by his cellmate to establish causation. See, Doc. P, para. 25-26, 30, 31, 44-45, 48-49; declaration 9-11, 14, 18, 19; Affidavit of Richard Bell, para. 7, 11; Doc. G; Doc. H; Doc. I.

5. Wether Defendant Jacobsen allowed Plaintiff's cellmate to retain a tray in his cell. See, Doc. P, para. 31, 45, 47-50; declaration, para. 15, 18-20; Doc. X, Pg. 93, L. 10-16; Affidavit of Richard Bell, para. 10, 11; Doc. G; Doc. H; Doc. I.

6. Wether Defendant Jacobsen subjectively knew or should have reasonably known that the tray he allowed Plaintiff's cellmate to keep could be used as a weapon. See, Doc. P, para. 31, 45, 47-50; Doc. X, pg. 130, L. 1-22; Affidavit of Richard Bell, para. 7

7. Wether Plaintiff was assaulted by his cellmate with a tray. See, Doc. X, para. 31-34, 45, 47-50; declaration, para. 15-20; Doc. X, pg. 76, L. 10-pg. 77, L. 25; Doc. G; Doc. H; Doc. I; Doc. J; Doc. K; Doc. L; Doc. M; Doc. N; Doc. O; Affidavit of Richard Bell, para. 11

8. Wether Defendant Jacobsen made statements to both Plaintiff and Plaintiff's cellmate that were maliciously and sadistically intended to incite physical violence between the two cellmates. See, Doc. P, para. 25-28, 32; declaration, para. 10-12; Doc. X, pg. 130, L. 1-pg. 132, L. 21; Affidavit of Richard Bell, para. 7, 11.

9. Wether non-party officials removed the weapon (tray), provided by Defendant Jacobsen, from the scene after the attack and omitted it's use as the weapon in the assault against Plaintiff from the subsequent incident and disciplinary reports in a attempted cover up. See, Doc. P, para. 45, 47-50; declaration, para. 18-20; Doc. G; Doc. H; Doc. I; Affidavit of Richard Bell, para. 8, 11.

10. Wether there exists a sufficient nexus between officials' concealment of the weapon (tray), provided by Defendant Jacobsen, and the prosecution of the Defendants for their liability for the attack on Plaintiff to constitute a showing of consciousness of guilt. See, Doc. P, para. 31-34, 45, 47-50; declaration, para. 15-20; Doc. X, pg. 76, L. 10-pg. 77, L. 25; Doc. G; Doc. I;

Doc. H; Doc. J; Doc. K; Doc. L; Doc. M; Doc. N; Doc. O; Affidavit of Richard Bell, para. 11

11. Wether Witness Isaac Day was present at Santa Rosa Correctional Institution in B-dormitory cell B-1112 at the time of the September 11, 2020 inmate assault incident involving Plaintiff as he has sworn to and is offering a credible testimony of what he actually witnessed. See, Doc. N; Doc. O; Doc. Q; Affidavit of Richard Bell, para. 9

12. Wether Defendants subjectively knew or should have reasonably known that their actions/inaction violated Plaintiff's U.S.C. Amendment right. See, Docs'R and "S", Q&A #4 and 5; Doc. P, para. 45, 47-50; Doc. X, pg. 130, L. 1-12; Affidavit of Richard Bell, para. 7, 11

13. Wether prison authorities' nonresponse to Plaintiff's grievance filed prior to the September 11, 2020 inmate assault incident, pertaining to Plaintiff's ordeal with his cellmate reflected that inaction was a reasonable response to Plaintiff's claim of a substantial risk posed to him made prior to the attack on Plaintiff or merely reflects prison authorities mishandling of his grievance. See, Doc. T, Chapter 33-103.005(5)

Date: 11/17/2023

/s/ Richard Bell

Richard A. Bell DC# C03384

Charlotte Correctional Institution

33123 Oil Well Road

Punta Gorda, FL 33955

9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RICHARD ALLEN BELL
DC Number: C03384
       Plaintiff,

v.                                                    Case No.: 3:22-cv-4701-MCR-HTC

OFFICER JACOBSEN, et al,
       Defendants.

_____/

DECLARATION IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

Richard Bell states:

1. I am the Plaintiff in the above-entitled case. I make this declaration in opposition to Defendants' Motion for summary judgment on my claim concerning the Defendants' deliberate indifference by their failure to protect plaintiff from the assault by his cellmate.

2. The defendants' affidavits claim, in summary, that they have no recollection of plaintiff or his cellmate, Rashan Mike, or of the events that caused and precipitated the September 11, 2020 inmate assault incident. They both deny having any prior knowledge of, complicity in, or culpability for, the September 11, 2020 attack on plaintiff, or of having any knowledge plaintiff requested he or Mike be moved.

3. The defendants are not entitled to summary judgment because there are genuine issues of material fact to be resolved. These issues are identified in the accompanying statement of Disputed Factual Issues filed by the Plaintiff pursuant to Local Rule 56.1 of this district court. The facts are set out in this declaration.

4. On August 3, 2020 inmate Rashan Mike was brought to my assigned cell B-1114 at Santa Rosa Correctional institution to be my cellmate, as set forth in my complaint at paragraph 19-20.

5. Mike suffered from psychological issues which made him paranoid and hostile to other inmates and and officials and me whom was his cellmate, as set forth in my complaint at paragraph 20.

6. Between August 1, 2020 and August 20, 2020 I and Mike had several hostile altercation, that nearly became physically violent, due to his paranoia and that lead to Mike threatening to kill me because he believed I was plotting on him, as set forth in my complaint at paragraph 21.

7. On approximately August 25, 2020 my cellmate Mike pulled his criminal case Discovery documents from his locker and showed them to me while explaining that he was serving a life sentence for assaulting a law enforcement officer with a knife because he believed the officer was plotting on on him, as set forth in my complaint at paragraph 22.

8. On approximately August 26, 2020 I submitted a grievance seeking a cell change describing Mike's psychological issues and how they were creating a hostile and dangerous enviroment leading to Mike threatening to kill me because he now believed I was plotting on him. This grievance was never responded to, as set forth in my complaint at paragraph 23 and deposition of Plaintiff, Doc. X, pg. 88, L. 3 - pg. 89, L. 25

9. On approximately August 30, 2020 I stayed back at shower time while my cellmate went to shower to speak one on one with an officer about obtaining a cell change for either me or my cellmate. At that time I spoke to Defendant Jacobsen and conveyed my cellmate's mental health issues and how they were making him hostile toward me because he was paranoid and had threatened to kill me because he believed I was plotting on him. I attempted to convey the seriousness of this threat of violence by exemplifying Mike's prepensity to act upon these delusions by relaying details about Mike's criminal case for assaulting a L.E.O. with a knife because he believed the officer was plotting on him. I then requested his intervention to have me moved cells, as set forth in my complaint at paragraph 25, and Doc. X, deposition of Plaintiff, pg. 105, L. 10 - pg. 106, L. 13, as 130, L. 1-22.

10. Defendant Jacobsen disregarded all this information I relayed to him pertaining to the issue with my cellmate and stated "Neither of you are getting moved! Either get along or go ahead and kill each other." And then indicated his intentions to enlist other officers not to intervene either, as set forth in my complaint at paragraph 25; and Doc. X, deposition of Plaintiff, Pg. 105, L. 10 - pg. 106, L. 13, pg. 130, L. 1-22; Affidavit of Richard Bell, para. 7 and 11.

11. Defendant Jacobsen then incited altercation between me and Mike by telling Mike I had threatened that if Mike wasn't moved from my cell I was going to fuck him up, as set forth in my complaint at paragraph 25-28, 32; Doc. X, deposition of Plaintiff, pg. 130, L. 1 - pg. 132, L. 21; Affidavit of Richard Bell, para. 7, 11.

12. Upon returning to the cell Mike confronted me about Defendant Jacobsen's statement to him that I had threatened to fuck him up. Mike wanted to fight, but I avoided a violent encounter with Mike by denying I made that comment getting back on my top bunk and refusing to fight him, as set forth in my complaint at paragraph 27-28; Doc. X, deposition of plaintiff, pg. 130, L. 1 - pg. 132, L. 8.

13. After the incitement incident when Defendant Jacobsen told Mike I threatened to harm Mike he started acting even more paranoid and hostile, as set forth in my complaint at paragraph 28.

14. On Approximately Between September 5 and 6, of 2020 Mike went to a dental call-out and while he was away from the cell B-dorm's Lieutenant Neel did a security round in B-1 quad, where I was housed. At that time I spoke to him and conveyed the ordeal concerning my cellmate including Mike's psychological issues that made him paranoid and hostile toward me and his subsequent threats to kill me because he believed I was plotting on him. I conveyed the details about his criminal case and the fact that I had already conveyed to Defendant Jacobsen these information and his subsequent reckless actions to incite physical violence between I and my cellmate. I requested his intervention by having either or my cellmate moved. He refused to intervene and move either of us or act in any way to resolve the matter. As set forth in my complaint at paragraph 30; and Doc. X, deposition of plaintiff, pg. 132, L. 12-21; Affidavit of Richard Bell, paragraph 11.

15. Approximately between September 5-10, 2020 Defendant Jacobsen at dinner meal gave my cellmate Mike an extra tray of food and allowed him to retain the tray in the cell after tray pick up. When urged by me to finish eating and give the tray back Mike stated, "No, It's okay. Jacobsen knows what's up. He straight. I'll just push it back at breakfast." As set forth in my complaint at paragraph 31; and Doc. X, deposition of plaintiff, pg. 97, L. 1-16; Affidavit of Richard Bell, paragraph 10.

16. On September 11, 2020 approximately between 12:00 A.M. and 3:00 A.M. while I was asleep in my assigned top bunk my cellmate, Mike, attacked me in a brutal assault, with the tray Defendant Jacobsen armed him with. I came awoke for a few moments of lucidity after I was struck and saw Mike over me in the dark poised to strike me again with something large in his hands, though I couldn't tell exactly what it was because the lights were off, subsequently I was struck again and was knocked unconscious while Mike continued to beat me. As set forth in my complaint at paragraphs 32-36; Doc. X, deposition of plaintiff, pg. 76, L.10 - pg. 77, L.25; Doc. G; Doc. H; Doc. I; Doc. J; Doc. K; Doc. L; Doc. M; Doc. N; Doc. O; Affidavit Richard Bell, paragraph 11.

17. In the attack I suffered a nearly (2) week long coma, broken jaw, broken nose, broken eyesocket, a trauma induced cataract, the loss of (3) teeth, (2) cranial fractures, numerous lacerations to the face and head, and massive brain swelling and hemorraging and some nerve damage, as set forth in my complaint at paragraph 39.

18. Between October 1-8, of 2020 the D.R. investigator came to see plaintiff in the infirmary at Santa Rosa C.I. to request from me a written statement for the disciplinary proceeding for the DR written against my cellmate Mike for the September 11, 2020 assault. At that time the DR was read to me and upon my request I was allowed to see it as well. I noticed the DR didn't indicate the use of a weapon in the attack although after waking up out of the coma the hospital nurse and doctor treating my injuries told me I'd been beat with a food tray by my cellmate. Later this fact would be corroborated by the Optometrist at

Butler's Regional Medical Center who Notified me I'd suffered a trauma induced cataract caused by some form of debris that entered and damaged my lens at the time of the initial injury and then crystalized into a cataract. A injury Not conducive with the disciplinary report. later this was reinforced when plaintiff's brain injuries healed and I begin to regain portions of my memory and recalled the few lucid moments of the attack and seeing Mike poised over me with a large object in his hand before being struck with it and losing conscious-Ness. As set forth in my complaint at paragraph 41, 44-45; Doc. X, deposition of plaintiff, pg. 76, L.2 ~ pg. 77, L.9; Doc. G; Doc. H; Doc. I; Doc. J; Doc. K; Doc. L; Doc. M; Doc. N; Doc. O; Affidavit of Richard Bell, paragraph 6, 8, and 11.

19. On November 15, 2021 while housed at Charlotte C.I. I was reacquainted with a inmate Named Isaac Day whom was housed in a cell across from me at Santa Rosa C.I. on September 11, 2020. Isaac Day relayed his personal knowledge to me that I had been assaulted with a tray having witnessed a officer, shortly after the attack, enter the cell where the attack occured retrieve a bloody tray from the cell and hand it to a Lieutenant as he listened to these officers discuss it being the weapon used in the assault on me. Day also expressed his suspect at the time that their was going to be a cover up when he witness the Lieutenant leave with the tray. As set forth in my complaint at paragr-aphs 47-49; Doc. X, pg. 77, L. 5-22; Doc. N; Doc. O; Doc. G; Doc. H; Doc. I; Doc. W, Affidavit of Richard Bell. Paragraph 9.

20. On November 15, 2021 and January 17, 2022 Isaac provided me sworn affidavits describing what he witnessed the morning of September 11, 2020, As set forth in my complaint at paragraphs 50; Doc. N; Doc. O; Doc. W, paragraph 9.

Pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Date : _____

/s/ _Richard A. Bell_

Richard A. Bell DC# C03384
Charlotte Correctional Institution
33123 Oil Well Road
Punta Gorda, FL 33955

## DECLARATION OF OATH

**Under the penalties of perjury, I,** _Richard A. Bell_ ,
declare that I have read the foregoing DECLARATION and that the facts stated in it
are true, pursuant to Florida Statutes, Chapter 92.525, on this ___ day of
_November 17_ , 20 _23_.

_Richard Bell_
Affiant, Declarant

## NOTARY

**STATE OF FLORIDA)**
**COUNTY OF** _Charlotte_ )

Before me, the undersigned authority, this day personally appeared
_Richard Bell_ , who first being duly sworn, says that he is the
Defendant/Appellant/Petitioner in the above styled cause, that he has read the
foregoing document, and has personal knowledge of the facts and matters therein
set forth and alleged and that each and all of these facts and matters are true and
correct.

_Erika McDermott_
(your signature)

The forgoing instrument was acknowledged before me this _17_ day of
_November_ , 20 _23_ by _Richard Bell_ ,
who is personally known to me or has produced a Department of Corrections I.D.
as identification and who did take an oath.

_4/14/2027_
MY COMMISSION EXPIRES

14

**ERIKA MCDERMOTT**
Notary Public
State of Florida
Comm# HH376028
Expires 4/14/2027

NOTARY PUBLIC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

RICHARD ALLEN BELL
DC Number: C03384
    Plaintiff,

v.
                Case No.: 3:22-CV-4701-MCR-HTC

OFFICER JACOBSEN, et al.,
    Defendants.

_____ /

## PLAINTIFF'S BRIEF WITH MEMORANDUM IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION

### Statement of the Case

This is a §1983 action filed by a Florida Department of Corrections prisoner at Charlotte Correctional Institution seeking damages based on the Defendants' failure to protect Plaintiff from an attack by his cellmate while housed at Santa Rosa Correctional Institution. Defendants have filed a Motion for Summary Judgment as to Plaintiff's failure to protect claim against Defendants Officer Drew Jacobsen and Lieutenant Justin Neel arguing that they had No knowledge of a substantial risk to Plaintiff and that their conduct did not violate the Constitution.

### Statement of Facts

The Plaintiff's declaration submitted in response to the defendants' motion states that between August 1-5, 2020 Rashan Mike became plaintiff's cellmate. Mike suffered from psychological issues which made him paranoid and hostile toward other inmates. Those issues led to multiple heated verbal altercations between Plaintiff and Mike which had nearly turned physically violent. Mike threatened to kill Plaintiff because he believed Plaintiff was plotting on him and showed Plaintiff documents pertaining to his criminal case explaining that he was serving a life sentence for assaulting an Law Enforcement Officer with a knife because he believed the Officer was plotting on him. The following day, Plaintiff filed a grievance describing his ordeal with his cellmate and requesting a cell change, though

This grievance was never responded to. Plaintiff then spoke one on one with Defendant Jacobsen pertaining to his ordeal with his cellmate. Plaintiff relayed Mental Health issues and described their effect of making Mike paranoid and hostile toward Plaintiff that had caused the cellmates to get in multiple verbal altercations that had nearly turned violent and had led to Mike threatening to kill Plaintiff because Mike believed Plaintiff was plotting on him. Plaintiff also described the incident involving, and the information he'd learned regarding, Mike's criminal case. Plaintiff then told Defendant Jacobsen he feared for his own safety or what he might be forced to do to defend himself and requested a cell change. Defendant Jacobsen refused to move either cellmate and then went further to incite a physical altercation between Plaintiff and his cellmate by first telling Plaintiff "Either get along or go ahead and kill each other" then conveyed his intent to enlist other officers to not intervene and move the cellmates either, And then stated to Plaintiff's cellmate Mike that while he was away from the cell Plaintiff had told him that officers were going to either move Mike out of the cell or Plaintiff was going to fuck him up. Defendant Jacobsen's statement incited an immediate physical altercation on that day, however, Plaintiff eluded that physical conflict by denying he stated that, getting in his top bunk and refusing to fight. A few days later Plaintiff spoke to Defendant Lieutenant Neel while his cellmate was away from the cell at a call out. Plaintiff conveyed all the same information about his ordeal with his cellmate that he had explained to Defendant Jacobsen and also described Defendant Jacobsen's acts to further incite a physical altercation between he and his cellmate and effect those efforts had had on his cellmate Once. Plaintiff then requested Defendant Neel intervene by having either or his cellmate removed from the cell. Defendant Lieutenant Neel refused to move either cellmate or act in anyway to address the matter. After Plaintiff's discussion with Defendant Neel, Defendant Jacobsen while feed dinner meals gave Mike an extra tray at meal time and allowed Mike to retain the tray after tray pick up to later use as a weapon in a attack against Plaintiff. Days later Mike attacked Plaintiff in his sleep with the tray Defendant Jacobsen had provided him. Plaintiff was beat into a two week coma and suffered severe injuries including brain trauma, broken jaw, broken eye socket, two cranium fractures, a trauma induced cataract, And the loss of three teeth. After the attack Non-party officials then removed the weapon (confinement tray) used in the attack from the scene and omitted it's use in the attack from the resulting incident and disciplinary report to conceal Defendant Jacobsen's culpability and complicity in the attack.

      The Defendant's affidavits tell a different story. They both claim not to know Plaintiff or his cellmate they both deny having any knowledge about the conflict between Plaintiff and Mike or having denied having denied Plaintiff's request to move he or his cellmate. Defendant Jacobsen additionally denies having made remarks to Plaintiff or his cellmate to incite

16

a physical altercation or allowing Mike to retain a food tray

## ARGUMENT
## POINT I
## THERE ARE GENUINE ISSUES OF MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT FOR THE DEFENDANTS ON THE PLAINTIFF'S FAILURE TO PROTECT CLAIM

Summary judgment is to be granted only if the record before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56 (c), Fed. R. Civ. P. A "Material" fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

The declaration of the plaintiff and the defendants' are squarely contradictory as to the roles the Defendants played in causing, and the events that precipitated, the 9/11/2020 inmate attack on Plaintiff and ultimately wether Defendants caused and are liable for, the inmate assault on Plaintiff. The allegations in Plaintiff's declaration portray how both Defendants came in possession of the subjective knowledge of the substantial risk of harm to plaintiff and then recklessly disregarded that risk to the plaintiff's detriment. Id. paragraphs 9,10, and 14. It also portrays Defendant Jacobsen's completely needless reckless remarks to both Plaintiff and his cellmate aimed to incite physical violence between the cellmates (Id. paragraphs 10-12) and then further acted maliciously by illicitly arming plaintiff's cellmate with with a instrument to use as a weapon in attack on plaintiff. Id. paragraph 15. The declaration finally portrays how non-party officials subversively acted to conceal evidence that supported Defendants' complicity and/or culpa- bility for the attack on Plaintiff. Id. paragraphs 18 and 19. The Defendants, by contrast, claim to not know plaintiff or his cellmate, they both deny having any knowledge of any conflict between plaintiff and his cellmate, or having knowledge plaintiff requested a cell change. Defendant Jacobsen additionally denies having made reckless remarks to plaintiff and his cellmate to incite physical violence between the cellmates, he also denies having allowed (Mike) plaintiff's cellmate, to retain a tray. (See Affidavits of Officer Jacobsen and Captain Neel).

The factual dispute is also material. Under governing law the test of wether prison officials can be found liable for failure to protect depends on: 1) The existence

17

of substantial risk of serious harm; 2) The prison official's deliberate indifference to that risk; and 3) Causation." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed. 2d 811 (1994); (Goodman v. Kimbrough, 718 F.3d 1332 (11th Cir. 2013)" To establish deliberate indifference in this context, a prisoner must show that prison officials subjectively knew of the substantial risk of serious harm and that the prison official knowingly and recklessly disregarded that risk."

In Cantu v. Jones, 293 F.3d 839, 844-45 (5th Cir. 2002) the Court established

"The treatment a prisoner receives in prison and the conditions he
is confined are subject to scrutiny under the Eighth Amendment.
Specifically, prison officials have a duty to protect prisoners
from violence at the hands of other prisoners. A prison official
may be held liable under the Eighth Amendment for denying humane
conditions of confinement only if he knows that inmates face a subst-
antial risk of harm and disregards that risk by failing to take reason-
able measures to abate it..."

Under the Cantu requirement, even if all of Defendants' arguments against the validity and admissibility of Plaintiff's other various forms of evidence establishing Defendants' culpability and liability is correct, which plaintiff will show in the following arguments they are not, a reasonable jury could find in favor of the Plaintiff based solely upon the material facts established through his sworn statements give in Plaintiff's declaration, affidavit, deposition, and complaint. See, Wilson v. Williams, 997 F.2d 348, 350-51 (7th Cir. 1993) (rejecting district court's view that the plaintiff's affidavits could not establish a material factual issue"). This is still true even omitting the facts presented in paragraph 11 of Plaintiff's declaration if the court were to find favor of Defendants' argument regarding the admissability of Mike's statement implicating Jacobsen's incitement, because "Officials have a duty to investigate information suggesting a risk of injury". See, Ginest v. Board of County Comm'rs of Carbon County, 333 F.Supp.2d 1190, 1198 (D. Wyo. 2004); (Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005) (Where prisoner pushed an emergency call button and told staff he was having a conflict with his cellmate, officers claim that he did not know the cellmate was holding a razor blade to the Plaintiff's neck, or that plaintiff would be raped did not show he lacked knowledge of the risk.") Summary judgment must therefore be denied.

18

# POINT II
## CONTRARY TO DEFENDANTS' ARGUMENT THERE IS EXTENSIVE RECORD EVIDENCE AND EVIDENCE THAT RAISE A REASONABLE INFERENCE THAT DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE TO PLAINTIFF AND KNOWINGLY OR SHOULD HAVE REASONABLY KNOWN THAT THEIR ACTIONS/INACTION PLACED PLAINTIFF AT SUBSTANTIAL RISK OF SERIOUS INJURY

A. Plaintiff's Established Record of Evidence of Defendants' Constitutional Violations

Under the CANTU Standard plaintiff has established extensive and more than sufficient record evidence of Defendant's deliberate indifference by them knowingly and recklessly placing Plaintiff at substantial risk of serious harm. Plaintiff first established this record evidence in the sworn statement given in his Second Amended Complaint. See, Id. paragraphs 25-27, 30, and 31-32. (See, Cantu v. Jones); (Farmer, 511 U.S. At 833 "Prison officials have a duty... to protect prisoners from violence at the hands of other prisoners."); ("To raise a cognizable deliberate-indifference claim, an inmate must show that the alleged mistreatment was "objectively" serious and that the defendants "subjectively" ignored the risk to the inmates safety." Leary v. Livingston County, 528 F.3d 438, 442 (7th Cir 2008). That record evidence is corroborated by Plaintiff's sworn statements given at deposition. See Id. pg. 130, L. 1-22, pg. 132, L. 12-21. Corroborated by plaintiff's declaration in response to defendants' motion for Summary Judgment. See, Id. Paragraphs 9-12, 14,15-16. Finally, this record evidence is corroborated by Plaintiff's sworn Affidavit. Id. paragraph 7.

"A supporting or opposing affidavit must be made on personal Knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Rule 56 (e)(1), Fed. R. Civ. P.

A federal statute provides that "in federal Court proceedings written declaration made under penalty of perjury are accepted in lieu of Notarized affidavits. 28 U.S.C. §1746

Plaintiff has established through this proliferation of sworn testimony extensive admissible and cognizant record evidence of the Defendant's deliberate indifference and reckless disregard for the substantial risk of serious harm to plaintiff. (Taylor v.

Rodriguez, 238 F.3d 188, 195 (2d Cir. 2001) ("Prisoner's Affidavit was sufficient without corroboration by other Affidavits and documentation."); Wilson v. Williams, 997 F.2d 348, 350-51 (7th Cir. 1993) (rejecting district court's view that the plaintiff could not establish a material factual issue.); Scicluna v. Wells, 345 F.3d 441, 445 (6th Cir. 2003) (Plaintiff's deposition testimony that he told a prison employee about a risk of assault was enough to defeat summary judgment.) In the instant case Plaintiff illustrates in numerous sworn Statement how he informed both Defendants of the substantial risk of serious harm to him even the fact that his cellmate had literally threatened to kill him yet both Defendant disregarded that risk by failing to take any measures to abate that risk.

## B. Reasonable Inferences of Defendants Deliberate Indifference

Reasonable inferences are established on the record inferring Defendants deliberate indifference and liability for the attack on Plaintiff first through Plaintiff's portrayal of officials acts showing consciousness of guilt. Plaintiff established these facts for the record in Plaintiff's Second Amended Complaint (See, Id. paragraphs 41, 44-45, and 47-50) corroborated by Plaintiff deposition testimony (See, Affidavit of Richard Bell, para. 11), and by Plaintiff's declaration.(See, Id. para. 18-19), also by the eye witness testimony of Isaac Day All describing Non-party officials acts to conceal evidence. (tray provided to Mike illicitly by Defendant Jacobsen to use as a weapon in the 9/11/2020 attack on Plaintiff) that would support Defendants liability for the attack on Plaintiff, by removing the weapon from the scene without documenting or photographing it's presence on the scene and then omitting its presence and use in the attack from the resulting incident and disciplinary reports. See, Doc. W, para. 8. Those inferences were then supported by Isaac Day's sworn Affidavits (See, Docs. N and O), and now have been legitimized by official documents Acquired by plaintiff in Discovery. (See, Docs. "G", Interdepartment email from: EAC-Emergency Action Center, Sent: friday, 9/11/2020, To: Radford, Maurice; And "H", Interdepartment email from EAC, Sent: friday, 9/11/2020, To: Jackson, Kalauree)

These emails establish for the record that Staff observed Plaintiff's cellmate, Bashan Mike, assaulting Plaintiff "with an unknown weapon", it then indicates that for some unknown reason "Staff did not recover the weapon. Isaac Day's sworn testimony establishes why this weapon was not recovered when he describes in his affidavits witnessing an officer enter Plaintiff's cell with a Lieutenant and retrieve a blood tray shortly

20

After Plaintiff and Mike was removed from the cell. He then heard these officials discussing it being the weapon the officer witnessed Mike beating the Plaintiff. This tray then after being removed from the scene is also omitted from the subsequent incident and disciplinary reports. Officials whom were not present to see or hear this exchange are now referring to it as an "unknown weapon" that "staff did not recover".

Officials attempts at concealing this evidence that would otherwise significantly aid in establishing Defendants' culpability and liability is evidence of consciousness of guilt. (Penalver v. State, 926 So. 2d 1118, 1132 (Fla. 2006) "Evidence that a suspect in any manner attempts to evade prosecution after a crime has been committed is admissible and relevant to the consciousness of guilt... Where there are two conflicting theories as to the meaning of evidence tending to show consciousness of guilt, the trial court does not abuse it's discretion in admitting such evidence, "the conflict in the theories goes to the weight to be accorded this evidence, not it's admissibility."

Shortly after the incident on 9/11/2020 a knife was recovered from the cell occupied by Plaintiff and inmate Mike. (See, Doc. "I", Interdepartment email from: James Baxley, sent: Friday, 9/11/2020, To: Knight, Janine) This is significant to note for two reasons. One, though this weapon was found on the scene it was determined not to be the weapon used in the attack on Plaintiff connoted by the information reports emailed between E.A.C. and other department officials that indicated the use of a unknown weapon that was not recovered. And, two, this email also divulges that after the assault incident a statement was taken from inmate Mike and he gave a different version of events for the violent encounter with Plaintiff (See, Doc. "I", email between Baxley and Knight) In Mike's version of events Plaintiff possessed the knife and he was merely defending himself. This is relevant to show wether Mike's or Plaintiff's version of events is the true course of events liability for the violent encounter does not shift from defendants. Defendant Jacobsen's reckless and deliberate indifference to the knowledge he possessed of a substantial risk of harm to Plaintiff and then increased that risk by his remarks aimed at inciting that physical violence between he and his cellmate was the causation that ultimately brought the physical encounter to fruission. Defendant Neel's reckless and deliberate indifference to the substantial risk of serious harm when Plaintiff

21

spoke to him conveyed the hazardous circumstances and requested his intervention, which he refused, was the causation that ultimately brought about the physically violent encounter between Plaintiff and his cellmate. Defendant Jacobsen advised Plaintiff that he and his cellmate would have to either get along or go ahead and kill each other and in Mike's and Plaintiff's version of events that ultimate encounter is what occured to Plaintiff's detriment.

Next, is the reasonable inference created by Plaintiff's injuries, which are inconsistent with Defendants theory of events. Defendants allege Plaintiff was assault by Mike with Mike's fists. In the 9/11/2020 incident Plaintiff suffered, along with a long list of other serious injuries, a trauma induced cataract to his right eye. Plaintiff was notified by the FDOC's Regional Medical Center Optometrist that the cataract, which had not been present prior to the attack, was a particular type of cataract. A "trauma induced cataract" which was the result of some form of debris that had ruptured and damaged the lens in Plaintiff's eye and then crystalized into the cataract. Plaintiff explained to the Optometrist the attack and the he had been beaten with a confinement tray, to which the doctor responded "That definitely explains it." (See, Complaint paragraph 45; and Docs "J"- "M", Optometry medical reports pertaining to Plaintiff's eye injury.) Plaintiff has here again presented evidence on record that raise reasonable inferences in support of Plaintiff's version of events. If this court correctly view all facts and make all reasonable inferences in favor of the nonmoving party summary judgment must be denied. ( Miller v. Leather, 913 F.2d 1085, 1088 (4th Cir. 1990)(Per Curiam)("Miller's version of the incident support a reasonable inference that Leather intended to provoke an incident so as to allow Leather to beat him under the guise of maintaining order or defending himself."); ( Wilson v. City of Chicago, 707 F. Supp. 379, 381-82 (N.D. Ill. 1989) (Summary judgment could not be granted to a police supervisor whose conduct permitted the inference that he condoned or encouraged excessive force).

Finally, as to Defendants assertion that the fact the Plaintiff filed a grievance 2 weeks prior to the 9/11/2020 assault, pertaining to his issue with his cellmate and the fact that grievance was never responded to somehow supports an inference that illegitimizes and undermines the substantialness of the risk to Plaintiff and justifies the Defendants response of recklessly disregarding that knowledge of risk of serious harm to Plaintiff, is illogical and flawed reasoning. Chapter 33-103.005(5), F.A.C. establishes:
   "It is the policy of the department that all inmate request forms be answered." (See, Doc. "T", Chapter 33-103.005(5), grievance procedure.)

22

Therefore, if it is the department's policy to answer all grievances wether meritorious or not, wether concerning grievable issues or not, even when illegible, wether the response is to approve, Deny, or Return the Grievance Without Action, a response will be rendered logic would demand that one conclude that a grievance not responded to at all or returned is the result of mishandling of a grievance and not attributable to merillessness. However, in any case, this argument is once again predicated upon conflicting theories on the interpretation of fact, or rather, material factual disputes which require a trial, (Gilroy v. Gilroy, 163 So. 3d 674 (Fla. 2nd DCA 2015)" The Former Husband's testimony to the contrary simply present a factual dispute for the trial court to resolve") and not grounds for Summary Judgment. As Plaintiff has shown there is extensive record evidence and reasonable inference to support his version of facts such that any reasonable compitent jury could could return a verdict in favor of Plaintiff's claim, Summary Judgment must therefore be denied.

## POINT III
## PLAINTIFF'S SWORN STATEMENTS MADE UNDER PENALTY OF PERJURY ARE SUFFICIENT TO ESTABLISH MATERIAL FACTUAL ISSUES AS A RULE OF LAW AND PLAINTIFF'S STATEMENTS ARE NOT CONTRADICTED BY ANY SUBSTANTIVE RECORD EVIDENCE

Defendants' second argument is predicated wholly upon their allegation that Witness ISAAC DAY had been transfered two weeks prior away from Santa Rosa C.I. And wasn't present at the time of the attack to witness the events he describes witnessing in his affidavit. However, Defendants have presented no definitive or irrefutable documentation or evidence to support this claim because they can't, such evidence doesn't exist, because ISAAC DAY was at Santa Rosa C.I. on 9/11/2020. Instead, Defendants depend on the Department's Self Serving statement of a Department employee, as well as leaving the relay of information subject to human error. As Plaintiff will show, humans are far from infallible and so are computer databases, which are uploaded information by fallible humans.

See, Doc. "Q". This informal grievance filed by Plaintiff is regarding a official FDOC document produced by the same Department official Affiant and

23

incorporated with the same compilation of responsive official documents produced by Defendants during Discovery. This emailed incident report submitted by Lieutenant Drew Dice to various department and state officials describes some details regarding the 9/11/2020 inmate assault involving Plaintiff (See, Doc.'Q') The report incorporates profile information on both Plaintiff and Mike from this same "Florida Department of Corrections' "Corrections Database Center' ("CDC)"  When reciting the database's profile information on Plaintiff it erroneously alleges Plaintiff "has two prior escape charges: Plaintiff has never been charged with, or attempted, escape. Therefore, Plaintiff submitted the indicated grievance regarding the erroneous classification, and recieved the following response:

"A review of your file shows no indication of any escape charge. There is no escape charge that would affect your housing or job placement."

(See Doc.'Q')

So ultimately either the Department's database that this official recovered his information from provided flawed and erroneous information, which would be the same fallible Department database Defendant witness, Sergeant Christy Padgett, acquired her information from. Or the officials whom compiled all this information made erroneous recitation of the database's information. Which of these reasons is the cause for this promulgation of disinformation can not be determined by the documentation and information on record, however, by these documents and disinformation deriving from the same database and same compilation of documents provided by this SAME Department official casts a questionable shadow over the entirety of the information presented through this database and those documents. A signed and dated document, signed in Isaac Day's hand, establishing his presence at Hamilton Correctional Institution would be a different matter, which there are numerous documents that must be sign by an inmate upon his arrival at a new institution. However, Plaintiff has shown in this instance, flawed and erroneous information can and already has been promulgated through the production of information produced by Defendants through this same fallible database, and/or the flawed and erroneous recitation of information provided through this database by these same Department officials. Defendants have hardly presented it refutable or conclusive evidence that Isaac Day was not present at Santa Rosa September 11, 2020 and that he is now offering a fabricated testimony. Isaac Day's testimony by law is to be credited the same factual basis as Defendant's witness. Department officials are not infallible

24

or above fabricating information or testimony to shield themselves and fellow depart-
ment officials from liability. (See, Sanders-EL v. Spielman, 38 F.Supp. 2d 438, 439
n.1 (D. Md. 1999)("it would seem that the law must entertain the possibility that health care providers
in a prison setting might bring certain biases to their occupation.") Though the Sanders-EL case
is spoken in regards to "health care providers in a prison setting" falsifying official docum-
ents to shield prison official from liability. Presumably it would not misapply the Court's
ruling to include other genres of prison officials.

    Isaac Day, however, has sworn to his being present at Santa Rosa's B-
dormitory and witnessing the events he describes in his affidavit (See, Doc. "N", "O", and
Doc. W, paragraph 9). Plaintiff also has sworn to having knowledge of Isaac Day being
present at the relevant time (See, Docs. P, para. 47; declaration, 19 para; and Doc. W, para. 9). So
Defendants' argument, again, essentially predicates upon a conflict of theories or versions
of events, Plaintiff's and Isaac Day's versus Defendants' and Sergeant Christy Padgett's.
Which are factual disputes for a trial court to resolve. See, Gilroy v. Gilroy.


    Furthermore, Defendants' assertion the Plaintiff's claim of being beaten with a tray
is entirely predicated upon the testimony of Isaac Day and that Plaintiff had no kn-
owledge of the tray being the weapon used in the attack is incorrect. Prior to being rea-
quainted with Day Plaintiff had knowledge of being beaten with a tray. See Doc. P, para. 45; de-
claration, para. 18; Docs. "U" and "V"; and Doc. W, para. 12. Prior to be reacquainted with
Isaac Day Plaintiff had numerous sources of knowledge that he'd been assaulted with
a tray: Hospital physicians and nurses informed Plaintiff after he awoke from 2week
coma, Plaintiff eye injury and RMC's optometrist supporting information of Plaintiff
being assaulted with a tray, Plaintiff's independent knowledge of viewing Mike with a large
object in his hands before being struck with it. All of this information Plaintiff possessed
prior to reaquainting with Day. Nearly a year prior to meeting up with Day again Plaintiff being
filed grievances regarding the attack indicating he had been beaten by his cellmate with
a confinement tray. See, Docs. "U" and "V". All of this is to say nothing for the supporting
evidence acquired in discovery. Therefore, Plaintiff's claim is not solely predicated
upon Isaac Day's testimony, though all inferences and evidence is supported by his sworn
testimony.

    Also relevant to this argument is Defendants' claim that Plaintiff statement about
being confronted by Mike about Defendant Jacobsen's comment intended to incite.

physical violence between the cellmates is inadmissible hearsay, is incorrect. Mike's statement would fall under the narrow scope of § 90.803.3 Then-Existing Mental, Emotional, or Physical Condition; Hearsay exceptions :

"The provision of s. 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness:

(3) Then-existing mental, emotional, or physical condition.

(a) A statement of the declarants then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:

1. Prove the declarants state of mind, emotion, or physical sensation at that time or at any other time when such state in an issue in the action.

2. Prove or explain acts of subsequent conduct of the declarant."

Mike's statement stating he intended to fight (physical violence) Plaintiff (intent) because Jacobsen to him I threatened to kick his ass if officers didn't move him (motive) (state of mind). This statement would be admissible to "explain acts of subsequent conduct of the declarant." (Assaulting Plaintiff), and to "Prove the declarants state of mind... at that time and at any other time when such state is an issue in the action."

Mike's emotional and mental state after Jacobsen's statement to him in this action, where Defendants are arguing that Jacobsen's comments were merely "a negligent approach to handling two quarreling cellmates" and "... create no strong likelihood of a risk of serious injury to Plaintiff that arises to the level of deliberate indifference," are material and essential elements.

Finally, Defendants argument that Plaintiff's claim of Defendant Jacobsen allowing Plaintiff's cellmate to keep an extra tray for Mike to later use in the attack on Plaintiff is conclusively refuted by Defendants producing daily security rosters for September 9

26

and 10 of 2020 which conflict with the Approximate date given by Plaintiff for when Defendant Jacobsen allowed Mike to retain the tray. First, it should be noted Plaintiff gave an approximate date (See Doc. P, para. 31; declaration, para. 15; and Doc W, para. 10) Knowing that in the aftermath of a brutal assault where plaintiff suffered massive head injuries and brain trauma his recount of some of the exact dates of the pertinent events may not be with perfect precision, though Plaintiff wanted to show that if they were not, they were not so grossly inaccurate to the point of denoting a fraud. However, Plaintiff was not able to establish this because Defendants have not complied with the Courts Order to produce daily security rosters for "August 30 through September of 2020". (See, ECF Doc. 88)

Secondly, it should be noted Defendants are now subversively attempting to use their advantage created by them disobeying the Courts Order, and Plaintiff's subsequent disadvantage by him not being able to prove this element of his claim with official documentation, against him.

In ECF Doc. 95 "Defendants Response To Plaintiff's Objection To Defendants Failure To Obey The Court's Discovery Order," the response #2 indicates:

"Defendants have neither Requested nor recieved any other duty rosters from the Santa Rosa C.I. or the Florida Department of Corrections including the daily Security rosters for August 30 through September 8, 2020."

Now it is clear why despite Plaintiff's discovery requests and this Court's Order Defendants have failed to even request the indicated daily security rosters. The Court should not rule in favor of Defendants' argument based on their unfair advantage created by their subversive tactic of refusing to produce evidence favorable to the Plaintiff's case. Especially when it pertains to such a small inconsequential part of Plaintiff's claim. Even without this element of Plaintiff's claim of Defendant Jacobsen allowing Plaintiff's cellmate to retain a confinement tray to use in the attack, even without that element Plaintiff's claim of Failure To Protect is wholly supported by the evidence on record. Summary Judgment must therefore be denied.

## POINT IV

# DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW

In Defendants' Final Argument for Summary judgment Defendants Argue that they Are entitled to qualified immunity. Here Plaintiff will show Defendants Are not entitled to qualified immunity as a matter of law. In Defendants' Argument they've cited Pearson v. Callahan, 555 U.S. 223 (2009) Stating that " When evaluating a claim of qualified immunity, a court must determine (1) wether the facts alleged, viewed in the light most favorable to the Plaintiff, show that the officer's conduct violated a constitutional right, and (2) wether, under the facts alleged, there was a violation of ' clearly established law'" Defendants Argue that they Are entitled to qualified immunity because they were acting within their discretionary Authority and their Actions were objectively reasonable.

It's questionable wether defendants were acting in their discretionary Authority and it can Not be alleged that their Actions were "objectively reasonable" when both Defendants have indicated that to the best of their Knowledge on the procedures for a security official to employ in a situation such as the one described in the instant Complaint Neither Defendant in their own opinion response was reasonable. When asked to:

" State the procedures... for a security official to employ if he/she are made aware of a substantial risk of serious physical threat posed to a inmate confined to segregation housing by his cellmate. And further if the inmate is the individual who notifies the security official of the physical jeopardy he is in and requests of the security official for his intervention to be removed from the hostile situation..."

Both Defendants responded:
" If a serious risk of physical threat exists, we would normally Seperate the inmates and move them to different housing and then investigate the threat..."  See, Docs. "B" and "S", Q & A #4

Additionally when asked for :
" State the procedures... for a Security Supervisory official to employ if he/she Are made aware of a substantial risk of serious physical harm

28

posed to an inmate created by the reckless, malicious, and illicit behavior of a subordinate officer. And further if the inmate is the individual that notifies the Security Supervisor of the physical jeopardy he is in and requests for the Security Supervisor to intervene and remove the inmate from the hostile situation..."

Both Defendants responded:

'If such a complaint was made, supervisors would evaluate the claim and if there is any merit to the complaint, either the officer or inmate was moved to a different dorm..." See, Docs. "R" and "S", Q&A #5

Neither Defendant, Officer Drew Jacobsen or Lieutenant Justin Neel, whom was of a Security Supervisory rank and had the authority to act in either capacity, however, neither acted in either manner or did anything to abate that risk. So by this admission, neither defendant to the best of their own knowledge acted objectively reasonable in their discretionary authority. Plaintiff told both Defendants that he feared for his safety or what he might be forced to do to defend himself, explained and illustrated to both Defendants his cellmates mental health issues and proclivity to act violently upon those delusions, plaintiff told both Defendants his cellmate had threatened to kill him and asked that he or his cellmate be moved from the cell. Yet neither Defendant acted objectively reasonable in their discretionary authority, instead both recklessly disregarded that substantial risk of serious physical harm to Plaintiff. Defendant Jacobsen went even further and acted to enhance that risk by inciting and facilitating physical violence between the cellmates to Plaintiff's detriment.

The question now becomes wether the facts alleged, viewed in the light most favorable to the Plaintiff, show that the officer's conduct violated a constitutional right and wether, under the facts alleged, there was a violation of clearly established law. The Eleventh Circuit establishes, "rights may be clearly established for qualified immunity purposes by one of three methods: (1) Case law with indistinguishable facts clearly establishing the constitutional right, (2) A broad statement of principle within the constitution, statute, or case law that clearly establishes a constitutional right, or (3) Conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Crocker v. Beatty, 886 F. 3d 1132, 1137 (11th Cir. 2018)

The right of prisoners to humane treatment and conditions under the Eighth

29

Amendment has long been established by the Supreme Court. See, Farmer v. Brennan, 511 U.S. 825, 832, 128 L.Ed. 2d 811, 114 S. Ct. 1970 (1994) ("Specifically, prison officials have a duty to protect prisoners from violence at the hands of other prisoners". Id. at 833. "A prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. "To find that an official is deliberately indifferent, it must be proven that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he {2002 U.S. App. LEXIS 14} must also draw the inference." Id. at 837.

Defendant Jacobsen's statement to Plaintiff that he and his cellmate would "Either get along or go ahead and kill each other.", establishes that he drew that inference. Jacobsen's statement establishes that he subjectively knew the risk to Plaintiff was to a degree it potentially would result in his death. (See, Leary v. Livingston County Jail, 528 F. 3d 438, 442 (7th Cir. 2008) ("Stone's statement to Leary that "Once other inmates found out what he did, there would be no protection from anyone here at the jail", confirmed that the inmates knowledge of such charges posed an objectively serious risk of harm...Subjectively, Stone's own words show he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed" and that he "drew the inference.")

In respects to Defendant Jacobsen's incitement the Courts have also long established that too as a Constitutional violation of the Eighth Amendment. In the case, Ballard v. Matthews, 2022 U.S. Dist. LEXIS 161890. Courts found that "in Glover v. Ala. Dept. of Corrs., [734 F.2d 691, 694 (11th Cir. 1984)] The Eleventh Circuit Court of Appeals clearly establishes as a broad principle the wrongfulness of inciting prisoners to commit violent acts against their fellows. Although the facts of Glover are not "indistinguishable" from the facts here – a gaurd in Glover offered a reward of cigarettes for violence, and made the offer only days before an assault, as opposed to "With a weeker two" Glover's reasoning has long established the wrongfulness of inciting speech with a nexus to prison violence."    As with the Ballard citing of Glover, although the facts of the instant case are not indistinguishable – in the instant case, Defendant Jacobsen made comment to Plaintiff's cellmate telling him Plaintiff had threatened to kick his

ass and approximately 10 days later Plaintiff was attacked, unprovoked by plaintiff, by his cellmate in his sleep. Creating the same nexus between the inciting speech and the violent attack on Plaintiff. Therefore, Ballard and Glover broad principle establishing the wrongfulness of inciting speech with a nexus to prison violence still pertains and takes precedence, surely at the heart of these cases the essential factors are indistinguishable.

It must be stated that although Defendant Jacobsen played a more dominate role in the events that precipitated into the attack on Plaintiff, Defendant Neel is every bit as culpable and liable for the violent attack on Plaintiff. (See, Ginest v. Board of County Comm'rs of Carbon County, 333 F. Supp. 2d 1190, 1198 (D. Wyo. 2004) "Officials have a duty to investigate 'information suggesting a risk of injury.") In the instant case Both Defendants had knowledge of 'particularized risk of harm to Plaintiff conveyto them by Plaintiff. See, Doc. P, para. 25 and 30; declaration, para. 9 and 14. Yet Both Defendants recklessly disregarded that knowledge of substantial risk of serious harm to Plaintiff by failing to take reasonable measures to abate it.

Defendants claim they are entitled to qualified immunity by alleging they had no knowledge of Mike's violent history or possible behavior issues. However, in Jones v. Wilhelm, 425 F. 3d 455, 461 (7th Cir. 2005) The Seventh Circuit Court found that "requiring actual knowledge of relevant facts to overcome immunity in all cases would allow state actors to trample on the constitutional rights of citizens by maintaining willful ignorance."

The Seventh Circuit Court found in Velez v. Johnson, 395 F. 3d 732, 736 (7th Cir. 2005) Where prisoner pushed an emergency call button and told staff he was having a conflict with his cellmate, officer's claim that he did not know the cellmate was holding a razor blade to the Plaintiff's neck, or that the Plaintiff would be raped, did not show that he lacked knowledge of the risk." Defendants claim they are not liable because no officers observed any violence or threats of violence between Plaintiff and his cellmate. In Snider v. Dylag, 188 F. 3d 51, 55 (2d Cir. 1999) (The Second Circuit held "It would be ridiculous to hold that Dylag would have been personally involved only if he had watched Snider be pummeled but not intervened. Dylag allegedly issued an order of permission for inmates to abuse Snider in close temporal relationship to the actual abuse of Snider. In this context, it is irrelevant that there is no allegation that Dylag was present when Snider

was beaten.") Therefore, for both those Defendants to possess every relevant and minute fact is not a requirement of law to overcome immunity. Plaintiff has establish for the record that through his conversation with both Defendants, prior to the 9/11/2020 attack on Plaintiff, both Defendants possessed foreknowledge of particularized risk of serious harm to Plaintiff yet both Defendants failed to take reasonable (or any) measures to abate it. Defendant Jacobsen then enhanced that risk by his comments intended to recklessly incite physical violence between Plaintiff and his cellmate.

    Defendant Lieutenant Neel additionally knew about those reckless malicious acts of his subordinate and the subsequent increased risk of serious harm to Plaintiff due to those actions yet failed to take reasonable - or any - measures to abate it. (Hendrix v. Tucker, 535 F. App'x 803, 805 (11th Cir. 2013) "Causal connection ... Supervisor knew that the subordinate would act unlawfully and failed to stop them from doing so.") In the instant case the supervisor knew the subordinate had acted unlawfully and because of those actions Plaintiff had been placed in an even higher substantial risk of serious harm and recklessly disregarded that risk by failing to take reasonable measures to abate it. ("A supervisor can be held liable under Section 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the Constitutional rights of the Plaintiff, ... And his conduct was causally related to the Constitutional violations committed by his subordinate."

    If after these arguments this court feels none of these cases cited are closely analogous enough to hold presedence in the instant case, then it should at least agree that under the facts of this case the "Common Sense" standard should. Defendants can not claim to have acted reasonably it is common sense that it is a violation of a inmate's rights for an official to refuse to act upon knowledge that an inmate's cellmate threatened to kill him. It is common sense that as a Prison Security Official whose professional duty is predicated upon "Care, Custody, and Control" and that inmate's safety is reliant upon it is a violation of an inmate's rights to not only recklessly disregard knowledge of a substantial risk of serious harm to him but to also increase that risk by inciting physical violence between those inmates. It is common sense as a Prison Security Supervisor when presented with foreknowledge of these circumstances and a inmate's subsequent vulnerability to victimization because of them it is a violation of a inmate's rights once he asks for you to act in your official capacity to protect him from the

substantial risk of serious harm to refuse and fail to take any reasonable measures to abate that risk. It is common sense that after a prison security official has already illicitly acted to incite physical violence between inmates it is a violation of a inmate's Constitutional rights to then arm one of those inmates with a instrument he can wield as a weapon in an attack against the other inmate. (Giebel v. Sylvester, 244 F.3d 1182, 1189 (9th Cir. 2001) ("Common Sense" holding that 'even if there is no closely analogous case law, a right can be clearly established on basis of 'common sense'") (Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596 (2004) "... in an obvious case, general standards can 'clearly establish' a right ... even without a body of relevant case law.") For the following reasons Qualified Immunity should be denied.

## CONCLUSION

For the foregoing reasons the Defendants as a rule of law are Not entitled to Summary judgment. Plaintiff, therefore, prays this Court will deny Defendants Motion For Summary judgment.

Date :                                     Respectfully Submitted,

                                          /s/ Richard Bell

                                          Richard A. Bell  DC# C03384

                                          Charlotte Correctional Institution

                                          33123 Oil Well Road

                                          Punta Gorda, FL 33955


## CERTIFICATE OF SERVICE

I Hereby Certify that a true and correct copy of the foregoing has been furnished by U.S. Mail, this ___ day of _____, 2023 to USDC Northern District of Florida, 1 North Palafox Street, Pensacola, Florida 32502; and to Defendants Drew Jacobsen and Justin Neel at Matthews & Higgins, LLC, 913 Gulf Breeze Parkway Suite 33, Gulf Breeze, Florida 32561

# INMATE REQUEST

**DEPARTMENT OF CORRECTIONS**

Doc. "A"

Mail Number: _____
Team Number: _____
Institution: _____    5

| TO: (Check One) | ☐ Warden ☐ Asst. Warden | ☑ Classification ☐ Security | ☐ Medical ☐ Mental Health | ☐ Dental ☐ Other | Mr. Quagan |
|---|---|---|---|---|---|

| FROM: | Inmate Name Richard A. Bell | DC Number CO3384 | Quarters G-4112 | Job Assignment N/A | Date 12/03/2021 |
|---|---|---|---|---|---|

## REQUEST

Check here if this is an informal grievance ☐

This is A Legal Records request pursuant to florida Statute 119.01 And florida Constitution Article 1 Section 24. I need to procure, for the purpose AS A require documentation in A current Legal civil case, A copy of the Disciplinary Report written reporting A Battery infraction perpetrated by RashAn Mike And SAntA RosA C.I - MAin Unit on September 11, 2020 that I Richard Bell was the victim of. I Am in the process of obtaining civil remedies for the incident And the Aforementioned disciplinary report is A require document. So please provide me A copy of ~~the~~ Mentioned Disciplinary Report.

All requests will be handled in one of the following ways: 1) Written Information or   2) Personal Interview. All informal grievances will be responded to in writing.

| Inmate (Signature): Richard A. Bell | DC#: CO3384 |
|---|---|

---

**DO NOT WRITE BELOW THIS LINE**

RECEIVED

## RESPONSE

DATE RECEIVED: Dec 06 2021

CHARLOTTE C.I.
CLASSIFICATION DEPT.

You have already been provided this document and it is your responsibility to keep the D.R's that are given to you.

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____. (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

| Official (Print Name): T. Roberts | Official (Signature): Roberts | Date: 12-14-21 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

34

# INMATE REQUEST

Doc. "B"

Mail Number: _____
Team Number: 5 Roberts
Institution: _____

| TO: (Check One) | ☐ Warden | ☑ Classification | ☐ Medical | ☐ Dental |
|---|---|---|---|---|
| | ☐ Asst. Warden | ☐ Security | ☐ Mental Health | ☐ Other |

| FROM: | Inmate Name | DC Number | Quarters | Job Assignment | Date |
|---|---|---|---|---|---|
| | Richard A. Bell | C03384 | G2102 | N/A | 12/13/2021 |

## REQUEST

Check here if this is an informal grievance ☐

This is a public records request that I Am requesting pursuant to Fla. Stat. 119.01 And Fla. Const. Article 1 section 24. As legal records in a current civilcase I Am requesting to provide the courts as an exhibit the Disciplinary Report written on a Battery On a inmate perpetrated by inmate Rashan Mike At Santa Rosa-Main Unit on 09/11/2020 of which I was the victim included in the Statement of Facts. Any Monetary charges required to facilitate this request can taken from my Inmate Account.

RECEIVED

_ _ 4 2021

CHARLOTTE C.I.
CLASSIFICATION DEPT.

**All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All informal grievances will be responded to in writing.**

Inmate (Signature): _Richard Bell_       DC#: C03384

---

## DO NOT WRITE BELOW THIS LINE

## RESPONSE

DATE RECEIVED: _____

That report has already been provided to you. It is your responsibility to keep it.

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____. (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

| Official (Print Name): T Roberts | Official (Signature): Roberts | Date: 12-28-21 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

35

# INMATE REQUEST

DEPARTMENT OF CORRECTIONS

Mail Number: _____
Team Number: _____
Institution: _____

510-2112-0479    Doc. "C"

| TO: (Check One) | ☑ Warden ☐ Asst. Warden | ☐ Classification ☐ Security | ☐ Medical ☐ Mental Health | ☐ Dental ☐ Other _____ |

| FROM: | Inmate Name | DC Number | Quarters | Job Assignment | Date |
|---|---|---|---|---|---|
| | Richard A. Bell | C03384 | G2212 | N/A | 12/20/2021 |

## REQUEST                          Check here if this is an informal grievance ☑

I am filing this informal in refrence to my denied Public Records request Pursuant to Florida Statute 119.01 and Florida Constitution Article I section 24.
        There was obviously a misunderstanding by classifation Officer T. Roberts in responding to my Legal Records request. In that response (See Attached) She starts by stating she believes I have Already been provided a copy of the document I was requesting. As if I were the inmate charged of the infraction in the disciplinary report I am requesting. The document I am requesting is a copy of the Disciplinary Report written reporting a battery infraction perpetrated by inmate Rashan Mike at Santa Rosa C.I. - Main Unit on September 11, 2020 that I, Richard A. Bell #C03384, was victim of. Only the perpetrator of a infraction is provided a copy of the resulting DR. reporting it, not the victim. So I never recieved a copy of this Disciplinary Report. I am in the midst of civil litigations and this is a necessitated exhibit. And I do have the funds in my Inmate Trust fund Account to accomodate any monetary charge to facilitate this request.

All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All informal grievances will be responded to in writing.

| Inmate (Signature): R. Bell | DC#: C03384 |

RECEIVED DEC 20 2021

---

### DO NOT WRITE BELOW THIS LINE

**RESPONSE**                                 DATE RECEIVED By_____

Please see the attached response

MAILED DATE
DEC 22 2021
INMATE GRIEVANCE OFFICE

[The following pertains to informal grievances only:]
Based on the above information, your grievance is _____ (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

| Official (Print Name): S. Sudmore | Official (Signature): SC | Date: 12/22/21 |

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

36

Incorporated by Reference in Rule 33-103.005, F.A.C.

Your informal grievance has been received and reviewed. It is your responsibility to maintain copies of documents previously provided to you. You have not demonstrated an exceptional need for the information contained in the department's records. Copies of documents are available from the Classification Department/Sentence Specialist at a cost of $.15 per single sided page plus a service charge equal to approximately 30 minutes based on the current rate of pay for the pay grade of the person performing the service. Pursuant to Rule 33-102.101 Fla. Admin. Code, requested copies will not be released until payment is received.

Submit a DC6-236 Inmate Request form, not an Informal Grievance to the Sentence Specialist to receive a response on this issue.

This grievance is **RETURNED WITHOUT ACTION**.

Charlotte Correctional Institution

Informal Grievance Log #510-2112-0479

MAILED DATE:

DEC 22 2021

INMATE GRIEVANCE OFFICE

( Continuation Page ; Public Records Request 'Informal grievance )

As remedial action I only seek that any monetary charges to facilitate this Public Records Request by charged to my Inmate Trust Fund Account and that I be provided a copy of the requested Disciplinary Report. Again, the report I am requesting Charged inmate Rashan Mike with the infraction of Battery or Assault on a inmate at Santa Rosa-Main Unit on September 11, 2020 and I, Richard Bell #C03384, Am named as the victim.

Thank you for your time and help with this matter,

Respectfully Submitted

Richard Bell #C03384

38

Doc. D

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

**INMATE REQUEST**

Mail Number: _____
Team Number: 5
Institution: _____

| TO: (Check One) | ☐ Warden  ☐ Asst. Warden | ☐ Classification  ☐ Security | ☐ Medical  ☐ Mental Health | ☐ Dental  ☑ Other _Sentence Specialist_ |
|---|---|---|---|---|

| FROM: | Inmate Name Richard A. Bell | DC Number C03384 | Quarters G-2212 | Job Assignment N/A | Date 12/28/2021 |
|---|---|---|---|---|---|

**REQUEST**                                    Check here if this is an informal grievance ☐

This is a Public Records request Pursuant to Florida Statute 119.01 And Florida
Constitution Article 1 Section 24
        I Submitted A informal to the warden And it was returned without
Action, however, instructing me all that was necessary to have this issue
Addressed is for me to Submit this request form to your department. What
I would like to Accrue is a copy of the Disciplinary Report written
reporting a Battery/Assault on a inmate perpetrated by inmate Rashan
Mike at Santa Rosa C.I.-Main Unit on September 11, 2020 in which I
Richard A. Bell #C03384, was named the victim of the Attack in the
report. I was not charged with the infraction I was victim of the infraction
So I did not recieve A copy of this report. I do have money in my Account
to facilitate this request. Please take the required Sum And provide me A copy of this report

All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All
informal grievances will be responded to in writing. This document is A required exhibit in civil litigation

Inmate (Signature): _Richard Bell_                    DC#: C03384

---

**DO NOT WRITE BELOW THIS LINE**

**RESPONSE**                              DATE RECEIVED: _____

RECEIVED
JAN 03 2022
CHARLOTTE C.I.
CLASSIFICATION DEPT.

That document has been provided to
you already.

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____. (Returned, Denied, or Approved). If your informal grievance is denied,
you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

| Official (Print Name): T. Roberts | Official (Signature): Roberts | Date: 1-5-22 |
|---|---|---|

- Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as
required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no
later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)                    39
                    Incorporated by Reference in Rule 33-103.005, F.A.C.

Doc. "E"

## PART B - RESPONSE

| BELL, RICHARD | C03384 | 2201-510-034 | CHARLOTTE C.I. | G2212L |
|---|---|---|---|---|
| NAME | NUMBER | FORMAL GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your administrative appeal has been received and evaluated.

As per Florida Statute 945.10, an inmate currently incarcerated with the Florida Department of Corrections can have access to these records if the inmate demonstrates an exceptional need for the information. It is mandated that the inmate provide a written request to his Classification Officer detailing the records being requested and the exceptional need for these records. You have submitted a written request but have failed to provide an exceptional need for the records. You need to review Florida Statute 945 and Florida Administrative Code 33-601.901 prior to submitting another request. Ensure that you meet the criteria for a public records request from a currently incarcerated offender and present an approved exceptional need. Based on this information, and the criteria set forth in Statute and Code.

Based on the above information, your appeal is DENIED. As outlined in Chapter 33-103.007, you may obtain further administrative review of your complaint by obtaining a DC1-303, Request for Administrative Remedy or Appeal, completing the form, providing attachments as required, and forwarding your complaint to the Bureau of Inmate Grievance Appeals.

| | | |
|---|---|---|
| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | 1/25/2022 DATE |

MAILED DATE:

JAN 25 2021

INMATE GRIEVANCE OFFICE

40

**FLORIDA DEPARTMENT OF CORRECTIONS**

Continuation of Exhibit "E"

**REQUEST FOR ADMINISTRATIVE REMEDY OR APPEAL**

RECEIVED
JAN 7 2022

☐ **Third Party Grievance Alleging Sexual Abuse**

TO: ☑ Warden        ☐ Assistant Warden        ☐ Secretary, Florida Department of Corrections

From or **IF Alleging Sexual Abuse**, on the behalf of:

| Bell | Richard | A. | C03384 | Charlotte Correctional Institution |
|------|---------|-----|---------|-----------------------------------|
| Last | First | Middle Initial | DC Number | Institution |

2210-510-034

---

**Part A – Inmate Grievance**

I am appealing the decision found in informal grievance LoG # 510-2112-0479 to return my grievance without action for the following reason:

Grounds

After recieving the response to grievance LOG # 510-2112-0479 to return my grievance without action while also instructing me how to appropriately address this is via the Classification Department/Sentence Specialist, I then sent the instructed required request to the Sentence Specialist requesting this document, to no avail. The same Classification Officer T. Roberts whom had responded to every other one of my request pertaining to this matter responded to this request as well (Please see attached marked: Exhibit A). You can also see from Exhibit "B", which is another request to Classification Department regarding this same matter and the request attached to my informal level grievance regarding this matter you will see that all 3 of these documents including the one addressed, as instructed to by the respondent to my informal grievance, to Sentence Specialist are all being responded to by this same T. Roberts whom is refusing my request to be charged for and provided a copy of the Disciplinary Report reporting a Battery on a inmate infraction perpetrated by inmate Rashan Mike at Santa Rosa-Main Unit on 09/11/2020, Pursuant to Fla. Stat. 119.01 and Fla. Const. Article 1 Section 24 "Public Records Request". T. Roberts' refusal to avail me this service is predicated on untrue assumptions. All of T. Roberts' refusals state the same untrue reasoning : "That this report has already been provided to me, and it is my responsibility to keep it." That is false I have NEVER recieved a copy of this report. I ...

MAILED DATE

Doc. "F"

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**RICHARD ALLEN BELL** ,
**DC Number: C03384**
      Plaintiff,

v.                  Case No. 3:22CV4701-MCR-HTC

**OFFICER D. JACOBSEN**, et al.
      Defendants.

_____/

## PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34, Fed. R. Civ. P., the plaintiff requests that the defendants produce the documents listed within 30 days, either by providing the plaintiff with copies or by making them available to the plaintiff for inspection copying:

1.) Any and all grievances, complaints, or other documents recieved by prison officials at Santa Rosa Correctional Institution ("Santa Rosa") or FDOC's Secretary's Office concerning the mistreatment or abuse of inmates, or dereliction of duties, by Defendants Officer Drew Jacobsen or Justin Neel, and any memoranda, investigative files, or other documents created in response to such complaints, accumulated over the duration of their employment to Florida Department of Corrections.

2.) Any and all policies, directives, or instructions to staff concerning the handling and/or reporting of incidents of inmates conveying to officials fear of imminent physical harm pose to them by their cellmate.

3.) Any and all policies, directives, or instructions to Supervisory Officials concerning the handling and/or reporting of incidents of inmates conveying to Supervisory officials fear of imminent physical harm posed to the inmate due to the reckless and/or malicious behavior of the Supervisor's Subordinate official.

1 of 3    42

Doc. "F"

4.) Any and all policies, directives, or instructions to staff concerning the reporting, photographing, and collection of evidence, of a assault on inmate infraction involving the use of a weapon, that were in effect September of 2020.

5.) Any logs, lists, or other documentation reflecting officers' security detail work assignments, i.e. what officers were assigned to work in what dormitory on what dates. If applicable specifically logs, lists, and other documentation pertaining to Santa Rosa, B-dormitory, from August 1, 2020 to October 1, 2020.

6.) Any and all logs, records, reports, and documents written by and/or signed by Defendants Officer Drew Jacobsen or Lieutenant Justin Neel pertaining to any matters regarding Santa Rosa's B-dormitory from August 1, 2020 to October 1, 2020.

7.) Any and all documents, including but not limited to use of force reports, incident reports, disciplinary reports, evidence logs and photos, medical reports, etc. created by any Santa Rosa staff member or any other Department of Corrections employee or official concerning any incident involving the plaintiff and/or his cellmate Bashun Mike on or about September 11, 2020, or any investigation or action concerning that incident.

8.) All sick-call request form submitted by the plaintiff from September 11, 2020 to the date of your response.

9.) The Plaintiff's complete medical records and dental records from September 11, 2020 to the date of your response, including all Plaintiff's medical visits to, and surgery performed by, medical specialists at FDOC's Reception and Medical Center.

10.) The Plaintiff's complete Mental Health records from September 11, 2020 to the date of your response.

11.) Any and all grievances, complaints, or other documents received by prison officials at Santa Rosa or the Secretary's office of FDOC concerning incidents in 2019 through 2021 of officials instigating, encouraging, and/or facilitating inmate assaults.

Doc. "F"

12.) Any and all policies, directives, or instructions to staff concerning inmates harboring food service items in their cells.

13.) Any and all policies, directives, or instructions to staff that were in effect September of 2020 concerning officials condoning, encouraging, inciting, and/or facilitating inmates to violate Departmental rules.

14. Any and all of the following Daily Special Housing Records for Santa Rosa, B-dormitory completed and/or signed by either Defendant Officer Drew Jacobsen or Lieutenant Justin Neel from July 1, 2020 to October 1, 2020, including but not limited to Daily Record of Special Housing, forms DC6-229 and DC6-229B, Inspection of Special Housing Record, Form DC6-228, and Housing Unit Log, Form DC6-209.

## CERTIFICATE OF SERVICE

I Hereby Certify that a true and correct copy of the foregoing has been furnished by regular U.S. Mail, this ___04___ day of ___MAY___, 2023 to U.S.D.C. Northern District of Florida Clerk of Court, 1 North Palafox Street, Pensacola, Fl 32502, and to Drew Jacobsen and Justin Neal at Matthews & Higgins, LLC Civil Trial Attorneys, 913 Gulf Breeze Pkwy, Suite 33½ Gulf Breeze, Fl 32561.

/s/ Richard A. Bell

Richard A. Bell DC# C03384
Charlotte Correctional Institution
33123 Oil Well Road
Punta Gorda, FL 33955

3 of 3   44



**Rister, Alexis**

| | |
|---|---|
| **From:** | Maloney, James |
| **Sent:** | Friday, September 11, 2020 4:11 PM |
| **To:** | Knight, Janine |
| **Subject:** | FW: Battery-Inmate-Serious: Santa Rosa CI |

**From:** Maloney, James
**Sent:** Friday, September 11, 2020 7:30 AM
**To:** Radford, Maurice <Maurice.Radford@fdc.myflorida.com>
**Subject:** Re: Battery-Inmate-Serious: Santa Rosa CI

FDLE was notified at 6:58 a.m., 9/11/2020. OPERATOR ID #8514 was provided the information and advised he would provide information to a an Agent, who would be calling. SI Baxley will be handling the scene.

Inmate is ████████████████████████ (information obtained as I was typing this email).

**From:** Radford, Maurice <Maurice.Radford@fdc.myflorida.com>
**Sent:** Friday, September 11, 2020 6:35:19 AM
**To:** Maloney, James <James.Maloney@fdc.myflorida.com>
**Subject:** Fwd: Battery-Inmate-Serious: Santa Rosa CI

FYI

Please contact SARCI and ████████ to obtain necessary information and dispatch someone to handle this aggravated battery incident.

Also notify the FDLE Watch Desk if the inmate's ████████████████████.

Thanks,

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** EAC - Emergency Action Center <emergencyoperations@mail.dc.state.fl.us>
**Sent:** Friday, September 11, 2020 6:29:03 AM
**To:** Radford, Maurice <Maurice.Radford@fdc.myflorida.com>
**Subject:** Battery-Inmate-Serious: Santa Rosa CI

Battery-Inmate-Serious: Santa Rosa CI

On 09/11/2020 at approximately 0630 hours, staff observed Inmate MIKE, RASHAN W32521 assaulting Inmate BELL, RICHARD C03384 with an unknown weapon in B-dorm. ████████████████████ and ████████ to Inmate Bell, which includes ████████████████████████ ██████ of Inmate Bell ████████████████████. Staff placed the perpetrator(s) in AC, pending

45

Doc. G

DR(s). Staff did not recover the weapon and does not believe the incident is STG related. Staff notified Duty Warden Colonel Cannon of this incident.

███████████████████████

EAC contacted: 0719 Hours
EAC notified On-Call IG K. Jackson: 0723 Hours

Point of Contact: LT CARTER, JOHNATHAN 850-380-7924

Duty Officer: McCray

46



**Rister, Alexis**

| | |
|---|---|
| **From:** | Jackson, Katouree |
| **Sent:** | Friday, September 11, 2020 7:29 AM |
| **To:** | Knight, Janine |
| **Subject:** | Fwd: Battery-Inmate-Serious: Santa Rosa CI |

Get Outlook for iOS

**From:** EAC - Emergency Action Center <emergencyoperations@mail.dc.state.fl.us>
**Sent:** Friday, September 11, 2020 7:28:49 AM
**To:** Jackson, Katouree <Katouree.Jackson@fdc.myflorida.com>
**Subject:** Battery-Inmate-Serious: Santa Rosa CI
Battery-Inmate-Serious: Santa Rosa CI

On 09/11/2020 at approximately 0630 hours, staff observed Inmate MIKE, RASHAN W32521 assaulting Inmate BELL, RICHARD C03384 with an unknown weapon in B-dorm ████████████ both inmates and ████████████ to Inmate Bell, which includes ████████████ of Inmate Bell ████████. Staff placed the perpetrator(s) in AC, pending DR(s). Staff did not recover the weapon and does not believe the incident is ████████. Staff notified Duty Warden Colonel Cannon of this incident.

████████████████

EAC contacted: 0719 Hours
EAC notified On-Call IG K. Jackson: 0723 Hours

Point of Contact: LT CARTER, JOHNATHAN 850-380-7924

Duty Officer: McCray

"P/LM"
Doc con "I"
80

**Rister, Alexis**

| | |
|---|---|
| **From:** | Baxley, James |
| **Sent:** | Friday, September 11, 2020 3:50 PM |
| **To:** | Knight, Janine |
| **Subject:** | RE: Battery-Inmate-Serious: Santa Rosa CI |
| **Attachments:** | B-dorm crime scene log.pdf; COC teeth.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Good afternoon,

This is information you need to finish the information briefing; sorry it took so long. The cell was processed and staff found a knife inside the cell, however there is evidence to support that the knife was used on IM Bell. IM Mike told staff that IM Bell pulled the knife on him and he defending himself by beating IM Bell. IM mike only had a ███████████ ███████████. I believe IM Mike slammed IM Bell's head on the corner on the lower bunk several times. I'll send you the rest of the pictures when they download, or if you want to wait until we figure out gets assigned the case.

From: Knight, Janine
Sent: Friday, September 11, 2020 6:55 AM
To: Baxley, James <James.Baxley@fdc.myflorida.com>
Subject: Fwd: Battery-Inmate-Serious: Santa Rosa CI

Fyi

Get Outlook for Android

From: Jackson, Katouree <Katouree.Jackson@fdc.myflorida.com>
Sent: Friday, September 11, 2020 6:29:04 AM
To: Knight, Janine <Janine.Knight@fdc.myflorida.com>
Subject: Fwd: Battery-Inmate-Serious: Santa Rosa CI

Get Outlook for iOS

From: EAC - Emergency Action Center <emergencyoperations@mail.dc.state.fl.us>
Sent: Friday, September 11, 2020 7:28:49 AM
To: Jackson, Katouree <Katouree.Jackson@fdc.myflorida.com>
Subject: Battery-Inmate-Serious: Santa Rosa CI

Battery-Inmate-Serious: Santa Rosa CI

On 09/11/2020 at approximately 0630 hours, staff observed Inmate MIKE, RASHAN W32521 assaulting Inmate BELL, RICHARD C03384 with an unknown weapon in B-dorm. ████████████████ both inmates and ████████████ to Inmate Bell, which includes ████████████ ████████ of Inmate Bell ████████████████████████. Staff placed the perpetrator(s) in AC, pending DR(s). Staff did not recover the weapon and does not believe the incident ████████████. Staff notified Duty Warden Colonel Cannon of this incident.

1        48

# FLORIDA DEPARTMENT OF CORRECTIONS
## CONSULTATION REQUEST/CONSULTANT REPORT

Doc # 3

| Specialty Service: Optometry | Sending Institution: RMC Tho | Date of Request: 11/19/20 |
|---|---|---|

| Reason(s) for consultation: | Acuity: | Date Appointment Made: 11/20 |
|---|---|---|
| Evaluate and recommend diagnostic plan_____ | Emergency _____ | Staff Signature: L. Thomas Scheduler RMC |
| Evaluate and recommend treatment plan_____ | Urgent _____ | |
| Other (specify):_____ | Routine ✓ | |
| | Visit Type: | Appointment Date: 12/1 |
| | Initial ✓ | |
| Follow-up consults require justification | Follow-Up | Authorization #: |
| *Optometry/Ophthalmology – attach DC4-702A | Post Op | |

Condition is (check one): ☐ Acute Trauma   ☐ Acute Illness   ☐ Chronic

History of present illness (include onset, presentation, progress):

Refraction — Now + then Repeat DE in 6 Month
64 of Honelty

Physical findings:

Diagnostic results (laboratory, x-ray, or other tests): Trauma / mild cataract OD wilprogress

**RECEIVED**
**NOV 20 2020**
**RMC**

Failed prior therapy:

Provisional diagnosis: Blurred vision — trauma & myopea

Health Care Provider Signature/Stamp: _____   Date 11/19/20
N. Anandjiwala, MD
Chief Health Officer
RMC

Dr. Hasty
Ophthalmologist
RMC

CHO/Designee Approval Signature/Stamp: _____

## AUTHORIZATION FOR SPECIALTY EVALUATION

I, the undersigned, have had explained to me and understand that I require _____
which cannot be accomplished at _____ I also understand that should hospitalization and/or surgery be necessary, a separate consent form will be signed prior to such hospitalization and/or surgery. I therefore consent to be referred to a reception and medical center, or such other health care facility as may be appropriate for the reason(s) stated, and consent to undergo health care services as may be necessary to evaluate my health status.

Signature of Patient:_____   Date:_____

Signature of Witness:_____   Date:_____

## IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE AWARE OF ANY SCHEDULING INFORMATION PENDING ANY APPOINTMENT OUTSIDE THE INSTITUTION

| Inmate Name Bell, Richard | Alternative Treatment Plan: |
|---|---|
| DC# C03384   Race/Sex B/m | |
| Date of Birth 11-23-88 | |
| EOS DATE: WH | |

DC4-702 (Revised 9/12/19) Page 1 of 2

This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

49

COPY

## CONSULTANT'S REPORT

### NO PROCEDURE(S) MAY BE PERFORMED WITHOUT PRIOR APPROVAL BY THE REGIONAL MEDICAL DIRECTOR or UTILIZATION MANAGEMENT.

**Additional History:**

2019 Rx     — 250 –075 x 045     None x 3mo
            — 300 –075 x 155

Refraction          OMD  11/2020     ① Blunt trauma OD- poss orbital repair
                                     ② mild traum cat rpigment disp OD

**Findings:**

VA ßc < 20/ CF          Pupils Normal          T < 11
         20/ 200-       EOM om/full                11

Subj < —385–075 x 045   20/70-
      — 300 –075 x 155   20/20

**Recommendations:**

1. Cataract OD – VA worse than 20/70. Refer to ophthalmology (Hasty) for cataract eval

2. CMA ou – Rx updated. Monitor

3. Visual impairment (cataract) OD – Polycarbonate.  R/C 1yr for full exam

**Consultant Signature/Stamp:**          Dortheanne Roberts OD
                                         Optometrist          **Date:** 01 Dec 2020

IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE AWARE OF ANY
SCHEDULING INFORMATION PENDING ANY APPOINTMENT OUTSIDE THE INSTITUTION

**Inmate Name** Bell, Richard
**DC#** C03344          **Race/Sex** B/M
**Date of Birth** 1/23/85
**Institution** YCMK
**EOS DATE:**
DC4-702 (Revised 9/12/19) Page 2 of 2

| Consultant Recommendations Reviewed: Date _____ |
| Clinician Name & Stamp _____ |
| Recommendations Ordered _____ |
| Date Submitted to U.M. _____ |
| Date/s Scheduled _____   Completed Yes ___ No ___ |
| See DC4-701 for Alternative Treatment Plan Yes ___ No___ |

COPY

This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

FLORIDA DEPARTMENT OF CORRECTIONS
CONSULTATION REQUEST/CONSULTANT REPORT

| Specialty Service: Ophtalmology | Sending Institution: Santa Rosa | Date of Request: 9/24/2020 |

| Reason(s) for consultation: | Acuity: | Date Appointment Made: |
| Evaluate and recommend diagnostic plan ✓ | Emergency _____ | |
| Evaluate and recommend treatment plan ✓ | Urgent ✓ | Staff Signature: ___ |
| Other (specify):_____ | Routine _____ | |
| | Visit Type: | Appointment Date: |
| | Initial ✓ | 11/9/20 |
| Follow-up consults require justification | Follow-Up _____ | Authorization #: |
| *Optometry/Ophthalmology – attach DC4-702A | Post Op _____ | OP 2238759581 |

Condition is (check one): ☑ Acute Trauma    ☐ Acute Illness    ☐ Chronic

History of present illness (include onset, presentation, progress):
31 y/o BM that sustained multiple face/head trauma. Evaluated at Hosp. by
Dr. Fletcher (Ophthalmology) due to bil pneumo/hemosclera with severe periorbital
edema. Pt complaining of partial vision loss. Outpatient f/u was recommended
by Dr. Fletcher

Physical findings:
R pupil 6mm non reactive, L pupil 3mm brisk
EOMI, R eye edema
Bil hemorrhaged conjunctiva

Diagnostic results (laboratory, x-ray, or other tests):
Please see Hospital reports

Failed prior therapy:

Provisional diagnosis:
Bil Pneumo/Hemosclera

Health Care Provider Signature/Stamp: _____  W. Santiago Miranda, MD    Date 9/24/2020
                                                Santa Rosa CI

CHO/Designee Approval Signature/Stamp:

## AUTHORIZATION FOR SPECIALTY EVALUATION

I, the undersigned, have had explained to me and understand that I require _____
which cannot be accomplished at _____.
I also understand that should hospitalization and/or surgery be necessary, a separate consent form will be signed
prior to such hospitalization and/or surgery. I therefore consent to be referred to a reception and medical center,
or such other health care facility as may be appropriate for the reason(s) stated, and consent to undergo health
care services as may be necessary to evaluate my health status.

Signature of Patient: X ___ Richard Bill    Date: 9/24/20
                                        A. Brady, RN
Signature of Witness: _____ ABrady    Date: 9/24/20
                                  Santa Rosa CI/Inmate AVG

IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE
AWARE OF ANY SCHEDULING INFORMATION PENDING ANY
APPOINTMENT OUTSIDE THE INSTITUTION

| Inmate Name: Bell, Richard | Alternative Treatment Plan: |
| DC#: C03384    Race/Sex: BM | |
| Date of Birth: 11/24/88 | |
| EOS DATE: life | |

DC4-702 (Revised 9/12/19) Page 1 of 2

This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

COPY

CONSULTANT'S REPORT

**NO PROCEDURE(S) MAY BE PERFORMED WITHOUT PRIOR APPROVAL BY THE REGIONAL MEDICAL DIRECTOR or UTILIZATION MANAGEMENT.**

Additional History:

2017 Rx  -250 -075 x 045   20/20
         -300 -075 x 155   20/20

Pt had trauma to head and face. Seen at hospital. Bilat hemorrhage noted (conj). Pt reported partial LOV. Pt reports some improvement

No specs x 3mo

Findings:

VAsc r cf @ 3ft   Aniso OD>OS   Tgh 1x 10u   T< 8/12   OCT of mac done
20/200-           Pupils NL/APD                          OD- unable. Central
                  EOM                                    opacity
                                                         US- done w/o diff.

Ext - Brow laceration Repair / R LL incision (2) blow out Fx Repair

SLE - Neg-conj/cornea/AC
Lens OD 2+ ASC/3+ BSC/Pigment debris anterior lens capsule (Lim ASC/PSC/lens pigment OD)

Fundus → 4/04, No holes/tears seen /No RD, bot poor Vis

① Blunt trauma OD
Possible orbital Repair
② Mild traumatic cataract & pigment dispersion OD

Recommendations:

OCT normal OS unable OD

Refer to Optometry for refraction

Dr. Hasty
Ophthalmologist
RMC

Consultant Signature/Stamp:                          Date: 11/1/20

IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE AWARE OF ANY SCHEDULING INFORMATION PENDING ANY APPOINTMENT OUTSIDE THE INSTITUTION

Inmate Name Bell, Richard
DC# C03821   Race/Sex BM
Date of Birth 11-03-80
Institution
EOS DATE: UGL

Consultant Recommendations Reviewed: Date _____
Clinician Name & Stamp _____
Recommendations Ordered _____
Date Submitted to U.M. _____
Date/s Scheduled _____ Completed Yes ___ No___
See DC4-701 for Alternative Treatment Plan Yes ___ No___

DC4-702 (Revised 9/12/19) Page 2 of 2

COPY  This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.



# FLORIDA DEPARTMENT OF CORRECTIONS
## Chronological Record of Health Care

Allergies: NKDA

| DATE/TIME | |
|---|---|
| 11/30/10 0930 | Pt. seen in sick call — see DC4-683HH & DC4-683DD. Pt. c̄ multiple issues/concerns. S/p altercation on 9/11/30 with unresponsiveness & hospitalization. Refer to provider for evaluation.  R. Kevin Sears RN  RMC |
| 01 Dec 2020 1405 | - Refer to ophthalmology for cataract eval OD (Hasty)  - Visual impairment OD. Polycarbonate  Treatment Plan Discussed With Inmate X _____  Dortheanne Roberts OD Optometrist |
| 12-2-2020 0725 | CHART REVIEWED BY SCRUB   CONSULT SUBMITTED PRIOR APPROVAL SUBMITTED   for urgent ophth eval OS Has Dental Hold  D. Crawfield LPN  CRAWFORD LPN |
| 12/3/10 10:5 | M.T. Esapa, PMHNP - BC Psych MH Nurse Practitioner RMC |

Inmate Name  Bell, Richard
DC#  C03384      Race/Sex  B/M
Date of Birth  4/3/1988
Institution  RMC

S- Subjective Data
O- Objective Data
A- Assessment of S and O Data
P- Plan
E- Education



DC4-701 (Effective 4/8/10)      Incorporated by Reference in Rule 33-602.210

51



Retinal Eye Care, Inc. (Rino Optometry)

| | |
|---|---|
| Patient: BELL, RICHARD | Exam Date: 11/19/2020 |
| Physician: | DOB(age): 11/26/1988 (31) |
| Operator: | Gender: Male | Ethnicity: African Descendant |
| Disease: | ID: C03384 | Algorithm Ver: A2016, 0, 1, 132 |

## Retina Map

Scan Quality Index    ☐ View Reproducibility      Left / OS



250µm

☑ Auto Zoom



6mm x 6mm





Thickness
Full Retinal
Inner Retinal
Outer Retinal
NDB Reference
● Full Retinal

95%-99%
1%-5%
< 1%



---

Report Date: Thursday 11/19/2020 11:27:11      Software Version: 2016.0.1.132
Comment:
Signature:

Defining the OCT Revolution      optovue

COPY

"Doc. 'N"

# AFFIDAVIT

**Affiant:** _____

**Date:** 11-15-21

**State of** Florida )

**In the County of** Punta Gorda )

I, Isaac Day , do hereby swear that the

following statement is true and correct, made on my own free will and free of duress and is

made from my own personal knowledge;

I swore, my statement is true and facts. On the 9/11/2020 I witness two officer come out the cell B1-1114 with a bloody tray I overheard Lt said that this is the tray that was use to beat another inmate with Lt. Sloke, I also overheard the inmate said I am gonne to kill you fool. Also where the officer come out the room he come byside my windos cell front with the tray I heard him and the Lt. Stoke talking about this is the tray the infraction haveing in B1-1114 and I was in B1-1112 and witness the whole thing I swore my statement is true

53



Doc. "N"

# DECLARATION OF OATH

**Under the penalties of perjury, I,** _Isaac Day_ ,
declare that I have read the foregoing 'AFFIDAVIT' and that the facts stated in it
are true, pursuant to Florida Statutes, Chapter 92.525, on this _15_ day of
_October_ , 202_1_ .

_[signature]_ W08556
Affiant, Declarant

## NOTARY

**STATE OF FLORIDA)**
**COUNTY OF** _Punta Gorda_ )

Before me, the undersigned authority, this day personally appeared
_[signature]_ , who first being duly sworn, says that he is the
Defendant/Appellant/Petitioner in the above styled cause, that he has read the
foregoing document, and has personal knowledge of the facts and matters therein
set forth and alleged and that each and all of these facts and matters are true and
correct.

_[signature]_
(your signature)

The forgoing instrument was acknowledged before me this _15_ day of
_October_ , 202_1_ , by _Isaac Day_ ,
who is personally known to me or has produced a Department of Corrections I.D.
as identification and who did take an oath.

MY COMMISSION EXPIRES     55     NOTARY PUBLIC

Doc. "O"

# AFFIDAVIT

**Affiant:** _____

**Date:** 1·17·22

**State of** Florida                    )

**In the County of** Punta Gorda       )


I, _____Isaac Day_____, do hereby swear that the following statement is true and correct, made on my own free will and free of duress and is made from my own personal knowledge;

I swore my statment is true and facts on 9·11·2020 I witness Lt Stokes and another officer talking about the some tray that the inmate beat his roommate with bloody come out with it in his hand and stated this the tray that he used to beat him with all this happend at Santa Rosa Annex CM wing i was housd in room B1·112 but it all happend in room B1·114 and i overheard him saiding fool i Going to kill you Lt Stoke and this officer stood at my door cell looking at the bloody tray i ask what heppend Lt Stoke told me to say nothing but it was a bloody tray in there hands all the abuve fact is true and 100% true it all happend in B-dorm Santa Rosa Annex 2020

56

Doc. "O"

Doc. "O"

# DECLARATION OF OATH

Under the penalties of perjury, I, ___Isaac   Day___,
declare that I have read the foregoing 'AFFIDAVIT' and that the facts stated in it
are true, pursuant to Florida Statutes, Chapter 92.525, on this _17_ day of
___January___, 20__ . 22

_____ UX8556
Affiant, Declarant

## NOTARY

STATE OF FLORIDA)
COUNTY OF ___Punta Gorda___ )

Before me, the undersigned authority, this day personally appeared
_____, who first being duly sworn, says that he is the
Defendant/Appellant/Petitioner in the above styled cause, that he has read the
foregoing document, and has personal knowledge of the facts and matters therein
set forth and alleged and that each and all of these facts and matters are true and
correct.

_____
(your signature)

The forgoing instrument was acknowledged before me this _17_ day of
___January___, 20 _22_ by _____,
who is personally known to me or has produced a Department of Corrections I.D.
as identification and who did take an oath.

_____        58        _____
MY COMMISSION EXPIRES                              NOTARY PUBLIC

Doc. "P"

should be attached. *Facts not related to this same incident or issue must be addressed in a separate civil rights complaint.*

1) On December 27, 2016 Defendants Sergeant Waters, Sergeant John Doe 1, And C.O. Nelson, All employed as correctional officers At the Department of Corrections Columbia Correctional Institution, conspired with each other while the Plaintiff was housed in the confinement unit At Columbia C.I. to Arrange for the Plaintiff's room-mate Jemar Davis to stab and beat Plaintiff in handcuff As retaliation Action due to them feeling Plaintiff disrespected A Nurse in the past.

2) At Approximately 2:00 A.M. on the forementioned date Defendants Sgt. John Doe 1 And C.O. Nelson cuffed up Plaintiff and pulled him out his designated cell location (H3210) to see A Nurse for a blood sample, ordered by the doctor.

3) There After At Approximately 2:30 A.M. Defendants Sgt. John Doe 1 And C.O. Nelson returned the Plaintiff to his cell And rolled the Plaintiff's cell door open without cutting up his room-mate Jemar Davis and told the Plaintiff to enter.

4) As Defendants Sgt. John Doe 1 And C.O. Nelson Secured the cell door close, Plaintiff's room-mate Jemar Davis began Attacking him with a Sharp home made Knife And a closed fist.

(See Continuation Pages 1 through 6)

5) Plaintiff's roommate Jemar Davis repeatedly stabbed and punched plaintiff while Plaintiff was in handcuffs.

6) Defendants Sgt. John Doe 1 and C.O. Nelson allowed the brutal attack to occur on Plaintiff for approximately 30 seconds before they began spraying a little can of chemical agents into the cell.

7) After such application of chemical agents Plaintiff was able to knock the knife out of his roommate's hand and it went out the cell door's flap.

8) Thereafter Defendants Sgt. John Doe 1 and C.O. Nelson cuffed up Plaintiff's roommate Jemar Davis and opened the cell door and placed them both in seperate showers to wash off the chemical agents.

9) Plaintiff was then escorted to see medical personnel for treatment for the injuries he suffered as a direct result of the brutal attack.

10) Plaintiff suffered digressed vision and periodic flashes of light, migraine headaches approximately 16 stitches to suture back together his severed right nostril, approximately 4 stitches on inside of upper lip, 2 cuts on the back of his head, one deep laceration along the back of his left ear, and bruises and swelling to the left side facial area.

11) Thereafter on 1-11-17, Defendant Sgt. Waters pulled Plaintiff from his assigned cell for a medical call-out and placed the Plaintiff in a holding cage area next to the same inmate (Jamar Davis) the forementioned Defendants conspired to have brutally assault him.

12) Once the holding cage door was secured close and the Plaintiff realized who was seated next to him and advised Defendant Waters that this is the same inmate who just brutally assaulted him days before, Sgt. Waters then stated: "I know. Starting to get the message yet? That's what happens when you disrespect our nurses. We will fuck you up."

13) Thereafter Defendant Sgt. Waters cuffed inmate Jemar Davis up and left the holding cage area. At which time the Plaintiff asked inmate Jemar Davis was that why he assaulted him and inmate Davis stated: "Yes. They're the ones gave me the knife and I do it if they gone bless me." [told me to]

14) Between 1-03-17 and 1-28-17 Plaintiff exhausted all of his administrative remedies pertaining to the incident yet was still being housed in confinement at Columbia incurring threats and harrassment from officers and even confinement orderlies for reprisal for the Plaintiff's filed grievances pertaining to the 12-27-16 incident. So the Plaintiff tried a different method to seek some form of intervention and wrote letters to the F.D.O.C. Secretary's office, the Inspector Generals Office, and F.D.L.E. Headquarters.

15) Approximately between 02/20/17 and 02/28/17 after the barrage of grievance, letters filed by the Plaintiff and phone calls from the Plaintiff's family and finally forced by his physical refusal to leave confinement and and be released to the compound at that institution finally the Plaintiff was transferred but only to a neighboring institution, Suwannee C.I.. However, the Plaintiff was unwilling to remain at the institution due to the reputation of the institution being one of rampant staff abuse, corruption, and even murder of inmates and most importantly for being apart of the "Good Ole Boys" System. Which is a North Florida network of corrupt violent officers. So upon arriving at Suwannee the Plaintiff went Psych Emergency which succeeded in getting him transfered out of the region.

8                    60

16) Approximately April or May of 2017 a response letter from F.D.L.E caught up with the Plaintiff at Dade C.I. informing the Plaintiff the matter was out of their jurisdiction. The Plaintiff never recieved a response or any remedial action for any of his letters to the F.D.O.C. Secretary's office or Inspector General's Office.

17) The Plaintiff did not return to the North Florida Region until February of 2020, after being placed on Close Management 3 at Charlotte C.I. And then transfered to Santa Rosa C.I.'s Close Management Unit Mid February of 2020

8) At Santa Rosa C.I.-Main Unit between August 1, 2020 and September 11, 2020 Defendants C.O. D. Jacobsen, C.O. John Doe 2, LT Neel, And LT Stokes conspired to arrange for Plaintiff's cellmate to brutally attack the Plaintiff as officers had in the first attack, only this time they orchestrated for the attack to occur while the Plaintiff was sleep and with a different weapon. As retaliatory action for filing grievances and a lawsuit filed October 26, 2017 pertaining to the Constitutional violations of the officers involve with orchestrating the 10-27-16 attack. They then also conspired to have Defendants C.O. John Doe 2 And LT Stokes illegally tamper with evidence and falsify Department records And reports to conceal their complicity.

9) Approximately between 08/01/2020 And 08/05/2020 inmate Rashan Mike was brought to the Plaintiff's Assigned cell at Santa Rosa-Main Unit in (B1114) to be Plaintiff's cellmate.

20) On the forementioned approximate date the Plaintiff immediately noticed within the first few hours of inmate Mike being in the cell that he was extremely mentally disturbed and unstable. Inmate Mike often talked to himself in full dialogue And when the Plaintiff or anybody else on the wing held a conversation on the wing with Anyone else in his hearing inmate Mike believed they were talking about, and plotting on, him. He believed everyone was just speaking cryptically so he couldn't understand their true meaning. These delusions often made inmate hostile And threatning toward Plaintiff and others on the wing.

21) Between 08/01/2020 and 08/20/2020 the Plaintiff And his cellmate Rashan Mike at various times had several very hostile verbal altercations that nearly turned physically violent due to inmate Mike's paranoia problem.

22) Approximately 08/25/2020 Inmate Mike while randomly rummaging through his property pulled out his Criminal Case Discovery papers and showed them to the Plaintiff and conveyed to Plaintiff that he was serving a life Sentence for Assaulting An Officer (L.E.O) in his County jail with a seat belt cutter knife because he believed the officer was plotting to harm him.

23) The following day on approximately 08/26/2020 the Plaintiff submitted a grievance regarding the psychological paranoia problems of his cellmate's that made him emotionally unstable And extremely hostile toward the Plaintiff Even threatning to kill the Plaintiff if he discovered the Plaintiff was plotting on him. In the grievance the Plaintiff also conveyed what he knew about inmate Mike's Criminal case to show his disposition to act upon these delusions. Which the Institution's Administration, Security, And Mental Health Departments already knew about. As remedial Action the Plaintiff sought a cell change for either himself or his cellmate Rashan Mike. That grievance was never answered.

24) On approximately 08/30/2020 the Plaintiff stayed back from Shower while his cellmate went to Shower to Attempt to speak to an Officer one on one About the issues with his cellmate. While he was away at Shower so he wouldn't exasperate his cellmate's paranoia problems.

25) On that forementioned date while the Plaintiff's cellmate was away at Shower the Plaintiff succeeded in calling Defendant Officer D. Jacobsen to his door. At that time the Plaintiff conveyed to Defendant Jacobsen that he feared for his safety or what he might be forced to do to his cellmate to defend himself against an attack. The Plaintiff explained about his cellmate's mental health problems And extreme paranoia which Defendant Jacobsen Acknowledged that he already knew about, and Plaintiff explained how those mental problems were making inmate Mike extremely hostile toward him, even threatning Plaintiff to kill him because inmate Mike believed everyone was plotting on him. Plaintiff Also conveyed the several heated altercations that had

9

61

Almost turned physically violent and then enlightened Defendant Officer D. Jacobsen on his cellmate's criminal case to demonstrate his cellmate's proclivity to act upon these delusions. After hearing all of this Defendant D. Jacobsen stated "No. Neither of you are getting Moved! Either get along or go ahead and kill each other. And I'm going to tell the other shifts not to move you either."

26) Thereafter on the same aforementioned date while escorting the Plaintiff's cellmate back to the cell from showers Defendant Officer D. Jacobsen lied to the Plaintiff's cellmate, in an attempt to instigate a physical altercation between the Plaintiff and his cellmate by telling inmate Mike that the Plaintiff had told him while inmate Mike was in the shower that they were either going to move the Plaintiff's Cellmate or he was going to "fuck him up."

27) Thereafter on the same aforementioned date when inmate Mike was returned to the cell he confronted the Plaintiff regarding Officer D. Jacobsen's allegations. Rashan Mike wanted to fight the Plaintiff about the alleged threat, however the Plaintiff was able to defuse the situation by admitting that he had asked the Defendant C.O. Jacobsen to move one of them because they weren't getting along due to inmate Mike always accusing the Plaintiff of things he hadn't done but that he hadn't said anything about harming inmate Mike.

28) After the 08/30/2020, instigation incident by Defendant Officer D. Jacobsen, inmate Rashan Mike started acting even more paranoid and jumpy in the cell anytime the Plaintiff moved around the cell for the remainder of the time they were in the cell together.

29) On approximately about 09/03/2020 inmate Mike asked the Plaintiff for help writing a grievance about proper indicating he'd only asked because he knew the Plaintiff was good at filing grievances and law suits. Plaintiff became alarmed at this revelation and asked his cellmate how he knew about Plaintiff's grievances and law suits. Inmate Mike was quiet for a moment and then lied stating he had heard it from other inmates. The Plaintiff knew this to be a lie because it had been nearly 2 years, and at a entirely different camp and region when his previous law suit had been dismissed there was no way for anyone on the wing to know about it and due to COVID-19 protocol the entire institution was on lock down. There was no recreation, dayroom, or group privileges. He hadn't been to any call out in the month he'd been in the Plaintiff's cell there was nowhere for him to have gone to hear it from other inmates. There was only one plausible source: Officers. Likely trying to depict the Plaintiff as a snitch.

30) On approximately 09/05/2020 or 09/06/2020 the Plaintiff's cellmate went to a denial call-out and while he was at call-out the dorm Lieutenant Defendant L.t. Neel did security check rounds in B-1 quad. At that time the Plaintiff stopped him and conveyed his ordeal with his current cellmate, Defendant C.O. D. Jacobsen's instigation and the Plaintiff's unresponded to grievances, and then asked Defendant L.t. Neel if he would move either the Plaintiff or his cellmate. Defendant LT Neel refused to intervene in any way merely stating "We aren't doing any Moves." Then walked away.

31) Approximately on 09/09/2020 or 09/10/2020 Defendant Officer Jacobsen at dinner meal time gave the Plaintiff's cellmate Rashan Mike an extra tray and then allowed him to keep the extra hard tray at tray pick up. Plaintiff insisted his cellmate hurry to finish eating so he could give the tray back because they could both incur disciplinary action if the tray was found in their cell past feeding time. Inmate Mike then stated "No. It's okay. Jacobsen knows what's up. He straight. I'll just push it back at breakfast." The Plaintiff did not know at the time Defendant Jacobsen had just equipped his cellmate he was later use in an attack against him.

32) On 09/11/2020 at approximately between 12:00 A.M. and 3:00 A.M. while the Plaintiff was asleep in his assigned top bunk he was attacked in an planned attack by his cellmate with the confinement tray that Defendant had armed him with.

33) In the 09/11/2020 attack on the Plaintiff After being struck with what he believes was the initial blow by his cellmate, Rashan Mike, Plaintiff regained consciousness for a moment of lucidity he would not recall until about a year later due to memory loss caused by brain damage sustained in the attack, and saw his cellmate poised over him with a large dark object in his hands preparing to strike the Plaintiff in the face again with it. The Plaintiff was subsequently struck again and knocked unconscious

10 of 62

34) The Plaintiff's cellmate continued to mercilessly beat the plaintiff in the face and head with the heavy confinement tray for a undetermined length of time before dragging the Plaintiff's unconscious body out of the top bunk making the back of the plaintiff's head collide with and burst open on the cell floor. Then standing over the plaintiff now, recommenced to beating the plaintiff in the face with the tray for an undetermined amount of time.

35) Approximately 3:30 A.M. Defendant John Doe 2 was in quad B-1 doing security rounds, he later stated in his disciplinary report, when he heard a commotion coming from cell B-1114 and upon approaching the cell he witnessed through the cell door window Rashan Mike standing over plaintiff's lifeless body repeatedly striking him in the ? No chemical agents were administered, though Defendant John Doe 2 does state he ordered inmate Mike to stop.

36) Approximately 3:35 A.M. Back up arrived to assist Defendant John Doe 2 in dragging the Plaintiff from the cell and laying him on the ground infront of cell B-1114 until Medical arrived.

37) Approximately around 4:00 A.M. on 09/11/2020 Medical staff arrived on the wing, the plaintiff was placed on a stretcher. And rushed to medical to attempt to treat his injuries. However, it was concluded that the extent of his injuries was beyond the institution's medical departments capacity to treat and so an Emergency Ambulance was called and plaintiff was transported to Sacredheart Hospital in Milton, Florida.

38) The Plaintiff remained in a coma at Sacredheart Hospital for nearly two weeks from 09/11/2020 until 09/23/2020 ~~between~~ to 09/25/2020 and where his immediate injuries were treated.

39) In the 09/11/2020 assault on the plaintiff by his cellmate, though orchestrated by officers, the plaintiff suffered a broken jaw, a broken right eye socket, and severely damaged right eye that resulted in a massive trauma induced cataract so that he could not see out of his right eye until his May 10, 2021 eye surgery could be underwent to remove the cataract and place a lens in his eye all as a direct result of the 9/11/2020 assault. The Plaintiff also suffered as a result of the attack a broken nose, and the loss of his top three front teeth that were knocked out in the attack along with a large portion of his gums that tore out with the teeth. The Plaintiff also sustained in the attack multiple lacerations to his face and head most of which had to be sutured close, he also sustained massive hemorraging of the br. and swelling that resulted in some permanent and some temporal brain damage that resulted in memory loss and diminished cognitive abilities and nerve damage that all drastically diminished his quality of life. The Plaintiff also learned from the nurses in the hospital that he was lucky to be alive because he had actually died in the ambulance on the way to the hospital and had to be revived.

40) Between the 09/23/2020 to 09/25/2020 approximate date of the Plaintiff waking up from the coma and his approximate 09/29/2020 discharge from the Sacredheart hospital the plaintiff had about 3 sessions with medical therapist to teach the Plaintiff to walk again and swallow without choking. Medical staff at the hospital expressed ~~to both~~ the plaintiff their desire keep the Plaintiff in their care longer to complete his treatment but reluctantly they had to discharge him because the institution had "Security Concerns".

41) Between 09/23/2020 to 09/25/2020 when the Plaintiff awoke from the coma he was confused about why he was in the Hospital and badly injured. He had no knowledge of the attack or even knowledge of the past year of his life. Plaintiff had no recollection of his moments of lucidity of being struck due to temporal memory loss. The plaintiff was enlightened by the nurses and physicians at the hospital in charge of his care that he had suffered major brain trauma and hemorraging due to an attack by his cellmate supposedly with a food tray and that's why he could remember much but that some of the memory and cognitive skills would come back hopefully over the following months and years, dependent that the Plaintiff doesn't suffer any further major head trauma. but that some were likely permanent.

42) Approximately 09/29/2020 or 09/30/2020 the Plaintiff was discharged from the Hospital and relocated to Santa Rosa C.I.'s Medical infirmary due to "Security Concerns." Plaintiff in Santa Rosa's infirmary awaiting transfer to F.D.C Medical center in Lake Butler, Florida. To receive another CatScan on his brain to determine the extent of the damage and to be treated by the Neurologist, Oral Surgeon, and Optometrist. All for injuries sustained in the 9/11/2020 assault.

43) Approximately between 10/01/2020 and 10/08/2020 while the Plaintiff was housed in the infirmary at Santa Rosa C.I. He obtained ~~obtained~~ (2) request forms (DC6-236 Form) and a pen and equipped with the information he had obtained from hospital personnel of what had happen along with the few memories the nurses and ?

1163

Staff back at Santa Rosa's infirmary were able to help galvanize the Plaintiff attempted to submit (2) informal grievances pertaining to incident and the main two things that he could now remember vividly: his conversation with officer Jacobsen and his subsequent antagonism of the entire incident and his conversation with LT Neel and his subsequent indifference. Neither of these grievances to the Colonel and Inspector General were answered

44) Between these same aforementioned 10/01/2020 and 10/08/2020 dates on the date after the Plaintiff submitted his informal grievances the DR investigator came to see the Plaintiff in the infirmary in regards to his making a statement in the DR investigation. However, due to memory loss and having been unconscious for nearly the entire incident he was unable to provide much of a statement.

45) On the aforementioned date while speaking to the DR investigator the investigator read the Plaintiff a copy of the DR to be served to inmate Mike for the 9/11/2020 assault on the Plaintiff and allowed the Plaintiff to see the DR. Although at the time of his conversation with the DR investigator the Plaintiff could not recall his lucid moments due to temporal memory loss. Later around mid September of 2021 the Plaintiff would begin to recall his lucid moments and a few other memories. The Plaintiff recalled seeing a large dark object in his cellmate's hands raised as he quickly prepared to strike him again. Although it was too dark in the cell for the Plaintiff to distinguish exactly what the object was at the time. Armed now also with the information provided by the hospital personnel of what he'd supposedly been attacked with along with the statement made by the optometrist at Butler who stated the cataract had been caused by some form of debris and when I informed him of what I'd supposedly been attacked with he stated "That definitely explains it." So at that time in mid-September of 2020 everything came together to portray a clear picture that the reporting officer who had written the disciplinary report against Rashan Mike, Defendant John Doe 2, had falsified his report by omitting the weapon used. However at that time the Plaintiff could not prove it

46) Approximately November 20, 2020 after having been transferred to R.M.C. for medical and after giving ample added time for his informal grievances' answers to follow him to R.M.C. the Plaintiff attempted again to submit 2 more informal level grievance at R.M.C. However addressed to the Colonel and I.G. again at Santa Rosa C.I. After that time elapsed for those grievances to be timely responded to, the Plaintiff attempted a different and addressed his next informal to the Assistant Warden at Santa Rosa in hopes they would not also employ these same subversive non-response tactics however they did and finally after several attempts the Plaintiff just by-passed the informal level altogether utilizing provision Chapter 33-103.011(4). However, at both successive institutional formal level and secretarial level both employed a common custom subversively employed pervasively throughout every level or officials within the Department of Corrections to elude addressing the issues of grievances that are problematic by not responding to informal level grievances so that when a grievant attempts to circumvent this obstruction by utilizing the Ch. 33-103.011(4) provision they inturn ignore their own procedures and respond as they did in both formal levels in the Plaintiff grievance process stating "... Non-compliance with the Rules of ... Chapter 33-103.014(f)(9) ... requires that you first submit an informal grievance at the appropriate level at the institution... You have not done so or have not provided this office with a copy..." When the Defendants falsely return a grievance without action it effectively prevents Plaintiff from accessing the court as to the claim in that grievance because return without action bars Plaintiff's claims from the court under the PLRA for failure to exhaust.

47) Subsequently on 11/15/2021 while housed on close management at Charlotte C.I. in F-dorm the Plaintiff was reaquainted with inmate Isaac Day whom was assigned as F-dorm's Houseman orderly inmate Day was also housed at Santa Rosa - main unit in B-dorm in Quad 1 with the Plaintiff. Inmate Day was housed in cell B-1112. Almost directly accross from the Plaintiff's cell in B-1114 on 09/11/2020 the morning of the attack on the Plaintiff

48) On the forementioned date inmate Isaac Day stopped at the Plaintiff's cell in F-2206 and discussed what he had witnessed the morning of the 09/11/2020 attack. Inmate Day resubstantiated again that the Plaintiff had been beaten with a confinement tray by his former cellmate. Plaintiff asked inmate Day if he was sure about the tray because although he does remember seeing a large object in his cellmate's hands before he was hit with and knocked unconscious. And having been told by multiple people at the hospital it had been with a tray still he had read the DR served to Rashan Mike for the assault and no where did it say anything about a tray or any weapon besides. Mr. Day assured the Plaintiff he was 100% sure because not only had he the watch the same initial officer to the cell (Defendant John Doe 2) later return to the cell when the Lieutenant arrived

12  64

And retrieved the bloody tray and exited the cell with it in his hand without photographing or cataloging it on the Scene as required pur F.A.C. Chapter 33 procedures but that he also witnessed Defendant John Doe 2 walk up to his Supervisor Defendant LT Stokes near enough to his cell for him hear Defendant John Doe 2 state to Defendant LT Stokes as he handed him the tray that it was what he saw the inmate Rashan Mike beating the Plaintiff

49) On the same forementioned date while Speaking to inmate Day he conveyed to the Plaintiff having had a Suspicion there was about to be a cover up when he witnessed Defendant LT Stokes tamper with evidence by leaving the Quad with the weapon used in the attack without photographing it, packaging it, or cataloging it after hearing officers express their beleif that the victim (Plaintiff) was dead.

50) On both 11/15/2021 and 01/17/2022 Inmate Isaac Day provided the Plaintiff with 2 sworn Affidavits delineating what he witnessed.

13    65

Doc. "Q"



## STATE OF FLORIDA
## DEPARTMENT OF CORRECTIONS

**INMATE REQUEST**

510-239-0315

Mail Number: _____
Team Number: _____
Institution: _____

**TO:** (Check One)  ☑ Warden  ☐ Classification  ☐ Medical  ☐ Dental
☐ Asst. Warden  ☐ Security  ☐ Mental Health  ☐ Other

| FROM: Inmate Name | DC Number | Quarters | Job Assignment | Date |
|---|---|---|---|---|
| Richard A. Bell | C03384 | G-1209 | N/A | 9/12/2023 |

**REQUEST**   C03384   Check here if this is an informal grievance ☑

I am grieving the notice that false information that is potentially injurious to me has been included in my inmate file.

Recently during the discovery proceedings of my current 1983 civil complaint against FDOC officials, I procured documents pertaining to me and another inmate involved in an incident in the email from Lt. Dice (see attached) he gives information about both inmates from our inmate files, in this recitation he states, "I/M Bell is A-Status inmate with a - NO S.T.G. Charges out of Orange County, A ERSD of Life, And is 32 years old. And has TWO PRIOR ESCAPE CHARGES." This assertion from my inmate file is false I have NEVER Attempted or been charged with escape, I've never even been written a DR for a infraction related to escape, such as possession of escape paraphernalia. This false information being included in my inmate file precludes me from denial job opportunities programs And housing statuses that would be beneficial if I succeed in my criminal appeal. (See continuation Attached)

All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All informal grievances will be responded to in writing.

Inmate (Signature): _____   DC#: C03384

---

**DO NOT WRITE BELOW THIS LINE**                    RECEIVED

**RESPONSE**                    DATE RECEIVED: SEP 12 2023

Charlotte C.I.
Assistant Warden

A review of your file shows no indication of any escape charge.
~~There is no escape charge that would affect your housing or job placement.~~

MAILED DATE:

SEP 14 2023

[The following pertains to informal grievances only:]
Based on the above information, your grievance is ___**denied**___. (Returned, **Denied** or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

| Official (Print Name): G. Brock | Official (Signature): G. Bk | Date: 9/12/23 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C, attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

66
68
Cecil

Doc."Q"

(Continuation Page : Falsified information inmate file informal level grievance)

## REMEDY SOUGHT

I seek that my inmate file be reviewed And that this false information be removed from my inmate file And that Any Changes to my housing and/or Classification Status resulting be made.

Thank you for your time And Attention to this matter

Gratefully submitted,

Doc. "Q"

**Rister, Alexis**

| | |
|---|---|
| **From:** | Dice, Drew A. |
| **Sent:** | Friday, September 11, 2020 8:23 AM |
| **To:** | Stokes, Marcus; Moss, Brandon; Schrock, Joseph; Carr, Justin; Barlow, Zachary; Rathbone, Terrylee; Tucker, Preston; Norris, Shawn; Oakes, Bradley; Jackson, Matthew; Clemmons, Walker; Martin, John T.; Olson, Robert; Fulford, Scott; Turner, William; Lingo, Timothy; Wiser, Jessica; Briggs, Jeffery; Patrick Hughes, Christopher; Beem, James Jr.; Tucker, Helen; Goddard, Diva; Smith, Jeffrey M.; Neel, Justin; Dykes, Travis E.; Brown, Latoya C.; Pittman, James D.; Santiago, Jessica; Pratt, Christopher; White, Patrick; Reyes, Peter; Wheaton, Thomas; McCranie, Tyler; Evans, James; Butler, Tim; Blum, Randy; Unruh, Joshua; Nousiainen, Jeffrey; Cannon, William A.; Youngs, Darwin; Raben, Dale; Leavins, Donald; Jones, Johnathan; Richter, Charles; Hair, Joseph |
| **Cc:** | Knight, Janine |
| **Subject:** | CIS IM BELL ▮▮▮ BATTERY |
| **Attachments:** | CIS  IM BELL BATTERY AND ▮▮▮.docx; IMG_0454.jpg; IMG_0455.jpg; IMG_0453.jpg |

IM BELL, RICHARD DC#C03384
IM MIKE, RASHAN DC# W32521
OFC HENRY WAS ▮▮▮▮▮▮▮▮ IN WING ONE OF B DORM, WHEN HE HEARD A ALTERCATION COMING FROM CELL B1114, WHICH HOUSES IM BELL AND IM BELL. OFC HENRY NOTICED IM MIKE STANDING OVER IM BELL WHO WAS ▮▮▮▮▮▮▮ AND SAW THAT IM BELL HAD SEVERE ▮▮▮▮▮▮▮. OFC HENRY ORDERED IM MIKE TO SUBMIT TO RESTRAINTS TO WHICH HE COMPLIED. LT DICE AND LT CARTER ENTERED THE CELL AND PLACED IM BELL IN RESTRAINTS, ▮▮▮▮▮▮▮▮▮▮▮▮▮ IM MIKE WAS SECURED IN A SHOWER CELL AND CELL B1114 WAS SECURED AS A CRIME SCENE. IM AT 5:40AM ▮▮▮▮▮▮ CONTACTED ▮▮▮▮▮ IM BELL TO BE ▮▮▮▮▮. COLONEL CANNON WAS NOTIFIED AND AUTHORIZED THIS ▮▮▮. A ▮▮▮▮ WAS ASSEMBLED AND IM BELL ▮▮▮▮▮▮▮. IM MIKE WAS SEEN BY ▮▮▮▮. IM MIKE WAS SECURED BACK INTO THE SHOWER CELL, UNTIL FURTHER INSTRUCTIONS ARE RECEIVED. COLONEL CANNON AND EAC MCCARY NOTIFIED OF THIS INCIDENT. AT ▮▮▮ IM BELL ▮▮▮▮▮▮▮
BOTH INMATES HAVE BEEN HOUSED TOGETHER IN B1114 SINCE AUGUST 3, 2020.
IM BELL IS A ▮▮▮ STATUS INMATE WITH A ▮▮▮▮ NO STG, CHARGES OUT OF ORANGE COUNTY, A ERSD OF LIFE, AND IS 32 YEARS OLD. AND HAS **TWO PRIOR ESCAPE CHARGES.**
IM MIKE IS A ▮▮▮ STATUS INMATE WITH A ▮▮▮▮▮▮, ▮▮▮▮▮▮ CHARGES OUT OF PALM BEACH COUNTY, A ERSD OF LIFE, AND IS 33 YEARS OLD.
▮▮▮:
OFFICER N. WEBB
OFFICER R. CLIFFTON
OFFICER N. PRICE
OFFICER W. WARREN


Please see attached.

**Drew Dice**
**Correctional Officer Lieutenant**

68

1



Doc."R"

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA

**RICHARD ALLEN BELL**
    **Plaintiff,**

**v.**                     **Case No.: 3:22-cv-04701-MCR-HTC**

**JACOBSEN, et. al.,**
    **Defendants.**
_____/

### DEFENDANT DREW JACOBSEN'S RESPONSE
### TO PLAINTIFF'S INTERROGATORIES AND
### REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Drew Jacobsen ("Jacobsen" or "Defendant") responds to Plaintiff's Interrogatories and Request for Production of Documents as follows:

1.    State the duties of Defendant Officer Drew Jacobsen, while a Correctional Officer at Santa Rosa Correctional Institution ("Santa Rosa"). If those duties are set forth in any job description or other document, produce the document(s).

**Response: I was assigned as a Corrections Officer during my employment with Santa Rosa Correctional Institution ("SRCI").**

2.    State the duties of defendant Justin Neel, while a Lieutenant at Santa Rosa, insofar as they pertain to his supervisory role over, and

69

responsibility and liability for, his subordinate officers. If those duties are set forth in any job description or other document, produce the document(s).

**Response: To the best of my recollection, Lt. Neel was assigned as dorm lieutenant during the times I knew him at "SRCI".**

3.    State the names, title, and duties of all security personnel at Santa Rosa between June 1, 2020 through October 1, 2020 assigned security detail for B-dormitory Second Shift 7:00 a.m. to 7:00 p.m.. If those duties are set forth in any job description or other document, produce the documents.

**Response: Objection. Overly broad and not likely to lead to the discovery of admissible evidence. Notwithstanding this objection, I recall very few names of officers working this detail during the dates requested including Officer Manners, Officer Miller, Officer Porter, and Sgt. Burns.**

4.    State the procedure in effect during September of 2020 at Santa Rosa, and if applicable pursuant to Florida Administrative Code, for a Security Official to employ if he/she are made aware of a substantial risk of serious physical threat posed to a inmate confined to segregation housing by his cellmate. And further if the inmate is the individual who notifies the security official of the physical jeopardy he is in and requests of the security official for his intervention to be removed from the hostile situation. If these

70

Doc. "R"

procedures are set forth in any policy, directive , or other document, produce

the document(s).

**Response: If a serious risk of physical threat exists, we would normally separate the inmates and move them to different housing and then investigate the threat. I do not recall any provision of the Florida Administrative Code that addresses this issue.**

5.   State the procedures in effect during September of 2020 at Santa Rosa, and if applicable pursuant to Florida Administrative Code, for a security supervisory official to employ if he/she are made aware of a substantial risk of serious physical harm posed to an inmate created by the reckless, malicious, and illicit behavior of a subordinate office. And further if the inmate is the individual that notified the security supervisory of the physical jeopardy he is in and requests for the security supervisor to intervene and remove the inmate from the hostile situation. If these procedures are set forth in any policy, directive, or other document, produce the document(s).

**Response: If such a complaint was made, supervisors would evaluate the claim and if there is any merit to the complaint, either the officer or inmate was moved to a different dorm. Disciplinary action could be taken if the action was that grievous. I do not recall any provision of the Florida Administrative Code that addresses this issue.**

6.   State the procedures in effect during September of 2020 at Santa Rosa, and if applicable, pursuant to Florida Administrative Code, for security

71

Doc."B"

personnel to employ in reporting and investigating a inmate assault involving

a weapon, including the procedures for collection, preservation, and

disposition of evidence. If these procedures are set forth in any policy,

directive, or other document, produce the document(s).

**Response: Such an incident is treated like a crime scene and, depending on the injuries, FDLE may be called in. I do not recall any provision of the Florida Administrative Code that addresses this issue.**

7.      State the names, title, and duties of all staff members at Santa

Rosa who have responsibility for responding to, investigating or deciding

inmate grievances. If those duties are set forth in any job description, policy

directive, or other document, produce the document(s).

**Response: Overly broad and not likely to lead to the discovery of admissible evidence. Notwithstanding this objection, an assistant warden is generally responsible for investigating grievances. I do recall the name of the assistant warden at the time of the alleged incident.**

8.      State the procedures in effect during October of 2020 through

January of 2021 at Santa Rosa, and if applicable pursuant to Florida

Administrative Code, for the Reviewing Authority to a inmate's formal level

grievance to employ in responding to, investigating, and deciding inmate

grievances, in situations where officials responsible for responding to a

inmate's informal level grievance fail to do so or fail to do so timely once the

inmate proceeds to the next step of the grievance process and clearly

72

Doc. "R"

indicates this fact in his formal grievance. If these procedures are set forth in any policy, directive, or other document, produce the document(s).

**Response: Overly broad and not likely to lead to the discovery of admissible evidence; further, I do not understand this request at all. I do not know of any provision of the Florida Administrative Code that may address this issue.**

9.     State the procedures in effect during January of 2021 through February of 2021 at the Secretary of Florida Department of Corrections Office, and if applicable pursuant to Florida Administrative Code, for the Secretary's Representative to employ in responding to, investigating, and deciding inmate grievances when the Representative becomes aware of a procedural error committed by the Reviewing Authority in Return[ing] without action a inmate's formal level grievance. If these procedures are set forth in any policy, directive, or other document, produce the document(s).

**Response: I am not familiar with procedures at the Department of Corrections level and cannot provide a response to this request.**

10.     State the procedures in effect during August of 2020 through September of 2020 at Santa Rosa, and if applicable pursuant to Florida Administrative Code, for passing out and collecting trays and other food service apparatuses at mealtime in Close Management Units, and any rules restricting inmates from holding food service items in their cells after meals.

73

If these procedures are set forth in any policy, directive, or other document,

produce the document(s).

**Response: Trays are passed out at the beginning of the meal and are collected at the end of the meal. All trays are accounted for at the end of the meal and no trays are left in a cell.**

11.   Describe in detail how the incident described in the complaint

happened, including all actions taken by you to prevent the incident.

**Response: I was not present at the time of the incident and have no knowledge of how this incident happened.**

12.   Describe in detail each act or omission on the part of any party

to this lawsuit that you contend was a contributing legal cause of the incident

in question.

**Response: I was not present at the time of the incident and have no knowledge of how this incident happened.**

13.   State the facts upon which you rely for each affirmative defense

in your Answer.

**Response: The affirmative defenses claiming immunity and privilege are based on state and federal law. Other affirmative defenses are fact based and Defendant is still obtaining facts through discovery that may be used in asserting these defenses.**

14.   Do you contend any person or entity other than you is, or maybe,

liable in whole or part for the claims asserted against you in this lawsuit? If

74

Doc. "B"

so, state the full name and address of each such person or entity, the legal basis for your contention, the facts or evidence upon which your contention is based, and whether or not you have notified each such person or entity of your contention.

**Response: I am not aware of anyone who may be liable in whole or in part for any claims asserted in this lawsuit.**

15.   List the names and addresses of all persons who are believed or known by you, your agents, or your attorneys to have any knowledge concerning any of the issues in this lawsuit; and specify the subject matter about which the witness has knowledge.

**Response: I am not aware of anyone who may have knowledge of the issues alleged in this lawsuit.**

16.   Have you heard or do you know about any statement or remark made by or on behalf of any party to this lawsuit, other than yourself, concerning any issue in this lawsuit? If so, state the name and address of each person who made the statement or statements, the name and address of each who heard it, and the date, time, place, and substance of each statement.

**Response: No.**

75

Doc. "B

17.   Please state if you have ever been a party, either plaintiff or defendant, in a lawsuit other than the present matter, and, if so, state whether you were plaintiff or defendant, the nature of the action, and the date and court in which suit was filed.

**Response: No.**

* * * * *

76

Doc. "R"

_DREW JACOBSEN_

STATE OF FLORIDA

COUNTY OF Okaloosa

The foregoing instrument was acknowledged before me this 6th day of

June , 2023, by **DREW JACOBSEN** who affirmed that he

provided the answers to the foregoing interrogatories and that said answers

are true and correct to the best of his knowledge or belief. **DREW**

**JACOBSEN** is personally known to me or has produced

FL DL as identification and did take an oath.



[SEAL]

Notary Public
Printed Name: Josephif Barnett

Doc. "R"

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to Richard Allen Bell, C03384, Charlotte Correctional Institution, 33123 Oil Well Road, Punta Gorda, FL 33955 by U.S. Mail this 6th day of June, 2023.

/s/ Larry A. Matthews

**Larry A. Matthews**
Florida Bar No.:  0339601
**Raymond F. Higgins, III**
Florida Bar No.:  0153117
**MATTHEWS & HIGGINS, LLC**
913 Gulf Breeze Parkway #33
Gulf Breeze, FL  32561
(850) 434-2200 Telephone
(850) 434-2600 Facsimile
E-Mail: LMatthews@matthewshigginslaw.com
RHiggins@matthewshigginslaw.com
TCrumbley@matthewshigginslaw.com
**Attorneys for Defendants**

78



Doc. 5

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA

**RICHARD ALLEN BELL**
     **Plaintiff,**

**v.**                                        **Case No.: 3:22-cv-04701-MCR-HTC**

**JACOBSEN, et. al.,**
     **Defendants.**
_____/

## DEFENDANT JUSTIN NEEL'S RESPONSE
## TO PLAINTIFF'S INTERROGATORIES AND
## REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Justin Neel ("Neel" or "Defendant") responds to Plaintiff's

Interrogatories and Request for Production of Documents as follows:

1.     State the duties of Defendant Officer Drew Jacobsen, while a

Correctional Officer at Santa Rosa Correctional Institution ("Santa Rosa"). If

those duties are set forth in any job description or other document, produce

the document(s).

**Response: To the best of my recollection, Officer Jacobsen was assigned as a Corrections Officer during the times I knew him at the Santa Rosa Correctional Institution ("SRCI").**


2.     State the duties of defendant Justin Neel, while a Lieutenant at

Santa Rosa, insofar as they pertain to his supervisory role over, and

responsibility and liability for, his subordinate officers. If those duties are set

forth in any job description or other document, produce the document(s).

79

Doc. "S"

**Response: Defendant was assigned as a dorm lieutenant during his employment with Santa Rosa Correctional Institution ("SRCI"). Supervised the overall activities in the dorm.**

3.    State the names, title, and duties of all security personnel at Santa Rosa between June 1, 2020 through October 1, 2020 assigned security detail for B-dormitory Second Shift 7:00 a.m. to 7:00 p.m.. If those duties are set forth in any job description or other document, produce the documents.

**Response: Objection. Overly broad and not likely to lead to the discovery of admissible evidence. Notwithstanding this objection, I recall very few names of Officers working this detail during the dates requested. I recall Drew Jacobsen only because he is a co-defendant in this lawsuit.**

4.    State the procedure in effect during September of 2020 at Santa Rosa, and if applicable pursuant to Florida Administrative Code, for a Security Official to employ if he/she are made aware of a substantial risk of serious physical threat posed to a inmate confined to segregation housing by his cellmate. And further if the inmate is the individual who notifies the security official of the physical jeopardy he is in and requests of the security official for his intervention to be removed from the hostile situation. If these procedures are set forth in any policy, directive , or other document, produce the document(s).

80

Doc. "5"

**Response: If a serious risk of physical threat exists, we would normally separate the inmates and move them to different housing and then investigate the threat. I do not recall any provision of the Florida Administrative Code that addresses this issue.**

5.      State the procedures in effect during September of 2020 at Santa

Rosa, and if applicable pursuant to Florida Administrative Code, for a

security supervisory official to employ if he/she are made aware of a

substantial risk of serious physical harm posed to an inmate created by the

reckless, malicious, and illicit behavior of a subordinate office. And further if

the inmate is the individual that notified the security supervisory of the

physical jeopardy he is in and requests for the security supervisor to

intervene and remove the inmate from the hostile situation. If these

procedures are set forth in any policy, directive, or other document, produce

the document(s).

**Response: These complaints are relatively common though generally without merit. If such a complaint was made, we would evaluate the claim and if there is any merit to the complaint, either the officer or inmate was moved to a different dorm. Disciplinary action could be taken if the action was that grievous. I do not recall any provision of the Florida Administrative Code that addresses this issue.**

6.      State the procedures in effect during September of 2020 at Santa

Rosa, and if applicable, pursuant to Florida Administrative Code, for security

personnel to employ in reporting and investigating a inmate assault involving

Doc "3"

a weapon, including the procedures for collection, preservation, and disposition of evidence. If these procedures are set forth in any policy, directive, or other document, produce the document(s).

**Response: Such an incident is treated like a crime scene and, depending on the injuries, FDLE may be called in. I do not recall any provision of the Florida Administrative Code that addresses this issue.**

7.   State the names, title, and duties of all staff members at Santa Rosa who have responsibility for responding to, investigating or deciding inmate grievances. If those duties are set forth in any job description, policy directive, or other document, produce the document(s).

**Response: Overly broad and not likely to lead to the discovery of admissible evidence. Notwithstanding this objection, an assistant warden is generally responsible for investigating grievances. I do recall the name of the assistant warden at the time of the alleged incident.**

8.   State the procedures in effect during October of 2020 through January of 2021 at Santa Rosa, and if applicable pursuant to Florida Administrative Code, for the Reviewing Authority to a inmate's formal level grievance to employe in responding to, investigating, and deciding inmate grievances, in situations where officials responsible for responding to a inmate's informal level grievance fail to do so or fail to do so timely once the inmate proceeds to the next step of the grievance process and clearly

Doc. "5"

indicates this fact in his formal grievance. If these procedures are set forth in any policy, directive, or other document, produce the document(s).

**Response: Overly broad and not likely to lead to the discovery of admissible evidence; further, I do not understand this request at all. I do not know of any provision of the Florida Administrative Code that may address this issue.**

9.     State the procedures in effect during January of 2021 through February of 2021 at the Secretary of Florida Department of Corrections Office, and if applicable pursuant to Florida Administrative Code, for the Secretary's Representative to employ in responding to, investigating, and deciding inmate grievances when the Representative becomes aware of a procedural error committed by the Reviewing Authority in Return[ing] without action a inmate's formal level grievance. If these procedures are set forth in any policy, directive, or other document, produce the document(s).

**Response: I am not familiar with procedures at the Department of Corrections level and cannot provide a response to this request.**

10.     State the procedures in effect during August of 2020 through September of 2020 at Santa Rosa, and if applicable pursuant to Florida Administrative Code, for passing out and collecting trays and other food service apparatuses at mealtime in Close Management Units, and any rules restricting inmates from holding food service items in their cells after meals.

83

Doc. "J"

If these procedures are set forth in any policy, directive, or other document,

produce the document(s).

**Response: Trays are passed out at the beginning of the meal and are collected at the end of the meal. All trays are accounted for at the end of the meal and no trays are left in a cell.**

11.   Describe in detail how the incident described in the complaint

happened, including all actions taken by you to prevent the incident.

**Response: I was not present at the time of the incident and have no knowledge of how this incident happened.**

12.   Describe in detail each act or omission on the part of any party

to this lawsuit that you contend was a contributing legal cause of the incident

in question.

**Response: I was not present at the time of the incident and have no knowledge of how this incident happened.**

13.   State the facts upon which you rely for each affirmative defense

in your Answer.

**Response: The affirmative defenses claiming immunity and privilege are based on state and federal law. Other affirmative defenses are fact based and Defendant is still obtaining facts through discovery that may be used in asserting these defenses.**

14.   Do you contend any person or entity other than you is, or maybe,

liable in whole or part for the claims asserted against you in this lawsuit? If

84

Doc. "5"

so, state the full name and address of each such person or entity, the legal basis for your contention, the facts or evidence upon which your contention is based, and whether or not you have notified each such person or entity of your contention.

**Response: I am not aware of anyone who may be liable in whole or in part for any claims asserted in this lawsuit.**

15.    List the names and addresses of all persons who are believed or known by you, your agents, or your attorneys to have any knowledge concerning any of the issues in this lawsuit; and specify the subject matter about which the witness has knowledge.

**Response: I am not aware of anyone who may has knowledge of the issues alleged in this lawsuit.**

16.    Have you heard or do you know about any statement or remark made by or on behalf of any party to this lawsuit, other than yourself, concerning any issue in this lawsuit? If so, state the name and address of each person who made the statement or statements, the name and address of each who heard it, and the date, time, place, and substance of each statement.

**Response: No.**

Doc. "S"

17.   Please state if you have ever been a party, either plaintiff or defendant, in a lawsuit other than the present matter, and, if so, state whether you were plaintiff or defendant, the nature of the action, and the date and court in which suit was filed.

**Response: I have been a defendant in several lawsuits filed by inmates. To my recollection, most of the lawsuits have been filed in Santa Rosa County Circuit Court but I do not recall the dates and have no documentation of the lawsuits.**

\* \* \* \* \*

Doc. "S"

_____

**JUSTIN NEEL**

STATE OF FLORIDA

COUNTY OF _Escambia_

The foregoing instrument was acknowledged before me this 2nd day of

_June_ , 2023, by **JUSTIN NEEL** who affirmed that he provided

the answers to the foregoing Interrogatories and that said answers are true

and correct to the best of his knowledge or belief. **JUSTIN NEEL** is

personally known to me or has produced _____ as

identification and did take an oath.

[SEAL]

NOTARY PUBLIC
STATE OF FLORIDA

LORI TISDALE
Commission # HH 387441
Expires August 15, 2027

_Lori Tisdale_

Notary Public

Printed Name: _Lori Tisdale_

87
9

Doc. "S"

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished to Richard Allen Bell, C03384, Charlotte Correctional Institution, 33123 Oil Well Road, Punta Gorda, FL 33955 by U.S. Mail this 5th day of June, 2023.

/s/ Larry A. Matthews
**Larry A. Matthews**
Florida Bar No.:  0339601
**Raymond F. Higgins, III**
Florida Bar No.:  0153117
**MATTHEWS & HIGGINS, LLC**
913 Gulf Breeze Parkway #33
Gulf Breeze, FL  32561
(850) 434-2200 Telephone
(850) 434-2600 Facsimile
E-Mail: LMatthews@matthewshigginslaw.com
        RHiggins@matthewshigginslaw.com
        TCrumbley@matthewshigginslaw.com
**Attorneys for Defendants**

88

Doc."T"

F.A.C. Ch. 33-501.301(4)(f) Inmates shall be limited to possession of no more than 15 research items from the law library. Research items shall be loaned for a maximum of 21 days. Inmates who fail to return research items within 21 days shall be subject to disciplinary action as provided in Rules 33-601.301–.314, F.A.C. Institutions shall also limit the accumulation of research materials when possession of same in an inmate's cell creates a safety, sanitation, or security hazard.

(3) Employees shall have access to this rule through rule books maintained in the departments within the institution to which they are assigned.

(4) Inmates shall have access to this rule from the inmate library. Inmates who are not in open population shall be able to access this rule through their housing officer in the confinement unit. Inmates in institutions or facilities without libraries shall have access to this rule from the classification office or security shift supervisor's office.

**AUTHORITY**
$ Authority 944.09 FS.

Law Implemented 944.09 FS.

**HISTORY**
New 10-12-89, Amended 1-15-92, 4-10-95, 12-7-97, Formerly 33-29.004, Amended 10-11-00, 2-9-05, 3-25-08, 5-27-12.

**33-103.005 Informal Grievance.**
(1) Inmates shall utilize the informal grievance process prior to initiating a formal grievance. Inmates may skip this step and initiate the process at the formal institutional level for issues pertaining to the following: grievance of an emergency nature, grievance of reprisal, grievance alleging violations of the Americans with Disabilities Act, medical grievance, grievance involving gain time governed by Rule 33-601.101, F.A.C. Incentive Gain Time, grievance challenging placement in close management or subsequent reviews, grievances regarding the return of incoming mail governed by subsection 33-210.101(14), F.A.C., grievances regarding disciplinary action (does not include corrective consultations) governed by Rules 33-601.301–.314, F.A.C., and grievances regarding allegations of sexual abuse as defined in subsection 33-103.002(17), F.A.C. Inmates may proceed directly to the Office of the Secretary on the following issues as governed by subsection 33-103.007(6), F.A.C.: grievance of emergency nature, grievance of reprisal, protective management, admissible reading material, sentence structure issues (release date calculations), and inmate banking issues. Grievances alleging a violation of the Health Insurance Portability and Accountability Act (HIPAA) must be filed directly with the Office of the Secretary using the Request for Administrative Appeal, Form DC1-303, Request for Administrative Remedy or Appeal. Form DC1-303 is incorporated by reference in Rule 33-103.006, F.A.C.

(a) An informal grievance shall be submitted to the designated staff by placing the informal grievance in a locked grievance box. Locked boxes shall be available to inmates in open population and special housing units. A staff person from classification, the grievance coordinator's office, or the assistant warden's office shall be responsible for the key. If the staff member collecting the grievances is from classification or the assistant warden's office, he or she shall retrieve the grievances and appeals and deliver them to the institutional grievance coordinator in a locked container. The warden shall designate one staff member who shall log all informal grievances and distribute to the appropriate department or staff. Grievances shall be picked up and forwarded by the institutions daily Monday through Friday.

(b) After being logged, informal grievances shall be forwarded to the staff member who is responsible in the particular area of the problem, the classification team, the appropriate section head, or other institutional staff. When an informal grievance is received by the reviewing authority as defined in Rule 33-103.002, F.A.C., the reviewing authority shall respond to the grievance or refer the grievance to a staff member for response.

(c) The inmate shall not file duplicate informal grievances with different staff members.

(2) When submitting an informal grievance, the inmate shall use Form DC6-236, Inmate Request, and shall:

(a) Check the appropriate box indicating to whom he is submitting the informal grievance. If the inmate checks the box designated "other," and elects to name a specific staff member, the final determination of the appropriate person to handle the grievance shall ultimately be made by staff. The inmate shall complete the other sections of the heading;

(b) On the line reading "Request," the inmate shall check the box to indicate that Form DC6-236 is being used as an "Informal Grievance." Failure to do this will cause the request to be handled routinely and it will not be considered an informal grievance. This will also cause the form to be unacceptable as documentation of having met the informal step if it is attached to a formal grievance submitted at the next step.

1. The act of asking questions or seeking information, guidance, or assistance is not considered to be a grievance. Answers to inmate requests of this nature shall not be considered as documentation of having met the informal step if they are attached to a formal grievance submitted at the next step. Inmate requests improperly submitted as informal grievances shall be treated

F.A.C. Ch. 33-501.301(4)(f) Inmates shall be limited to possession of **no more than 15 research items** from the law library. Research items shall be loaned for a **maximum of 21 days**. Inmates who fail to **return research items within 21 days** shall be subject to disciplinary action as provided in Rules 33-601.301–.314, F.A.C. Institutions shall also limit the accumulation of research materials when possession of same in an inmate's cell creates a safety, sanitation, or security hazard.

http://www.flrules.org/Gateway/reference.asp?No=Ref-01220. The effective date of the form is 6-18-07.

(2) Inmate Orientation. Through the use of a standardized lesson plan, inmates will receive training in the use of the inmate grievance procedure by institution or facility staff. Inmates shall sign a statement acknowledging receipt of training on the inmate grievance procedure. A copy of this statement shall be placed in the inmate file. Form DC1-307, Acknowledgement of Receipt of Grievance Orientation, shall be used for this purpose. Form DC1-307 is hereby incorporated by reference Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500. http://www.flrules.org/gateway/reference.asp?No=Ref-01221. The effective date of the form is 10-11-00.

(a) All incoming inmates shall receive training in the grievance procedure at the institutions that are designated for reception and orientation.

(b) When inmates are transferred from one institution or facility to another, they shall receive training in the inmate grievance procedure as part of their orientation at the new location.

(c) The orientation program shall include the following:

1. Receipt of written notification of the grievance procedure;

2. Availability of the written procedure in any language spoken by a significant proportion of the institution's population, and appropriate provisions for those speaking other languages and for the impaired and disabled;

3. Participation in orientation in which the grievance procedure is explained and in which there is an opportunity to ask questions and have them answered orally; and

4. Provisions for the impaired and disabled to participate in an orientation program.

**AUTHORITY**
$ Authority 944.09 FS.

Law Implemented 944.09 FS.

**HISTORY**
New 10-12-89, Amended 1-15-92, 4-10-95, 12-7-97, Formerly 33-29.003, Amended 8-1-00, 10-11-00, 2-13-03, 10-9-05, 5-27-12.

**33-103.004 Inmate Grievances - Staff and Inmate Participation.**

(1) Inmate and employee participation in the grievance process will take the form of solicitation of written comments by inmates and employees on selected formal inmate grievances that staff determine will significantly impact the inmate population and which challenge general procedures and practices prior to the initial adjudication of the grievance. Each institution shall within 5 calendar days of receipt, post copies of this type of formal grievance on inmate and employee bulletin boards, circulate among all inmates in all disciplinary, administrative, and close management areas, including all inmates under sentence of death. These grievances shall be posted and circulated without identification of individual names or identifying facts. Written comments must be received in the office of the reviewing authority as defined in Rule 33-103.002, F.A.C., within 5 calendar days from the date of posting in order to receive consideration. With the exception of submitting written comments, no inmate or employee who appears to be involved in the matter shall participate in any capacity in the final resolution of a grievance.

(2) Inmates and employees have the opportunity to review the effectiveness and credibility of the department's grievance procedure through the submission of written comments to the reviewing authority as defined in Rule 33-103.002, F.A.C. The reviewing authority shall review and respond to written comments received and institute procedural changes as appropriate. Comments received relating to this rule that are outside the decision making authority of the reviewing authority as defined in Rule 33-103.002, F.A.C., shall be forwarded to the Office of the General Counsel for review and appropriate action. If the comments or complaint focuses on the implementation of the rule at a particular institution, the reviewing authority as defined in Rule 33-103.002, F.A.C., has the authority to make necessary changes in this implementation consistent with the rule. If the comments or complaint deal with the content of the rule itself and the only way a change could be effected would be to change the rule, then it needs to be forwarded to the Office of the General Counsel. The Office of the General Counsel shall review the complaint to see if there appears to be a problem with the rule itself. If changes are necessary, the Office of the General Counsel coordinates the rule promulgation process. The warden shall receive a response and in turn advise the employee or inmate.

F.A.C. Ch. 33-501.301(4)(f) Inmates shall be limited to possession of **no more than 15 research items** from the law library. Research items shall be loaned for a **maximum of 21 days**. Inmates who fail to **return research items within 21 days** shall be subject to disciplinary action as provided in Rules 33-601.301–.314, F.A.C. Institutions shall also limit the accumulation of research materials when possession of same in an inmate's cell creates a safety, sanitation, or security hazard.

---

as inmate requests and the inmate shall be advised that he cannot appeal the response.

2. When completing the inmate request form for submission as an informal grievance, the inmate shall ensure that the form is legible, that included facts are accurately stated, and that only one issue or complaint is addressed. The inmate must limit all grievance narrative to Form DC6-236, and only two additional pages of narrative will be allowed. The inmate shall sign and date the form and write in his Department of Corrections number and forward the informal grievance to the designated staff person. If an inmate fails to sign his grievance, it shall result in a delay in addressing the grievance until it can be verified that it is that inmate's grievance. Form DC6-236 is incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500, http://www.flrules.org/Gateway/reference.asp?No=Ref-10011. The effective date of the form is 11/18.

(3) Upon receipt of the informal grievance, the recipient shall note the date on the form. The institutional greivance coordinator shall date-stamp Form DC6-236, in the designated area on the form, with the date the grievance was retrieved from the grievance box.

(4) The informal grievance shall be responded to within 15 days of the initial receipt date as noted on the informal grievance log.

(a) The recipient shall provide the inmate with a written response even if an interview with the inmate has occurred concerning the subject matter of the grievance. This is required due to the fact that if the inmate desires to pursue his grievance at the next level, except in cases previously noted, he is required to attach a copy of his informal grievance and response.

(b) The recipient shall state that the grievance is either approved, denied, or returned without action. The response shall also state the reason or reasons for the approval, denial, or return.

(c) The recipient shall then sign and date the form and cause the informal grievance to be returned to the inmate. The inmate shall receive the original and one copy of the informal grievance. The second copy shall be forwarded to the correctional sentence specialist for placement in the inmate's file.

(5) It is the policy of the department that all inmate request forms be answered.

**AUTHORITY**
$ Authority 944.09 FS.

Law Implemented 944.09 FS.

**HISTORY**
New 10-12-89, Amended 1-15-92, 12-22-92, 3-30-94, 4-17-94, 4-10-95, 8-10-97, 12-7-97, 2-17-99, Formerly 33-29.005, Amended 8-1-00, 2-9-05, 3-25-08, 1-31-10, 5-27-12, 11-7-12, 11-24-13, 4-20-14, 12-30-14, 11-7-18.

**CASE NOTES**
**ANNOTATIONS**
Exhaustion of administrative remedies

An inmate prematurely filed his complaint, prior to exhausting his administrative remedies pursuant to Rules 33-103.005 - .007, F.A.C. Consequently, the court dismissed the action without prejudice for failure to state a claim. Strattan v. Langford, 2008 U.S. Dist. LEXIS 2614 (M.D. Fla. Jan. 14, 2008).

A court determined that it was clear that an inmate did not properly and fully exhaust his administrative remedies with regard to any of the medical claims set forth in his Amended Complaint so that summary judgment was properly granted to the defendants. Specifically, the inmate did not appeal the denial of his informal grievance to either the institutional level or to the Secretary of the DOC as required by Rule 33-103.005, F.A.C. Laurencio v. Sec'y, Dept. of Corr., 2006 U.S. Dist. LEXIS 68585.

An inmate's motion seeking a temporary restraining order and/or a preliminary injunction was dismissed where he failed to first complete the three-step grievance process set forth in Rules 33-103.005, 33-103.006, and 33-103.007, F.A.C. Frierson v. Robinson, 2006 U.S. Dist. LEXIS 49864.

State prisoner's civil rights complaint under 42 U.S.C.S. 1983 challenging his medical treatment was properly dismissed for failure to exhaust administrative remedies under 42 U.S.C.S. 1997.e because the record was devoid of evidence that the issues were presented in informal or formal grievances and appeals as established under Rules 33-103.005, 33-103.006, 33-103.00, and 33-103.008, F.A.C. Kozuh v. Nichols, 2006 U.S. App. LEXIS 15712, 185 Fed. Appx. 874.

An inmate's grievance was not accepted because he failed to initiate the grievance process at the institutional level as required by Rules 33-103.005, 33-103.006, 33-103.007, 103.008 and paragraph

F.A.C. Ch. 33-501.301(4)(f) Inmates shall be limited to possession of **no more than 15 research items** from the law library. Research items shall be loaned for a **maximum of 21 days**. Inmates who fail to **return research items within 21 days** shall be subject to disciplinary action as provided in Rules 33-601.301–.314, F.A.C. Institutions shall also limit the accumulation of research materials when possession of same in an inmate's cell creates a safety, sanitation, or security hazard.

33-103.011(1)(c), F.A.C., prior to his case filing. The inmate had not exhausted his administrative remedies. Southers v. Lake Corr. Inst., 2005 U.S. Dist. LEXIS 35447.

Although paragraph 33-103.005(2)(b), F.A.C., did not require that an inmate's grievance forms include details about his complaints, the inmate's civil rights suit was dismissed because he had failed to exhaust his administrative remedies when the grievances that he submitted pursuant to Rule 33-103.005, F.A.C., did not contain enough information to allow prison officials to have taken responsive measures. Under the Prison Litigation Reform Act, inmates must exhaust administrative remedies prior to filing actions of this type. See 42 U.S.C. 1997.e(a). Inmate filed (and pursued to the end of the line) grievances and appeals challenging the taking of his contact lenses. The only issue is whether those filings were sufficient to exhaust his remedies with respect to the claim never mentioned in the administrative process - that the lenses were taken because of inmate's sexual orientation. Goldsmith v. White, United States District Court for the Northern District of Florida, Panama City Division, 2005 U.S. Dist. LEXIS 2920, February 28, 2005, 357 F. Supp. 2d 1336.

The Florida Administrative Code required that private facilities adopt inmate grievance procedures that were consistent with the Department of Corrections' procedures. All state prisoners, regardless of whether they were incarcerated in a state owned and operated prison or in a facility that was run by a private corporation under contract with the state, were required to exhaust these procedures before filing any civil complaint relating to the care and custody of inmates. Adlington v. Mosley, 757 So.2d 573, 2000 Fla. App. LEXIS 4791, 25 Fla. L. Weekly D 1019.

Medical grievances

In cases of a grievance relating to medical care, inmates are permitted to bypass the informal grievance step and begin the process at the formal grievance step pursuant to Rule 33-103.005, F.A.C. Thus, an inmate exhausts his administrative remedies when he properly files a medical grievance at the formal grievance level and the appeal grievance level. Sorrells v. Singer, 2008 U.S. Dist. LEXIS 100831 (M.D. Fla. Dec. 15, 2008).

Requirements

Although the inmate complained of being beaten in an Inmate Request, the court construed Rule 33-103.005, F.A.C. as defining an Inmate Request differently than an informal grievance, thus, the

inmate failed to file the proper form to initiate the grievance process on his claim of excessive use of force. Soloc v. Todd, 2009 U.S. Dist. LEXIS 60207.

Subparagraph 33-103.005(2)(b)2., F.A.C., and paragraph 33-103.006(2)(f), F.A.C., do not state that a prisoner needs to specifically name the defendants in a grievance. Rather, the rules only require that "the included facts are accurately stated" in a grievance. LaFlower v. Matthewson, 2007 U.S. Dist. LEXIS 7962.

**33-103.006 Formal Grievance - Institution or Facility Level.**

(1) When an inmate decides to file a formal grievance, he or she shall do so by completing Form DC1-303, Request for Administrative Remedy or Appeal, and filing within the time limits set forth in Rule 33-103.011, F.A.C. Form DC1-303 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500. http://www.flrules.org/Gateway/reference.asp?No=Ref-03315. The effective date of the form is 11-13.

(a) In institutions and private correctional facilities, inmates shall direct this form to the warden or assistant warden or deputy warden as defined in paragraph 33-103.002(15), F.A.C.

(b) In road prisons, vocational centers, work camps, community correctional centers and contract facilities the form shall be sent to the warden or assistant warden of the supervising institution.

(2) Procedural Requirements.

(a) The inmate shall fill out the identifying data at the top of the form, printing his committed name, Department of Corrections number, institution or facility name and checking the appropriate box.

(b) The inmate shall sign and date the form, indicating his Department of Corrections number. If the inmate fails to sign the grievance, it shall result in a delay in addressing the grievance until it can be verified that it is that inmate's grievance.

(c) The inmate shall state his grievance in Part A. If additional space is needed, the inmate shall use attachments rather than multiple copies of Form DC1-303. Only 2 additional pages of narrative will be allowed. If the inmate writes his complaint anywhere other than within the boundaries of Part

Doc. "U"

## PART B - RESPONSE

| BELL, RICHARD | C03384 | 2101-209-087 | R.M.C.- MAIN UNIT | I4104L |
|---|---|---|---|---|
| NAME | NUMBER | FORMAL GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your request for Administrative Remedy or Appeal has been received, reviewed & evaluated.

Your request for administrative remedy is in non-compliance with the Rules of the Department of Corrections, Chapter 33-103.014 (f) (g), Inmate Grievance Procedure. The rule requires that you first submit an informal grievance at the appropriate level at the institution. You have not done so or you have not provided this office with a copy of the informal grievance, nor have you provided a valid or acceptable reason for not following the rules.

Upon receipt of this response, if you are within the allowable time frames for processing a grievance, you may submit your informal grievance, in compliance with Chapter 33-103, Inmate Grievance Procedure.

Based on the foregoing information, your grievance is returned without action.

| BD Johnson | | 1/28/21 |
|---|---|---|
| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | DATE |

MAILED
JAN 28 2021

91

Doc. "U"

**FLORIDA DEPARTMENT OF CORRECTIONS**

**REQUEST FOR ADMINISTRATIVE REMEDY OR APPEAL**

☐ **Third Party Grievance Alleging Sexual Abuse**

TO: ☑ Warden    ☐ Assistant Warden    ☐ Secretary, Florida Department of Corrections

From or IF Alleging Sexual Abuse, on the behalf of:

Bell        Richard        A.'                   C03384            R.M.C.
_____        _____        _____        _____        _____
Last        First        Middle Initial        DC Number        Institution

---

### Part A – Inmate Grievance

I am grieving D.O.C. Staff's complicity in the recent attempt on my life and their subsequent attempts to cover it up in violation of my eighth Constitutional Amendment right against cruel and unusual punishment for filing grievances and law suits. [There is no informal grievance attached to this formal level because I have made several attempts to file informal level grievances regarding the incident since waking up out of a month long coma induced by the violent incident in September. All to no avail. Not one of my informal grievances have been answered. So I am exercising my Chapter 33 afforded right to proceed to the next level in light of official's inaction.]

I was attacked in my sleep September of 2020 at Santa Rosa-Main I Unit by my cellmate at the time with a heavy confinement tray. I was beat in the face and head which knocked me into a coma, broke my jaw and eye socket, knocked out 3 teeth, created trauma induced cataracts in my right eye and massive bleeding and hemorraging of the brain. I now have memory lose and shortages; I pass out randomly and experience migraines. There are a lot more tissue and nerve damage as well that I am waiting with medical to get treatment for. When this inmate came into my cell in August he was extremely psychologically disturbed: He talks to himself and goes on rampages and becomes extremely hostile when he talks about how he believes people are talking about, and plotting on, him. His psychological issues, and violent disposition because of them, were well known to Administration, Mental Health Department, and Security because he was on psych medication for his mental deficiencies and has a long psych history. He also accrued another outside charge for assaulting a L.E.O. since he's been incarcerated because he felt the officer meant him harm. He was imposed a life sentence for that charge. I believe his violent disposition and psychological issues was why he was placed in my cell as reprisal for filing grievances and a civil law suite for

01/06/2020                              Richard Bell  #C03584
_____                              _____
DATE                                    SIGNATURE OF GRIEVANT AND D.C. #

---

**\*BY SIGNATURE, INMATE AGREES TO THE FOLLOWING # OF 30-DAY EXTENSIONS:**

92                    #  /  _____
                                         Signature

**INSTRUCTIONS**

This form is used for filing a formal grievance at the institution or facility level as well as for filing appeals to the Office of the Secretary in accordance with Rule 33-103.006, Florida Administrative Code. When an appeal is made to the Secretary, a copy of the initial response to the grievance must be attached (except as stated below).

When the inmate feels that he may be adversely affected by the submission of a grievance at the institutional level because of the nature of the grievance, or is entitled to Chapter 33-103 to file a direct grievance he may address his grievance directly to the Secretary's Office. The grievance may be sealed in the envelope by the inmate and processed postage free through routine institutional channels. The inmate must indicate a valid reason for not initially bringing his grievance to the attention of the institution. If the inmate does not provide a valid reason or if the Secretary or his designated representative determines that the reason supplied is not adequate, the grievance will be returned to the inmate for processing at the institutional level pursuant to F.A.C. 33-103.007 (6)(d).

RP

Submitted by the inmate on: 1/15/21
                             (Date)

Receipt for Appeals Being Forwarded to Central Office

Institutional Mailing Log #: 2101-209-087          B
                                                   (Received By)

Reception & Medical Center
INSTITUTION/FACILITY

Date: 1/15/21          INMATE (2 Copies)
                       INMATE'S FILE
Initials: __           INSTITUTIONAL GRIEVANCE FILE

CENTRAL OFFICE
INMATE
INMATE'S FILE - INSTITUTION/FACILITY
CENTRAL OFFICE INMATE FILE
CENTRAL OFFICE GRIEVANCE FILE

DC1-303 (Effective 11/13)          Incorporated by Reference in Rule 33-103.006, F.A.C.

Doc. "U"

ps 2 of 3

( continuation of Santa Rosa Subverson formal grievance pg 1 )

e last paid hit officers paid for and facilitated at Columbia C.I. in 2017. When we my cellmate in confinement a knife and paid him to stab me while I was in handcuffs. I w anstered to a different region down south to Dade C.I. After the hit followed me from Colum I. to Suwannee so to prevent further attempts I was transfered to a different region and believe that is the only reason it went so long until they were able to make another attempt v life, because their is a different demographic of officers down south so their level of i nce and accessability diminished. My cellmate mentioned that he knew about that law suite ability to write grievances and asked for help filing a grievance about some property one day. s alarmed and asked how he knew about that. He looked skitish realizing he'd disclosed too much then d saying he'd heard other inmates talking about it. Santa Rosa was a relatively new camp for me and my l te had been long finished before I'd arrived there. not to mention due to COVID-19 there was no r dayroom there was no opportunity for him to learn about this from another inmate the only way he c ve learned about it was from officers. About a week before the incident I attempted to speak to icer Jacobson during showers by staying back from shower and talking to the officer while m mate was away from the cell to prevent further conflict because my cellmate and I had gott into ceral confrotations because of his psychological issues he was making accusation that I v tting to do him harm and talking behind his back. I conveyed this to officer Jacobson and he  , neither one of us was getting ~~along~~ Moved we had to either get along or kill each other." And that he  g to tell the other shifts not to move us either. He then went further to instigate conflict tween me and my cellmate by telling him on the way bringing him back to the cell after showe I told him " I wanted him moved because we kept getting into it and I was gonna end kicking his ass." When my cellmate got back to the cell we had another alercation becaus this but I was able to partially defuse the incident by admitting that I did ask the officer to move hi t I never threatened to do him any harm. He Accepted this admission without incident, how started acting really jumpy and paranoid anytime I moved around the cell ~~or~~ tried to spea i Lt. Neel as well Another day when my cellmate went to call out, he refused to move him as well. days after officer Jacobson told him I threatened to kick his ass he attacked me 3:00AM in the mor

(Continuation of Santa Rosa Subversion formal grievance pg 2)

and I woke up a month later out of a coma in Sacred heart Memorial. I had completely lost my memory of about the past previous year. Correction Officers who kept vigil over me, medical staff at the hospital filled me in on what happened and over the next several month all the pertinent details came back to me. However, while I was in the infirmary at Santa Rosa after the hospital discharged me and since I had no recollection of who my cellmate even was at that time that had happen I relied on the incident report from the Statement of facts of the discipline report they wrote him for the incident to tell me what happened and who exactly he was. In the disciplinary report it stated that an inmate named Rashaun Wright was my cellmate who assaulted me. So I conveyed this to my family so they could look him up and inform me who this person cause do to my lose of memory, staff could screw up and put me back in a cell with him and I won't even know I'm at risk. And what did my family learn? That no inmate in F.D.O.C. is even named Rashaun Wright. He doesn't exist, this is a fictious name. This is another attempt to cover up happened and conceal their complicity. They (D.O.C Staff) intentionally placed a psychologically disturbed and violently prone inmate in my cell and incited him to assault me and then attempted to cover up and conceal his identity by writing a fictious D.R. or falsifying state documents all in retribution for exercising my right to file grievances and law suites.

As remedial Action I seek that a thorough investigation by the Inspector General's office into this incident, these Officers' complicity, including the c.o. who wrote the d.r. and the inmate who assaulted me's true identity - because I have a right to know whom assaulted me - be investigated and exposed. To solidify conversation with and account of Officer Jacobson's subsequent refusal to resolve the situation and instigation of the incident please review camera footage of B-1 dorm between October , 2020 - September 11, 2020 monday, wensday, and friday at shower time and you will see me stay from shower and my cellmate leave and me call officer Jacobson to my cell. Due to brain damage and massive memory loss I can not recollect the exact date. And I had to wait to get assistance to write these grievances.

Thanks for you time and help with this Matter

94

MAILED/FILED
WITH AGENCY ~~CLERK~~          'Doc."√"

FEB 19 2021

Department of Corrections
Bureau of Inmate Grievance Appeals

**PART B - RESPONSE**

| BELL, RICHARD | C03384 | 21-6-05131 | TOMOKA C.I. | B1211U |
|---|---|---|---|---|
| NAME | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your administrative appeal to this office is in non-compliance with Chapter 33-103, Inmate Grievance Procedure, because your grievance at the institutional level was determined to be in non-compliance with the requirements of the rule.

Your request for administrative appeal is being returned without action.

A. KEATON

_____          *A. Keaton*          2|18|21

SIGNATURE AND TYPED OR PRINTED NAME OF
EMPLOYEE RESPONDING

SIGNATURE OF WARDEN, ASST.
WARDEN, OR SECRETARY'S
REPRESENTATIVE

DATE

95

Doc. "V"

**FLORIDA DEPARTMENT OF CORRECTIONS**

**REQUEST FOR ADMINISTRATIVE REMEDY OR APPEAL**

RECEIVED
FEB 1 6 2021
Department of Corrections
Inmate Grievance Appeals

☐ **Third Party Grievance Alleging Sexual Abuse**

TO: ☑ Warden        ☐ Assistant Warden        ☑ Secretary, Florida Department of Corrections

From or IF Alleging Sexual Abuse, on the behalf of:

| Bell | Richard | A. | C03384 | R.M.C |
|------|---------|-----|--------|-------|
| Last | First | Middle Initial | DC Number | Institution |

---

**Part A – Inmate Grievance**        21-6-05131

I am grieving D.O.C. Staff's complicity in the recent attempt on my life and their sub sequent attempts to cover it up, in violation of my eigth Constitutional Amendment right Against cruel and unusual punishment for filing grievances and law suites

[My institutional level formal grievance was denied for not attaching my informal level grievance but as I conveyed at the beginning of that formal level I did attempt several times to utilize institutional informal level to no avail. Not one of my informal level grievances pertaining to this incident has been answered My attempts at seeking remedy for this dire situation is being thwarted by the institutions refusal to address or even acknowledge my grievances. So inlight of the institutions refusal to answer my grievances pur F.A.C. 33-103.007 I am proceeding to the next level and I pray your office will acknowledge the validity of my reason for moving forward with my claim and the severity of the situation and grant me remedy.]

I was attacked by my cellmate in my sleep with a heavy confinement tray he was allowed to keep over night September 11, 2020 at Santa Rosa-Main Unit. I was beat in the face and head which knocked me into a coma, broke my jaw, and eye socket, knocked out 3 teeth, I also sustain trauma induced cataracts in my right eye which I now have to have surgery for and massive bleeding and hemmoraging of the brain. I now have memory lose and Shortages. I pass out randomly and suffer severe migraines. There are alot more damage and issues resulting from this attack I am still trying to get treatment for, esp psychologically. When this inmate came into my cell close to a month earlier in August 2020 he was extremely mentally disturbed. He talks to himself And goes on rampages becoming extremely hostile when he talks about how he believes people are talking about him and plotting to harm him. His psychological issues and violent disposition because of them were well known to Security and Administration and Mental Health Department because he's been recieving treatment for them, i.e.

| 02/03/2021 | Richard Bell #C03384 |
|------------|------------------------|
| DATE | SIGNATURE OF GRIEVANT AND D.C. # |

---

***BY SIGNATURE, INMATE AGREES TO THE FOLLOWING # OF 30-DAY EXTENSIONS:**

96                    /

#        Signature

**INSTRUCTIONS**

This form is used for filing a formal grievance at the institution or facility level as well as for filing appeals to the Office of the Secretary in accordance with Rule 33-103.006 Florida Administrative Code. When an appeal is made to the Secretary, a copy of the initial response to the grievance must be attached (except as stated below).

When the inmate feels that he may be adversely affected by the submission of a grievance at the institutional level because of the nature of the grievance, or is entitled by Chapter 33-103 to file a direct grievance he may address his grievance directly to the Secretary's Office. The grievance may be sealed in the envelope by the inmate and processed postage free through routine institutional channels. The inmate must indicate a valid reason for not initially bringing his grievance to the attention of the

Doc. "V"

Pg 2 of 3

(Continuation of Santa Rosa Subversion formal Secretary office level grievance)
psych medication and counseling he's been recieving even before his incarceration. and since his incarceration. And since his incarceration he was charged with "additional case for Assaulting a L.E.O. with a weapon because he felt the officer meant him harm. I believe his violent disposition and psychological issues were why he was placed in my cell as reprisal for filing grievances And civil law suite for tha last paid hit officers paid for and facilitated at Columbia in 20 when officers gave my cellmate in confinement a knife and paid him to stab me while in han cuffs. I believe the only reason it went so long before they were able to make another attempt on my life because I was transfered to a different region to Dade C.I. after the hit followed me from Colun C.I. to Suwannee Annex So because there's a different demographic of officers down Sou My cellmate mentioned that he knew about that law suite and my ability to write grievances and ask for help filing a grievance about property one day. I was alarmed and asked how he knew Abo that. He looked skittish realizing he'd said too much, then lied saying he'd heard other inmates talking it. Santa Rosa was a relatively "new institution for me and my law suite had been long finished be I'd arrived there. Not to mention because of COVID-19 there was no recreation or dayroom There was no opportunity for him to learn about my law suite from Another inmate, the only way he co have learned about it was from officers. About a week prior to the incident I attempted to speak to B-wing's officer Jacobson during showers by staying back from shower (because of brain tra caused in the incident my memory is no longer good enough to remember the exact date but if you review B-1 fix wing Camera between October 25, 2020 - September 11, 2020 Monday, Wensd and Friday at shower time you will see me stay back from shower and call officer Jacobson to Cell-B1114 and confer with him after my cellmate leaves and goes to shower.) I stayed back from Shower to speak to An officer while my cellmate was gone in an attempt to prevent further conflict b ause my cellmate and I had already gotten into several confrontations ~~altercations~~ because of his psychological is he was making accusations that I was plotting to harm him and talking behind his back. I convey this to officer Jacobson and he replied " No neither one of you guys are getting moved! Y'all Are eit going to get along or go ahead and kill each other." And that he was gonna tell the other shif not to move us either. He then went further to instigate conflict between me and my cellmate telling him on the way bringing him back to the cell that I told him " I wanted my cellm. moved because we kept getting into it. otherwise I was about to end up kicking his ass." Wh my cellmate got back to the cell we ended up having another altercation because of this howeve I was partially able to defuse the situation by admitting I did ask the officer to move one of us i ~~that~~ but that I never threatened to do him any harm. He accepted this admission without any further inciden however he started acting really jumpy and paranoid around me anytime I moved around the cel I also tried to speak to Lt. Neel as well another day when my cellmate went to callout, he refu

97

Doc."V"

Pg 3 of 3

(Continuation of Santa Rosa Subversion Formal Secretary office level grievance)

to move either of us as well. A few days later after Officer Jacobson told him I threatened h
"to kick his ass" he attacked me 3:00 A.M. in the morning and I woke up a month later out o
a coma in Sacred Heart Memorial Hospital. I had completely lost my memory of everything pertaining to t
last year. Correction officers whom took shifts keeping vigil over me and medical staff at the hos
al filled me in what happened and over the next several months bits and pieces of the past year
came back to me. However, while in the infirmary at Santa Rosa after the hospital discharged me the D.
Investigator Sergeant brought me the d.r. they were about to serve my former cellmate and to as
me to give a written statement but I had no recollection of what had happen, I couldn't even rec
                                         or who he was
my cellmate's name. So I depended on the statement of fact of the d.r. to tell me what happened and
exactly who he was. In the D.R. it stated that an inmate named Rashaun Wright was my cellmate
who attacked me. So I informed my family so they could look him up and inform me who this pe
on was because due to my memory loss staff could screw up and put me back in a cell with thi
person and I wouldn't even know I'm at jeopardy, and what did my family learn? That no inmat
in F.D.O.C even exists named Rashaun Wright, this is a fictitious name utilized in another
attempt to cover up what happened and conceal these officers' complicity. They (D.O.C. Staff) in
tionally placed a psychologically deranged and violent prone inmate in my cell and incited him t
assault me and then attempted to cover it up and conceal his identity by falsifying D.O.
documents and records, writing a fictitious d.r. All as retribution for exercizing my righ
to file grievances and law suites.

        As remedial action I seek a thorough investigation by the inspector
generals office into this incident, these officers complicity including the C.O. who
wrote this fictitious report. And that the identity of the inmate who assaulted
me be established and that I be informed because I have a right to know,
for my own safety sake, whom assaulted me. I further ask that the provided
video footage be reserved in the event further litigatons become necessary.

        Thank you for your time and consideration

                                        Respectfully Submitted
                                        Richard Bell   #C053

                    47    98

Doc. "W"

# AFFIDAVIT

**Affiant:** Richard Allen Bell DC# C03384

**Date:** _____

**State of** Florida                    )

**In the County of** _____ )

I, Richard A. Bell                                        , do hereby swear that the

following statement is true and correct, made on my own free will and free of duress and is

made from my own personal knowledge;

1. I Am Richard A. Bell DC# C03384, A Florida Department of Corrections inmate currently housed At Charlotte Correctional Institution

2. I Am Over 18 years old

3. I was Also A Florida Department of Corrections inmate housed at Santa Rosa Correctional Institution At the time of the August 2020 to September 2020 incidents described in the instant Second Amended Complaint.

4. I expressly deny the Defendants Assertion of my having a history of not getting Along with my cellmates. In over 16 consecutive year of incarceration I have only (3) infractions involving physical violence, only (2) of those involving Another inmate, And None of those involving a cellmate. My first infraction for refusing a cellmate was not incurred until after the 9/11/2020 inmate Assault incident. And my comment from the July 17, 2023 deposition that "Every time I get a cellmate, they try to kill me" was taken out of context. It was stated in a humorous manner And spoken figuratively. I have only been assaulted by (2) cellmates, however, both incidents occured over a (4) year span, with weapons, And while I was in handicap situations. So that I no longer feel comfortable cohabitating cells.

99

5. I refute the Defendants' characterization of me as a "psych patient" at the time of the August of 2020 to September 11, 2020 incidents. Though prior to the September 11, 2020 attack I did recieve mental health treatment, I had only ever been diagnosed and treated for depression.

6. I deny Defendants' assertion that I have "virtually no independent recollection of the attack. I clearly state in both my sworn statements given in my Second Amended Complaint and the July 17, 2023 deposition that I remember being hit, waking up in the dark, seeing Mike poised over me to strike me again with something large in his hands that I couldn't quite determine what it was because it was dark, before I was subsequently struck again and knocked unconscious. See Deposition transcripts of Richard Bell dated July 17, 2023, pg. 76, L. 10 - pg. 77, L. 9; and Second Amended Complaint, Statement of Facts, paragraph 33.

7. I emphatically deny having ever alleged Defendants had no intention of hurting me. To the contrary during the July 17, 2023 deposition I was questioned wether I think Defendant Jacobsen's actions were reckless and deliberate and wether he intended for me to be hurt. To which I answer to all these questions, "Yes, sir." (See, Id., pg. 130, L. 1-12). Defendants are again attempting to take my statement out of context when refering to (Id., pg. 104, L. 25 - pg. 106, L. 17) I was questioned, and answering, in respects to Defendant Jacobsen's motives, not intent.

8. I am unable to produce a copy at this time of the falsified disciplinary report written against inmate Rashan Mike for the September 11, 2020 assault on me, that omits the presence and use of the weapon (confinement tray), because I have attempted to obtain it myself though FDOC will not relinquish it to me for security reasons (Affidavit of Richard Bell Attachment Exhibits "A" - "E"). I then sought to obtain it during Discovery via Request for Production of Documents (See, Affidavit of Richard Bell Attachment Exhibit "F", Request for Production #7). The disciplinary report was not produced by Defendants so I filed a Motion To Compel with this court seeks the court to order Defendants to produce the disciplinary report, however, that Motion was unsuccessful. Therefore, at this time I am unable to substantiate my claim of officials' attempts to conceal evidence of Defendant Jacobsen's complicity and culpability by producing the falsified disciplinary report.

9. I am unable to produce any additional documentation evidence beside Isaac Day's

Doc."W"

Sworn Affidavit establishing his housing location at the time of the September 11, 2020 inmate Assault incident at Santa Rosa C.I. involving me and Rashan Mike to refute Defendants' assertion that Isaac Day was not housed at Santa Rosa B-dorm Cell 1112 at the time of the incidents described in his sworn Affidavit, because I am also a Florida Department of Corrections prisoner who is currently housed on Close Management level one meaning I have no ability to contact Isaac Day to obtain any possible documents in his possession verifying his location at that time. Isaac Day is not currently housed at Charlotte Correctional Institution, where I am currently located. And as a FDOC prisoner Florida Administrative Code forbids me from obtaining such official documents pertaining to another inmate through the institution. However, I can attest to Isaac Day being present and located at Santa Rosa B-dorm Cell 1112 at the time of the September 11, 2020 incident described in my Second Amended Complaint from my own personal knowledge.

10. I am unable to produce evidence that my approximate date given for when Defendant Jacobsen Allowed my former cellmate Rashan Mike to retain a tray because Defendants have failed to comply with the Court's September 14, 2023 order ordering Defendants to produce daily security rosters for August 30 through September 8 of 2020. I had previously requested these documents during Discovery proceedings in order to establish, Among other factors, the accuracy of my Approximate date I claim Defendate Jacobsen Allowed Mike to retain the tray and to show that even if the Approximate date was slitely inaccurate it is not grossly so, to the point of amounting to a fraud.

11. I am unable to produce and use more corroborating testimony given in my July 17, 2023 deposition as evidence to support my claims in establishing material facts for the record because although I requested copies of those transcripts from the Defendants during the deposition, they were never produced. On October 25, 2023 I mailed a motion to the Court for an extension of time and a order ordering Defendants to provide me copies of the July 17, 2023 deposition transcripts at my expense. To present date I have not recieved that Court order and due to the present deadline for my Response to Defendant's Summary judgment motion, I do not have the excess time to wait any longer and still meet that deadline.

101

Doc. "W"

12. Regarding the discrepancy over my statements given in my Complaint and declaration conflicting with my statement given at deposition pertaining to my explanation of when and how I first learned I'd been assaulted with a tray. The statement given in my complaint and declaration are the correct recount of this matter. As I indicate in the July 17, 2023 deposition I was given no fore knowledge of an impending deposition and was caught unprepared and off guard. (See Doc. X, pg. 106, L.18-21) The comment made at deposition when I identified Issac Day as being the one who initially shed light on the fact that the tray was used to assault me in the 9/11/2020 attack was a tray was a incorrect statement made by genuine mistake. Hospital personnel were the first to indicate that I had "supposedly" been beaten with a tray. However, they couldn't give me personal knowledge to establish definitely that it was a tray. They were relaying rumors allegedly passed along by officers. Even though those rumors were later supported by relevant information concerning my injuries and later again by my returning memory as my head injuries healed. However, I was not given definite and credible knowledge by someone with personal knowledge that the weapon used in the 9/11/2020 attack was a tray until I, Issac Day, as set forth in my Complaint at paragraph 41, 45, and 47-50; and in my declaration, paragraph 18-20.

Doc. "W"

## DECLARATION OF OATH

Under the penalties of perjury, I, _Richard A. Bell_, declare that I have read the foregoing 'AFFIDAVIT' and that the facts stated in it are true, pursuant to Florida Statutes, Chapter 92.525, on this ___ day of _November 17_, 20_23_.

_Rich A Bell_
Affiant, Declarant

## NOTARY

STATE OF FLORIDA)
COUNTY OF _Charlotte_ )

Before me, the undersigned authority, this day personally appeared _Richard Bell_, who first being duly sworn, says that he is the Defendant/Appellant/Petitioner in the above styled cause, that he has read the foregoing document, and has personal knowledge of the facts and matters therein set forth and alleged and that each and all of these facts and matters are true and correct.

_Erika Mcdermott_
(your signature)

The forgoing instrument was acknowledged before me this _17_ day of _November_, 20_23_, by _Richard Bell_ who is personally known to me or has produced a Department of Corrections I.D. as identification and who did take an oath.

_4/14/2027_                                    103
MY COMMISSION EXPIRES

ERIKA MCDERMOTT
Notary Public
State of Florida
Comm# HH376028
Expires 4/14/2027

_____
NOTARY PUBLIC



Doc. "X"

Richard Bell

*vs.*

Jacobsen

Deposition of:

RICHARD BELL

July 17, 2023

Vol 1

**LEXITAS**

**EXHIBIT "D"**

104

Doc. "X"

Richard Bell
July 17, 2023

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

Case No.: 3:22-cv-04701-MCR-HTC

RICHARD ALLEN BELL,

Plaintiff,

V.

JACOBSEN, et. al.,

Defendants.
_____/

DEPOSITION OF
RICHARD BELL

VOLUME 1  (Pages 1-160)
Monday, July 17, 2023
9:20 a.m. - 2:22 p.m.

In Person Deposition

Charlotte Correctional Institution
33123 Oil Well Road
Punta Gorda, Florida 33955

Stenographically Reported By:
Paige E. Kelleher,
Stenograph Machine Shorthand Reporter

Job No.: 318558

105

Doc. "X"

Richard Bell
July 17, 2023

Page 2

```
 1    APPEARANCES

 2

 3    On behalf of the Plaintiff

 4    Richard Bell, Pro Se

 5

 6
      On behalf of the Defendants
 7
      Raymond F. Higgins, III, Esq.
 8    Larry Matthews, Esq. (Appearing by phone.)
      MATTHEWS & HIGGINS, LLC
 9    913 Gulf Breeze Parkway #33
      Gulf Breeze, FL 32561
10    (850) 434-2200
      RHiggins@matthewshigginslaw.com
11    LMatthews@matthewshigginslaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Doc. "X"

Richard Bell
July 17, 2023

Page 3

1   INDEX

2                                                    Page

3   Deposition of Richard Bell

4          Direct Examination by Mr. Higgins          4

5
    Certificate of Oath                             159
6   Certificate of Reporter                         160

7

8

9   EXHIBITS

10                                                   Page

    (None were marked/identified.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Doc. "X" Case 3:22-cv-04701-MCR-HTC   Document 90-4   Filed 10/19/23   Page 5 of 19

Richard Bell
July 17, 2023

Page 51

```
 1      A.      No.   That's when I went to ICT.   I
 2  believe it was in July.
 3      Q.      July 2020 you went to ICT.   And that's
 4  when they evaluated you?
 5      A.      Right.   In August.
 6      Q.      ICT, that's where they evaluate --
 7      A.      Right.   And at that time, I would have
 8  either got released or continued, and I got --
 9      Q.      They continued you in what CMII?
10      A.      CMIII.
11      Q.      Continued on CMIII?
12      A.      For six more months because of that
13  incident.   No, I believe it was a 90-day review.
14      Q.      Okay.   So whatever it is, it took you
15  passed the incident.   Right?
16      A.      Yes, sir.   And that following week is
17  when they brought Rashan Mike to my cell.
18      Q.      So that would have been --
19      A.      August.
20      Q.      August?
21      A.      First week of August.
22      Q.      2020, Mike went to your cell.   And you
23  tried to get him kicked out as well?
24      A.      Well, that was down the line.   That was
25  after incident after incident.   He came inside -- I
```

Doc. "X"

Richard Bell
July 17, 2023

Page 60

1    didn't do nothing to those people.

2        Q.    All right.  So now we're back here at

3    Charlotte in June of '21.  And you've been here since

4    June of '21?

5        A.    Yes, sir.

6        Q.    What type of CM are you under right now?

7        A.    I'm on CMI.  Every time they -- they just

8    put me back on CMI.  They done dropped me down to CMII.

9    I don't want no cellmate no more.  I don't want a

10   cellmate.  Every time I get a cellmate, they try to kill

11   me.

12       Q.    So you're CMI.  Is that the highest level

13   of security?

14       A.    Yes, sir.

15       Q.    Have you been in CMI since June of 2021?

16       A.    Yes, sir.  Like I said, they dropped me

17   down to CMII.  And I did that for my family; my mom.

18   When you come down to CMII, you're able to talk on the

19   phone twice a month instead of once a month.  You can

20   try to get your tablet and stuff like that.  You have

21   more communication with your family and stuff like that.

22              But when you come down, you also have to

23   have a cellmate.  I can't -- I can't be having a

24   cellmate.  I don't mind being on the compound free and

25   stuff and all that when you get CMII.  You can come out

109

Richard Bell
July 17, 2023

Page 76

```
 1   for me.

 2        Q.     So what year is this?

 3        A.     2021.

 4        Q.     2021.  So a little over a year after the

 5   incident?

 6        A.     Right.

 7        Q.     November 15, 2021, that's when you first

 8   saw him?

 9        A.     Right.

10        Q.     Now, prior to meeting him in

11   November 2015, do you recall anything of the incident?

12        A.     Yeah.  Little parts and little things

13   over the span of time.  I remember, like -- I don't

14   know, little things would trigger inside my memory.

15   Like, at one point in time, I think it was around

16   August, I kind of remembered -- like, I be laying in my

17   bed and I be trying to remember more, like, did I do

18   anything.  I don't remember nothing happening.

19               I remember waking up.  Getting hit --

20   waking up.  When I wake up, it was dark.  So when he

21   attacked me, it was dark.  I couldn't see anything.

22   It's not, like, there was a light on like right now.  It

23   was dark.  I don't remember what I seen exactly, what

24   was inside his hand.  But there was something inside his

25   hand and it was big in his hand.  You know what I'm
```

Doc. "X"

Richard Bell
July 17, 2023

Page 77

1   saying?  And then boom.  You know what I'm saying?  And

2   then, like, I was -- but I don't -- like, as far as --

3   as far the attack, that's the only thing -- that's the

4   only part of the attack that I remember.

5        Q.     Okay.  Even in August of 2021, the only

6   thing that you remember is waking up, getting hit, and

7   something in his hand?

8        A.     And something big was in his hand.  It

9   was Antonio Day that said it was a tray.

10       Q.     Antonio Day, you mean Isaac?

11       A.     Isaac.  My bad.  Sorry.  Isaac Day was

12   the one who shed the light that it was actually a tray.

13       Q.     And he told you that in November of 2021?

14       A.     Yes, he did.  He's the one that told me

15   that and I'm, like, okay.  I have to keep remembering.

16   I remember it was dark.  When the light come, you

17   know -- when I woke up -- something woke me up.  I don't

18   think I even felt the pain from the first hit.

19   Something just woke me up.  And I guess that was from

20   him hitting me.  And I'm looking up and he was over me.

21   You know what I'm saying?  And I remember seeing his

22   teeth.

23       Q.     Slow down here.  What were you seeing?

24       A.     I remember seeing his teeth.  And he had

25   something big in his hands.  That's it.

111

Richard Bell
July 17, 2023

Page 84

1    beginning?

2        A.    No.  We were, like -- we had -- I tried

3    to make the most of it.  I'm already on a 90 and I'm

4    supposed to get off CM.  So I was trying to make the

5    best of a bad situation.  He was bugged out.  He was

6    bugged -- I mean, he was a psych patient.  We all psych,

7    but he, like, had more -- how would you say it -- the

8    word -- symptoms.

9        Q.    Okay.  So in August of 2020, you and he

10   did not get along?

11       A.    He was paranoid.  He was, like, paranoid.

12   He made a statement that was, like, around -- he felt,

13   like, the police was against him.  Because he had

14   assaulted an officer inside -- that's part of his crime.

15   That's why he have a life sentence for violent crime.

16   While he was inside the county jail, he believed the

17   officers were plotting on him.  So he got in a fight

18   with a police officer.  You know those little weapons

19   you cut the seatbelts with?  The officer -- he tried to

20   stick the office on the side of the head.  So he got

21   assault on an officer with a deadly weapon.  That's one

22   of the reasons he -- that was all based upon he felt,

23   like, the officers were plotting on him.

24       Q.    Okay.

25       A.    The dude told me that if he finds out

Doc. "X"

Richard Bell
July 17, 2023

Page 88

1    already happened to me, and I had an inmate attack me

2    while I was in handcuffs.

3        Q.    So you're telling me that sometime the

4    end of August, first part of September, you wrote a

5    grievance?

6        A.    Informal; informal grievance.

7        Q.    Informal grievance?

8        A.    Yes, an informal grievance.  I wanted to

9    tell him -- you know what I'm saying?  You need to

10   remove or separate us because he has issues.  We can't

11   have an altercation and stuff like that.  You know what

12   I'm saying?

13       Q.    Do you have a copy of that grievance?

14       A.    I never got a response to it.

15       Q.    Did you keep a copy of it when you sent

16   it?

17       A.    No.  You generally don't.  When they send

18   you back your grievance, they provide you copies.

19   Normally, they provide you two copies.  One for your own

20   personal records, and one for you to go proceed to the

21   next level.  That's how you get your copy.

22       Q.    So you submitted this informal grievance

23   and they didn't give you your copies?

24       A.    No.  They never responded.  When they

25   don't respond, you don't get your copy.  Otherwise, it

Doc. "X"

Richard Bell
July 17, 2023

Page 89

1    would have been attached to my lawsuit; my complaint.

2    You see I have copies of all my grievances?  All of

3    those are the copies that I received from when I get a

4    response.  When I get a response, then I get a copy.

5         Q.    But you never got a copy back from this

6    informal grievance?

7         A.    Never got a copy.

8         Q.    Okay.  Who did you submit this grievance

9    to?

10        A.    I believe, like I said, the warden.

11        Q.    Who did you hand it to?

12        A.    The classification -- I don't know her

13   name.  Female.  Redhead.

14        Q.    Classification officer at Santa Rosa?

15        A.    Yes, sir.

16        Q.    You handed it to her?

17        A.    Yes, sir.

18        Q.    Nothing became of it after that?

19        A.    No, sir.  She put it inside the box and

20   left.  And I don't never heard anything else about it.

21        Q.    Did you ever inquire about it?

22        A.    No.  Because they have 15 days.  They

23   have 15 days from when the time -- so there was no

24   opportunity or no reason for me to be suspect why I

25   didn't hear back from them at that time until the

Doc."X"

Richard Bell
July 17, 2023

Page 97

```
 1    or both of you-all do it, you both go on strip.

 2                   I told him to hurry up and give the tray

 3    back.  Hurry up and eat and give the tray back.  And he

 4    was, like, nah.  Nah.  Jacobsen already know what's up.

 5    He straight.  He's good.  I'll give it back to him

 6    tomorrow morning.  I ain't pushing the issue.  I just

 7    left it alone.  I was cool about it.  You know what I'm

 8    saying?  He said Jacobsen already knew.  He was

 9    straight.

10         Q.    But you knew you might have gotten in

11    trouble for having that tray in your cell?

12         A.    Yeah.  That's what I was thinking.  He

13    said Jacobsen already knew what's up.  Jacobsen don't be

14    messin' with him or something like that.  Or he knew

15    about him keeping a tray.  He said Jacobsen already know

16    what's up.  He's straight.

17         Q.    But you knew that Mike had an extra tray

18    in there?

19         A.    Yeah.

20         Q.    Why do you think he had it?

21         A.    I ain't thinking he is going to use it as

22    no weapon.  I knew of incidents of dudes -- trust me,

23    I'm a long ways from the first people who had a tray

24    used against him as a weapon.  Those are hard, like, a

25    crowbar.  I wasn't thinking of it as a weapon.  You know
```

Doc. "X"

Richard Bell
July 17, 2023

Page 98

1    what I'm saying?

2         Q.      You weren't concerned he was going to

3    strike you with it?

4         A.      No.   I wasn't thinking that -- I mean, I

5    wasn't thinking he was going to use that as no weapon or

6    anything like that.   Like, I mean, I wasn't connecting

7    those dots.   I knew there was already friction inside

8    the cell like that, but I'm not thinking that's why he

9    was trying to keep the tray so he can catch me in my

10   sleep.

11        Q.      All that friction in the cell, it didn't

12   bother you that he had a weapon and he wasn't giving it

13   up?

14        A.      No.   I mean, I didn't think of it as a

15   weapon.   Like I said, at the time I didn't think of it

16   as a weapon.

17        Q.      All right.   You don't know what meal

18   would have been delivered?

19        A.      Yes.   It would have been lunch.   Lunch --

20   no dinner.   Lunch was over.   Dinner.

21        Q.      Dinner.   And when would that have been

22   delivered?

23        A.      Sometime -- depending on -- sometimes

24   they do it before shift change.   So obviously, Jacobsen

25   was there, that means it was before the shift change.

Doc. "X"

Richard Bell
July 17, 2023

Page 104

1    somehow?

2        A.    I have no -- if he did -- like I said, I

3    haven't searched his property.  I don't know what he had

4    inside that room.  But I know -- like, I hadn't seen no

5    knife.  If they found a knife inside the room, he must

6    have had the knife hidden.  He intended to kill me.

7    They dropped it down from second degree murder to first

8    degree murder.  I don't know.

9        Q.    All right.  So you're not aware of any

10   knife.  You didn't have one.  You don't think Mike had

11   one?

12       A.    No.  I didn't know nothing.

13       Q.    You didn't know anything about a knife?

14       A.    I don't know anything about a knife until

15   you just said it.

16       Q.    You saw the DR, didn't you?

17       A.    Yes, sir.  I seen the DR.

18       Q.    Okay.

19       A.    I told you that the officer -- I can't

20   remember if I read it -- because my eye was messed up --

21   and he read it to me.  But I remember that DR was read.

22   That the officer heard a commotion.  Walked to the cell,

23   and seen through the cell window Mike standing over me

24   striking me.

25       Q.    Okay.  All right.  You mentioned you

117

Doc. "X"

Richard Bell
July 17, 2023

Page 105

1   wrote a grievance and included Jacobsen's name in the

2   grievance?

3        A.     Yes.

4        Q.     This was the end of August, beginning of

5   September?

6        A.     Yes, sir.

7        Q.     Prior to that, any problems with

8   Officer Jacobsen?

9        A.     No.

10       Q.     When it came to Mike, you wanted Mike out

11  of your cell and Jacobsen didn't want to help you?

12       A.     Right.

13       Q.     Other than that, no problems with

14  Jacobsen?

15       A.     No, sir.

16       Q.     So didn't sound like he was trying to

17  retaliate against you?

18       A.     No.  Like, we had no run-ins or nothing

19  like that.  And the other prior incidents before that

20  when I had my cellmates moved -- removed from my room --

21  that didn't involve Officer Jacobsen.

22               The first time, I believe it was the

23  Sergeant.  And the second time, I believe it was

24  Officer Manners or Miller.  There's rec officers, but

25  they're still on the wing sometimes as well.  It never

118

Doc. "X"

Richard Bell
July 17, 2023

Page 106

```
 1    involved Officer Jacobsen.  The first time I got into a

 2    situation where I needed Officer Jacobsen's

 3    assistance -- you know what I'm saying?  He, like, just

 4    wanted to be a jerk to me.  Feel what I'm saying?

 5         Q.     So when you wanted Mike out of your cell,

 6    that was the first time you had any involvement with

 7    Jacobsen?

 8         A.     No.  No.  No.  No, sir.  That's the first

 9    time that I needed his assistance with, like, a

10    situation of the caliber.  Besides me getting some

11    toilet paper or getting my food tray, that was the first

12    time I needed his assistance with an incident of that

13    caliber.

14         Q.     Any previous interactions with

15    Officer Jacobsen where you had any problems with him at

16    all?

17         A.     No, sir.

18         Q.     You didn't bring any documents with you

19    today, did you?

20         A.     No, sir.  Like I said, I was surprised

21    when they said I had a legal call.

22         Q.     Okay.

23              MR. HIGGINS:  What time is it now?

24              THE STENOGRAPHER:  1:35.

25              MR. HIGGINS:  We have been going a couple
```

Doc. "X"

Richard Bell
July 17, 2023

Page 130

```
 1        Q.      You state Defendant Officer Jacobsen

 2   acted under Color of State Law and with malice and

 3   deliberate indifference to the knowledge he possessed of

 4   the substantial risk of physical violence and serious

 5   harm to the Plaintiff.  He knowingly and recklessly

 6   disregarded that risk when he intentionally further

 7   incited and enabled the assault on Plaintiff.

 8                You think this was reckless and

 9   deliberate?

10        A.      Yes, sir.

11        Q.      He intended for you to get hurt?

12        A.      Yes, sir.

13        Q.      And you base that on what?

14        A.      I base that on the fact that -- first of

15   all, he stated that he knew about Rashan Mike's mental

16   disorder and being paranoid.  I told you that he

17   assaulted a police officer because he felt like he

18   had -- he was plotting on him.  So he go behind -- after

19   a couple minutes later, you go back to him and you tell

20   him that I had threatened to assault him.  I said you

21   move him or I was going to fuck him up.  And then after

22   you tell him that, you provide him a weapon.

23        Q.      Jacobsen told Mike that --

24        A.      I said that either I was going -- they

25   were going to move him, Rashan Mike -- move my cellmate
```

Doc. "X"

Richard Bell
July 17, 2023

Page 131

```
 1   or I was going to fuck my cellmate up.

 2        Q.    And he said that to Mike in front of you?

 3        A.    He said that to Mike -- Mike came back

 4   into the cell and confronted me about that.

 5        Q.    Okay.  Mike confronted you about what

 6   Jacobsen told him?

 7        A.    Just told him on the way -- they were

 8   walking back to the shower.

 9        Q.    That's what Mike said.  Okay.  So Mike

10   told you that Jacobsen said that?

11        A.    Yes.

12        Q.    That's the only way you know that

13   Jacobsen may have said something like that?

14        A.    Yes.  And in fact -- how would he know

15   that I just spoke to Jacobsen?  How did he know when he

16   was in the shower?  How did he even know I spoke to

17   Jacobsen?

18        Q.    Okay.  But the only way you know that

19   Jacobsen may have said that is because Mike told you?

20        A.    Right.  And the fact the inference -- the

21   fact that he know that I even had the conversation with

22   Officer Jacobsen.  So Officer Jacobsen had to tell him

23   something about us having a conversation, otherwise he

24   would have had no way of knowing that I even had a

25   conversation with Officer Jacobsen.
```

Doc. "X"

Richard Bell
July 17, 2023

Page 132

1      Q.      But you have alleged that you defused

2    that situation.   Correct?

3      A.      Immediately.   That immediate

4    confrontation, I was able to -- as far as what played on

5    his conscious later on after he laid down and he

6    continued to ruminate over it, I can't speak to that.

7    But I do know at that time, that immediate altercation,

8    I was able to defuse it.

9      Q.      So there wasn't a present risk for you at

10   that time.   Is that correct?

11     A.      No, sir.

12     Q.      You allege the same thing about

13   Lieutenant Neal, that he knew that Mike was a danger and

14   refused to move you?

15     A.      Yes.   I spoke to him as well a couple

16   days later about -- and this -- also let him know about

17   inciting the incident of Officer Jacobsen.

18   Additionally, telling him everything that I told

19   Officer Jacobsen about inmate Mike.   So he had -- he had

20   the same -- all the same information that

21   Officer Jacobsen had and he choose not to act on it.

22     Q.      The first incident report or grievance

23   that I see regarding this incident is dated June 6,

24   2021.   It was sent to medical health and you believe it

25   was sent as a grievance about your general health?

Richard A. Bell, DC# C03384
Charlotte Correctional Institution
3312 3 Oil Well Road
Punta Gorda, FL 33955

MAILED FROM
CHARLOTTE
CORRECTIONAL
INSTITUTION

$ 003.65⁰
02 1P
0000930667        NOV 20 2023
MAILED FROM ZIP CODE 33955

MAILED FROM A STATE
CORRECTIONAL INSTITUTION

NOV 2 7 2023

United States District Court
Northern District of Florida
1 North Palafox Street
Pensacola, FL   32502